UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRENDA MANNING, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>ELI LILLY AND COMPANY,<br><br>    Defendant. | CIVIL ACTION No. 04-11164 (RCL) |

**DEFENDANT ELI LILLY AND COMPANY'S
MEMORANDUM OF POINTS AND AUTHORITIES
<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff Brenda Manning and her son Brian Manning ("Plaintiffs") allege they were harmed by a drug, DES, that was manufactured and ingested in 1963. Only Brenda Manning ("Ms. Manning") alleges exposure to DES. Brian Manning alleges that his injuries were caused by his premature birth, which in turn was caused by the shape of his mother's uterus, which in turn was caused by his mother's *in utero* exposure to DES. All of Plaintiffs' claims fail as a matter of law.

Under Massachusetts law, Plaintiffs must identify the manufacturer of the DES that allegedly caused their injuries from among the more than 102 companies who sold the drug in 1963. To meet this product identification burden, Plaintiffs rely on two pieces of insufficient evidence: (1) the non-exclusive pill description of Janet P. Berg ("Ms. Berg"), Plaintiffs' mother and grandmother, and (2) the testimony of William R. Principe, a pharmacist who did not step foot in the dispensing pharmacy until 1967, more than three years after Ms. Manning was allegedly exposed to DES *in utero*. Ms. Berg's pill description is insufficient because it applies equally to DES pills produced by Lilly, Squibb, and Massachusetts-based Marsh Parker, and may

B3021205.6

apply to many others. Plaintiffs have not proved that *only* Lilly's pill Ms. Berg's description. Mr. Principe's testimony is simply irrelevant because he has no personal knowledge of the stocking and dispensing practices of the pharmacy where Ms. Berg allegedly filled her DES prescription. Taken together, Plaintiffs' product identification evidence amounts to no identification at all, a result requiring summary judgment for Lilly.

Alternatively, Lilly is entitled to partial summary judgment on Brian Manning's claims. As stated above, Brian Manning alleges that his claimed injuries are the result of his mother's *in utero* exposure to Lilly's diethylstilbestrol. Massachusetts, however, has not recognized, and in all likelihood, will not recognize "third-generation" product liability suits sounding in tort. In the context of "pre-conception torts" -- where the plaintiff is claiming injury from tortious action taken before his or her conception -- Massachusetts courts have expressed concern about their ability to sensibly analyze the concepts of duty, foreseeability, and causation. This concern is heightened in the context of "third-generation" claims where a plaintiff's claimed injury is one step further removed from the tortious action that allegedly caused it. Further, every appellate jurisdiction that has squarely faced third-generation DES claims have rejected them, based on the same policy considerations cited by Massachusetts courts. Brian Manning's third-generation claims are not cognizable in Massachusetts.

## STATEMENT OF UNDISPUTED FACTS

### A. Background Facts

1. Plaintiff Brenda Manning was born in Boston, Massachusetts on December 9, 1963. Brenda Manning's Responses to Lilly's First Set of Interrogatories ("Interrogs.") No. 1 (copy attached as Exhibit 1 to Affidavit of Brian L. Henninger ("Henninger Aff.")).

2. Plaintiff's mother, Janet P. Berg lived in Watertown, Massachusetts during her pregnancy with Ms. Manning and treated with multiple unidentified physicians in the Maternal

Infant Clinic of the Boston Lying-In Hospital, in Boston, Massachusetts. *Id.* at Nos. 2, 6 (Henninger Aff., Ex. 1); Transcript of Deposition of Janet P. Berg ("Berg Tr."), at 28 (excerpts attached as Exhibit 2 to Henninger Aff.).

### B. Facts Relevant to Product Identification

3. Ms. Berg testified that she was allegedly prescribed "stilbesterol" to prevent miscarriage during her 1963 pregnancy with Ms. Manning because her previous two pregnancies resulted in premature delivery and an ectopic pregnancy. Berg Tr., at 32 (Henninger Aff., Ex. 2).

4. At her deposition, Ms. Berg described the stilbestrol as "a little white pill that had an X across it." *Id.* at 18, 30. She was unable to identify the dosage of the pill. *Id.* at 29.

5. Mrs. Berg filled her stilbestrol prescription during her 1963 pregnancy with Ms. Manning at the Boston Lying-In Pharmacy. Interrogs. No. 7 (Henninger Aff., Ex. 1); Berg Tr., at 19 (Henninger Aff., Ex. 2). Plaintiffs have identified William R. Principe as a pharmacist who worked at the Boston Lying-In Pharmacy. Interrogs. No. 9 (Henninger Aff., Ex. 1).

6. Mr. Principe did not work at the Boston Lying-In Pharmacy when Ms. Berg filled her prescription there in 1963; at that time, Mr. Principe was enrolled in pharmacy school, and working part-time as a clerk in the Mahoney Pharmacy, in East Boston. Transcript of Deposition of William R. Principe ("Principe Tr."), at 8-10, 66-67 (excerpts attached as Exhibit 3 to Henninger Aff.). Mr. Principe did not set foot inside the dispensing pharmacy in this case until 1967. *Id.* at 98.

7. Mr. Principe explicitly stated that he could not be sure whether the Boston Lying-in Pharmacy carried Lilly's diethylstilbestrol in 1963. *Id.* at 121. Further, Mr. Principe did not look at any purchasing records, want books, or prescription slips from the Boston Lying-In Pharmacy prior to giving his statements and his deposition testimony. *Id.* at 44-45.

8.  In 1963, when Ms. Berg allegedly ingested the drug, DES was manufactured by at least 102 companies.  *See* 1963 *Drug Topics Red Book* ("Red Book");1962-1963 *American Druggist Blue Book* ("Blue Book"); 1963-1964 Blue Book (excerpts attached as Exhibits 4(A)-(C) to Henninger Aff.).

9.  A 25 mg generic DES pill manufactured by Massachusetts-based Marsh Parker was white and cross-scored, according to Robert Anderson, a pharmacist who practiced in Massachusetts from 1955 to 2002 and personally observed the Marsh Parker pill.  Transcript of Deposition of Robert Anderson in *Casale v. Eli Lilly and Company*, 03-CV-11833 (D. Mass.) ("Anderson Tr."), at 4-5, 15, 19 (excerpts attached as Exhibit 5 to Henninger Aff.).

10. Bristol-Myers Squibb Company also made and sold diethylstilbestrol as a white, cross-scored pill under the brand name Stilbetin.  *See* John J. Hefferon, *Description of the Identification Guide*, 182 JAMA 1146, 1195 (1962) (Henninger Aff., Ex. 6).

### C.  Facts Relevant to Brian Manning's Third-generation Claims

11. Ms. Manning became pregnant with Brian Manning in June 2000.  Interrogs. No. 15 (Henninger Aff., Ex. 1).  Brian was born at 26 weeks gestation on December 10, 2000.  *Id.*

12. Ms. Manning was allegedly exposed to diethylstilbestrol in 1963 in Massachusetts.  Complaint at ¶ 7 (copy attached as Exhibit 7 to Henninger Aff.).  Brian Manning was not conceived until June 2000, more than thirty-five years after his mother's alleged exposure to diethylstilbestrol.  Interrog. at No. 15 (Henninger Aff., Ex. 1).

13. Brian Manning has never been exposed to diethylstilbestrol.  Complaint at ¶ 26 (Henninger Aff., Ex. 7).

# ARGUMENT

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002).  Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.  *Carroll*, 294 F.3d at 236.  Neither "conclusory allegations [nor] improbable inferences" are sufficient to defeat summary judgment.  Rather, to withstand a properly supported motion for summary judgment, the opposing party must present "enough competent evidence" to enable a factfinder to decide in its favor on the disputed claims.  *Id.* at 236-37 (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)) (citations omitted).

## II. PLAINTIFFS CANNOT PROVE THAT LILLY MANUFACTURED THE DRUG TO WHICH MS. MANNING WAS ALLEGEDLY EXPOSED

Under applicable Massachusetts law, Plaintiffs must identify Lilly as the manufacturer of the pill Ms. Berg allegedly ingested.  Plaintiffs are essentially asking that a jury be allowed to identify Lilly based on the following facts:

- Lilly was one of at least three *known* companies marketing a small, white, cross-scored DES pill in Massachusetts in 1963;

- At least 102 other companies sold DES nationally in 1963; descriptions are not available for most of those pills and many could have fit Ms. Berg's description; and

- Pharmacist William Principe, based on nothing more than his knowledge of the 1967 stocking and dispensing practices of the Boston Lying-In Pharmacy, believes that Lilly's DES also would have been stocked there in 1963.

These facts make it no more likely that Lilly, as opposed to one of the other companies that made a white, cross-scored DES pill, produced the DES to which Ms. Manning was exposed. Massachusetts law requires better evidence of product identification, Plaintiffs' cannot provide it, thus Lilly is entitled to summary judgment.

    **A.**     <u>**The Substantive Law of Massachusetts Governs Plaintiffs' Claims.**</u>

Massachusetts substantive law governs this action because all of the operative events related to the prescription and use of diethylstilbestrol occurred there. *Boston Co. Real Estate Counsel v. Home Ins. Co.*, 887 F. Supp. 369, 372 (D. Mass. 1995) (holding that in Massachusetts, "the law of the jurisdiction with the 'most significant relationship' to the transaction governs the dispute"). Ms. Manning's alleged exposure to DES took place in Massachusetts, where she was born, where her mother lived during her pregnancy, where her mother allegedly was prescribed DES and filled her prescription for DES, and where she currently resides. Interrog. Nos. 1, 2, 5, 6 (Henninger Aff., Ex. 1). In addition, Brian Manning was born in Massachusetts and has resided there with his parents continuously since his birth. Brenda Manning's Responses to Lilly's First Set of Interrogatories as Mother, Guardian, and Next Friend of Brian Manning ("Brian Manning Interrogs.") No. 1 (copy attached as Exhibit 8 to Henninger Aff.). Further, all of Brian Manning's injuries have been diagnosed and treated in Massachusetts. *Id.* at Nos. 4-6.

    **B.**     <u>**Plaintiffs Cannot Prove That Lilly Manufactured the Drug to Which Ms. Manning Claims She Was Exposed.**</u>

Plaintiff's claims must fail because, under Massachusetts law, "a plaintiff in a products liability action must show that the injury is attributable to the defendant's negligence." *Gurski v. Wyeth-Ayerst Div. Of Am. Home Prods. Corp.*, 953 F. Supp. 412, 418 (D. Mass. 1997) (citing *Smith v. Ariens Co.*, 377 N.E.2d 954, 958 (Mass. 1978). "Identification of the party responsible

for causing injury to another is a longstanding prerequisite to a successful negligence action." *Payton v. Abbott Labs.*, 437 N.E.2d 171, 188 (Mass. 1982). Plaintiffs cannot meet their product identification burden by establishing mere mathematical probabilities; rather, Plaintiffs must submit evidence that would allow a reasonable juror to conclude that it is "more probable than not" that their injuries were caused by a particular defendant's actions. *Spencer v. Baxter Int'l, Inc.*, 163 F. Supp. 2d 74, 78 (D. Mass. 2001) (granting summary judgment to defendants where plaintiffs showed it was more likely than not that they contracted HIV virus from one of two blood products -- Alpha or Baxter AHF -- but could not identify Alpha or Baxter AHF as the specific cause of their injuries).

The issue of product identification is particularly important in DES cases because literally hundreds of companies manufactured diethylstilbestrol.[1] The factual context of this DES case is akin to that of *Smith v. Rapid Transit, Inc.*, best known in Massachusetts as the "Blue Bus" case.[2] 58 N.E.2d 754, 755 (Mass. 1945). Imagine that a woman is hit by a white car while crossing the street, sustaining serious injuries. She sues the owner of a white car that was driving on the same street, the same day, at the same time that she was hit. During discovery, it comes to light that the street was actually full of cars of varying descriptions that day. To recover in these

---

[1] See e.g., Sutowski v. Eli Lilly and Co., 696 N.E.2d 187, 188 (Ohio 1998) ("Because DES was not patented, some two hundred to three hundred drug companies produced DES in the years it was widely prescribed for use during pregnancy."); Smith v. Eli Lilly and Co., 560 N.E.2d 324, 329 (Ill. 1990) (noting that "as many as 300 companies" manufactured DES at some point prior to 1971); 1963 Red Book; 1962-'63 Blue Book; 1963-'64 Blue Book (Henninger Aff., Ex. 4) (listing at least 102 manufacturers of diethylstilbestrol in the year Ms. Manning was allegedly exposed).

[2] *See generally* Nesson, *The Evidence or the Event? On Judicial Proof and the Acceptability of Verdicts*, 98 HARV. L. REV. 1357 (1985). Nesson poses the following hypothetical. While driving late at night on a dark, two-laned road, a person confronts an oncoming bus speeding down the centerline of the road in the opposite direction. In the glare of the headlights, the person sees that the vehicle is a bus, but cannot otherwise identify it. He swerves to avoid a collision, and his car hits a tree. The bus speeds past without stopping. The injured person later sues the Blue Bus Company. He proves, in addition to the facts stated above, that the Blue Bus Company owns and operates 80% of the buses that run on the road where the accident occurred. Can he win? Of the course the correct answer is "no", not without evidence that would exclude the other 20% of the buses.

circumstances, a plaintiff would have to prove that none of the other cars on the street were white. If one or more other cars were white, it would be just guessing to say that one white car rather than another caused the injury. If the color of the other cars was not known, it would equally be just a guess to *assume* that none of them were white. A verdict cannot rest on such "conjecture". *Rapid Transit, Inc.*, 58 N.E.2d at 755.

Here, Plaintiff is trying to identify Lilly as the manufacturer of the drug ingested by Ms. Berg based on nothing more than a pill description that fits several DES pills that were on the market in 1963, and on the testimony of a pharmacist who has no personal knowledge of the stocking and dispensing practices of the pharmacy where Ms. Berg filled her DES prescription in 1963. Summary judgment for Lilly is warranted because a jury verdict for Plaintiffs based on this evidence would be rejected by a Massachusetts court as mere conjecture.

> 1. Ms. Berg's Unexceptional Pill Description Is Not Emblematic of Lilly's Diethylstilbestrol

During her deposition, Ms. Berg described the DES she allegedly ingested as "a little white pill that had an X across it." Berg Tr., at 18, 30 (Henninger Aff., Ex. 2). This description is insufficient to prove that Lilly manufactured the pill. Lilly was not the only company to produce white, cross-scored DES pills. Massachusetts-based Marsh Parker produced a DES pill that was white and cross-scored, according to Robert Anderson, a pharmacist who practiced in Massachusetts from 1955 to 2002 and personally observed the Marsh Parker pill. Anderson Tr., at 4-5, 15, 19 (Henninger Aff., Ex. 5). Bristol-Myers Squibb Company also made and sold a white, cross-scored DES pill under the brand name Stilbetin. *See* John J. Hefferon, *Description of the Identification Guide*, 182 JAMA 1146, 1195 (1962) (Henninger Aff., Ex. 6); 1963 Red Book (Henninger Aff., Ex. 4(A)). For most of the 102 other companies that made DES pills in 1963, there is no information or evidence concerning the appearance of their DES. Without

more, Ms. Berg's description does not make it more likely than not, that Lilly, as opposed to Squibb, Marsh Parker, or some other unidentified drug company, manufactured the DES to which Ms. Manning was exposed.

### 2. The Testimony of Pharmacist William Principe Should Be Disregarded As Irrelevant Speculation

Plaintiff also relies on the testimony of William Principe to meet her product identification burden. Mr. Principe testified at his deposition that the first time he ever visited the Boston Lying-In Pharmacy was in 1967, more than three years after Ms. Berg filled her DES prescription there. Principe Tr., at 98 (Henninger Aff., Ex. 3). In addition, Mr. Principe admitted that based on his personal knowledge of the stocking and dispensing practices of the Boston Lying-In Pharmacy from 1967-'74, he could not say for sure whether Lilly's DES was dispensed in 1963. *Id.* at 121. Finally, Mr. Principe did not look at any purchasing records, want books, or prescription slips from the Boston Lying-In Pharmacy prior to giving his statements and his deposition testimony. *Id.* at 44-45. In short, Mr. Principe simply has no personal knowledge of the 1963 stocking and dispensing practices at the Boston Lying-In Pharmacy, and his testimony should not be considered for purposes of summary judgment.

Discovery in this case is now closed, and Plaintiffs have not satisfied and cannot satisfy their burden of establishing that it is more likely than not that Lilly manufactured the DES to which Ms. Manning was allegedly exposed. The only evidence offered by Plaintiffs -- the testimony of Ms. Berg and Mr. Principe -- fails to identify Lilly. For this reason, Lilly is entitled to summary judgment on each of Plaintiffs' claims.

### III. LILLY IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO BRIAN MANNING'S CLAIMS BECAUSE MASSACHUSETTS DOES NOT RECOGNIZE THIRD-GENERATION CLAIMS.

Brian Manning has not alleged a cognizable cause of action in Massachusetts. A thorough review of Massachusetts case law reveals that no court in the Commonwealth has ever recognized "third-generation" claims. Furthermore, it is highly unlikely that Massachusetts *would* recognize a third-generation DES cause of action. Massachusetts courts have considered the viability of preconception torts several times and rejected such causes of action. Moreover, every appellate jurisdiction that has squarely considered the viability of third-generation DES claims has rejected them, based on the same policy considerations that Massachusetts has endorsed.

#### A. Massachusetts Courts Have Allowed Neither Third-generation Nor Preconception Tort Claims.

Massachusetts courts have never recognized a third-generation DES claim, nor any claim in which the plaintiff was not exposed to the defendant's product or even conceived when the alleged tortious conduct occurred. In fact, Massachusetts appellate and federal courts have considered preconception tort claims and rejected them. Claims that wrongful acts done before the plaintiff was conceived caused harm to the plaintiff have been rejected on policy grounds. *See McNulty v. McDowell*, 613 N.E.2d 904 (Mass. 1993) (declining to recognize a cause of action based on failure to administer a rubella test to the plaintiff's mother before plaintiff was conceived); *Angelini v. OMD Corp.*, 575 N.E.2d 41, 43 (Mass. 1991) (rejecting loss of consortium claims for children conceived after parent was injured); *see also Lareau v. Page*, 840 F. Supp. 920, 930 (D. Mass. 1993) (*aff'd by Lareau v. Page*, 39 F.3d 384 (1st Cir. 1994) (rejecting a loss of consortium claim by a daughter who was conceived after her mother was injured). Some jurisdictions have allowed preconception tort claims involving second generation

plaintiffs, clear causation, and a limited scope of liability.[3]  These decisions are extremely poor predictors of how Massachusetts would handle third-generation DES claims, which involve a more distant generation of plaintiffs, attenuated causation, and potentially unlimited liability.

**B.     Every Appellate Jurisdiction That Has Squarely Addressed Third-generation DES Claims Has Denied A Cause of Action.**

There is no basis to believe Massachusetts would depart from the overwhelming rejection of third-generation DES claims by other appellate courts.  To date, five appellate jurisdictions have squarely addressed third-generation claims in the DES context,[4] and all five have refused to let the claims go forward.  *See Wood v. Eli Lilly & Co.*, 38 F.3d 510, 513-14 (10th Cir. 1994) (affirming grant of summary judgment to manufacturers and distinguishing third-generation from second generation DES cases because "there is less certainty that a known ingestion of DES presents a consistent singular risk of a digestive tract injury to the grandchild of a person ingesting the drug); *Sparapany v. Rexall Corp.*, 618 N.E.2d 1098 (Ill. Ct. App. 1993) (concluding that Illinois law precludes the imposition of a legal duty to third-generation claimants if the alleged conduct occurred prior to 1977);[5] *Grover v. Eli Lilly & Co.*, 591 N.E.2d 696 (Ohio 1992) (holding, on certification from the federal district court, that there is no duty to

---

[3] *See e.g. Renslow v. Mennonite Hospital*, 367 N.E.2d 1250, 1255 (Ill. 1977) (allowing preconception tort suit based on Rh-sensitization because it was "clearly distinguishable" from suits where "successive generations of plaintiffs complain against a single defendant for harm caused by genetic damage done [to] an ancestor..."); *Monusko v. Postle*, 437 N.W.2d 367, 370 (Mich. Ct. App. 1989) (allowing preconception tort suit based on rubella testing, emphasizing "the direct connection between the [rubella] test and immunization procedure and the harm in this case").

[4] In addition, two federal district courts have considered third-generation DES claims and rejected them.  *See Sorrells v. Eli Lilly & Co.*, 737 F. Supp. 678 (D.D.C. 1990) (construing Maryland law to impose no duty to the unborn grandchild of a woman who ingested DES); *Fotsch v. Eli Lilly & Co.*, 995 U.S. Dist. LEXIS 5227, at *3, *10 (N.D. Ill. 1995) (applying *Sparapany*, and refusing to entertain the third-generation DES claims of minor plaintiffs).

[5] Two decisions from Illinois, reported *prior* to *Sparapany*, failed to substantively address the presence of third-generation plaintiffs at the earliest stages of litigation, thus allowing the suits to move forward.  *See Bowe v. Abbott Labs.*, 608 N.E.2d 223 (Ill. Ct. App. 1992) (allowing plaintiffs to amend complaint to allege alternative liability rather than market share liability without addressing the presence of a third-generation plaintiff in the suit); *McMahon v. Eli Lilly & Co.*, 774 F.2d 830 (7th Cir. 1985) (reversing grant of summary judgment to defendant on product identification and unforeseeability grounds without addressing presence of third-generation plaintiff).

a third-generation plaintiff); *Enright v. Eli Lilly & Co.*, 570 N.E.2d 198 (N.Y. 1991) (denying a third-generation claim premised on strict liability[6]); s*ee also Loerch v. Eli Lilly & Co.*, 445 N.W.2d 560 (Minn. 1989) (summarily affirming a trial court's rejection of third-generation claims). These courts were concerned with the doctrinal and public policy consequences of extending potential liability beyond the boundaries of traditional tort law. In particular, *Enright* and *Grover*, the two cases to most fully address third-generation DES claims, expressed deep concern about the potential for unlimited liability of DES pharmaceutical manufacturers, and voiced the need to "confine liability within manageable limits." *Enright*, 570 N.E.2d at 203.

In considering and rejecting third-generation DES claims, courts have identified three specific problems. First, the claims have no basis in established tort doctrine because the connection between the allegedly tortious behavior and the plaintiff's injuries is too remote. Second, opening the door to third-generation plaintiffs violates public policy by creating the opportunity for unlimited liability in the number of possible litigants, and indeed in the number of potential generations who might litigate. Third, extending liability to the third-generation or beyond runs in the face of public policy by deterring the research, development, and marketing of beneficial drugs. *See id.* at 203-04; *Grover*, 591 N.E.2d at 699.

### C. Massachusetts Courts Have Routinely Expressed The Concerns That Counsel Against Third-Generation Liability.

The doctrinal and public policy concerns driving the rejection of third-generation DES claims in other jurisdictions have been prevalent and unmistakable in Massachusetts's own cases addressing DES and preconception tort claims. Together, they indicate that Massachusetts is extremely unlikely to recognize third-generation DES claims.

---

[6] The lower court in *Enright* had previously refused to allow third-generation claims premised on negligence and breach of warranty, and appellants did not challenge this decision on appeal. *See Enright*, 570 N.E.2d at 200.

1. <u>Remoteness of third-generation claims</u>

It is a fundamental precept of common-law negligence that a plaintiff must demonstrate, among other things, that the defendant owed a duty to the plaintiff, that injury to the plaintiff was reasonably foreseeable to the defendant, and that the defendant's alleged act was the proximate cause of the plaintiff's injury. *Primus v. Galgano*, 329 F.3d 236, 241 (1st Cir. 2003) (applying Massachusetts law) (*quoting Heinrich v. Sweet*, 308 F.3d 48, 62-63 (1st Cir. 2002)). In a third-generation DES claim, the duty, foreseeability, and causation elements are almost impossible to satisfy, not least because the third-generation plaintiffs were never exposed to the drug. Consequently, third-generation allegations must rely on "the rippling effects of DES exposure." *Enright*, 570 N.E.2d at 203; *Grover*, 591 N.E.2d at 699.

"Rippling effects," however, are not enough to impose liability. Recognizing the practical limits of foreseeability, the *Grover* court found it "difficult to imagine that a pharmaceutical company, during the 1940s to the 1960s, could have foreseen the effect that a drug would have not only on a patient's child, but also on that children's children." *Grover*, 591 N.E.2d at 698 n.1. The court therefore held explicitly that a manufacturer's duty does not extend to the third-generation. "Where a pharmaceutical company prescribes drugs to a woman, the company, under ordinary circumstances, does not have a duty to her daughter's infant who will be conceived twenty-eight years later." *Grover*, 591 N.E.2d at 700. The Grover case dealt with claims very comparable to those made here.

Massachusetts has also made clear that a defendant has no duty to protect against remote, unlikely, or unforeseeable occurrences. *See Lindberg v. Gilbert*, 190 N.E.2d 105, 106 (Mass. 1963) ("the defendant was not bound to guard against what was only remotely likely to occur"); *Glick v. Prince Italian Foods of Saugus, Inc.*, 514 N.E.2d 100, 102 (Mass. App. Ct. 1987) ("the court will not hold the defendant liable for all possible injury no matter how remote"); *cf.*

*Vassallo v. Baxter Healthcare Corp.*, 696 N.E.2d 909, 923 (Mass. 1998) (abandoning the "hindsight approach" to implied warranty of merchantability suits, which charged product manufacturers with knowledge of all risks associated with a product regardless of the state of the art, in favor of an approach that charges manufacturers with risks that are foreseeable at the time of sale or could have been discovered with testing prior to marketing). The injuries alleged in third-generation DES claims - where harm is both physically and temporally removed from actual ingestion of the drug - are precisely the kind of remote or unlikely occurrences that Massachusetts courts would find as a matter of policy to be unforeseeable.

The remoteness of third-generation claims affects not only duty and foreseeability but also causation. The Ohio Supreme Court made lack of proximate cause a specific basis for rejecting third-generation DES claims, holding that "[b]ecause of the remoteness in time and causation, [the plaintiff] does not have an independent cause of action." *Grover*, 591 N.E.2d at 700. Massachusetts has expressed similar concerns about remoteness saying, as example, that "as a matter of policy, it must be recognized that tort liability cannot be extended without limit." *Feliciano v. Roseman Silver Co.*, 401 Mass. 141, 142 (1987) (refusing to extend loss of consortium claims to non-married couple). Massachusetts also, like most states, recognizes that claims based on events in the distant past raise troubling issues of lost evidence, unavailable witnesses, and confusion over the applicable state of the art. *See Klein v. Catalano*, 437 N.E.2d 514, 521, n.11 (Mass. 1982) (approving the policies underlying a legislative statute of repose). Given Massachusetts's clear holdings on the limitation of liability for remote or unforeseeable claims, and given the numerous foreseeability problems associated with third-generation DES claims, Massachusetts is likely to reject third-generation DES liability on doctrinal grounds alone.

### 2. Extending liability beyond manageable bounds

In addition to being incompatible with traditional tort doctrine, third-generation DES claims violate public policy by inviting the extension of tort liability beyond reasonable bounds. Recognition of third-generation liability increases the number of potential litigants and greatly extends the amount of time during which suits may be brought. Because a third-generation plaintiff "cannot be injured until the original patient's child bears children, the second injury will typically have occurred more than sixteen years after the ingestion of the drug." *Grover*, 591 N.E.2d at 699. Furthermore, because allowing third-generation claims opens the door for fourth, fifth, or successive generations - each usually 20 to 30 years apart - to bring claims based on an increasingly remote ancestor's alleged exposure, the period of liability if third-generation claims are recognized is potentially limitless. In their gate-keeping role, courts assessing DES-related claims have always drawn the line at the second generation, the last generation where direct exposure to the drug was possible. *See, e.g., Enright*, 570 N.E.2d at 203; *Grover*, 591 N.E.2d at 699.

Largely because of these same policy concerns, Massachusetts has steadfastly refused to recognize preconception torts. In *Angelini*, 575 N.E.2d at 42, the plaintiff sued for loss of consortium resulting from injuries his father sustained in an automobile accident. The plaintiff was *in utero* at the time his father was injured. The Supreme Judicial Court held that the plaintiff could proceed on his claim, but only because he had been conceived *before the time of injury* and was later born alive. *Id.* at 46. The court explained:

> A child conceived after the injury, and eventually born alive, may suffer the same loss of parental consortium as a child conceived before the injury and also born alive. It may be asked, therefore, why should the latter be allowed to recover for loss of consortium and not the former? The answer is that, after a parent is negligently injured by a defendant, he or she may continue having children for many years. *If no restriction is placed on the class of children who are eligible to recover for loss of parental consortium, a defendant may become liable for the*

> *loss of consortium several years, perhaps even decades, after the injury to the parent. As a matter of policy, however, it is important to limit the duration of liability.*

*Id.* at 43 (emphasis added). Two years later, in *Lareau*, a federal district court applying Massachusetts law barred a loss of consortium claim by a daughter who was conceived after her mother had discovered she had a brain injury, holding that "the *Angelini* decision necessarily bars actions by children conceived after the cause of action of the parent should have been known." *See Lareau*, 840 F. Supp. at 930 (citing the same policy concern about placing limits on defendant liability); *McNulty v. McDowell*, 613 N.E.2d 904, 907 (Mass. 1993) (refusing to recognize a duty of care running from a physician to a child not yet conceived based on the mere fact that a twenty-two year old patient is of child-bearing age in part because the physician cannot identify steps to limit liability).

*Angelini*, *Lareau*, and *McNulty* demonstrate that Massachusetts will not permit claims - particularly preconception tort claims - that could lead to liability without end. The logic of the *Angelini* opinion transfers naturally to the DES context: if no restriction is placed on the class of plaintiffs who can allege injury due to DES exposure two or more generations prior, a defendant may become liable decades after the initial injury allegedly occurred. Following its own case law and that of other jurisdictions, Massachusetts is likely to dictate that the duration of DES liability must be limited to the second generation. *See Angelini*, 575 N.E.2d at 43.

The Supreme Judicial Court recently employed analogous reasoning in barring minor plaintiffs from suing their own mothers for injuries negligently inflicted while they were *in utero*. *Remy v. MacDonald* involved a minor plaintiff who brought suit against her mother for chronic respiratory injuries stemming from an emergency caesarian section necessitated by her mother's negligent operation of an automobile. 801 N.E.2d 260, 262 (Mass. 2004). The Supreme Judicial Court imposed a blanket bar on such suits citing several doctrinal and policy

concerns. Foremost among those concerns was the fact that "recognizing a pregnant woman's legal duty of care in negligence to her unborn child would present an almost unlimited number of circumstances that would likely give rise to litigations." *Remy*, 801 N.E.2d at 263. The same concern about boundless opportunities for litigation stemming from a stale injury that led the Supreme Judicial Court to reject liability in *Angelini* and *Remy* would lead it to reject third-generation DES claims as well.

### 3. Deterring the manufacture of beneficial drugs

Recognizing third-generation liability will also have detrimental effects on the research and development of new and useful drugs. As the *Enright* court explained, "public policy favors the availability of prescription drugs even though most carry some risks .... [W]e are aware of the dangers of over-deterrence - the possibility that research will be discouraged or beneficial drugs withheld from the market. These dangers are magnified in this context, where we are asked to recognize a legal duty toward generations not yet conceived." 570 N.E.2d at 204.

The *Enright* court's concern about over-deterrence is not unique. Massachusetts has explicitly cabined potential liability in DES cases so as not to deter research and development. In *Payton v. Abbott Laboratories*, 437 N.E.2d 171 (Mass. 1982), the Supreme Judicial Court refused to impose market share liability on DES manufacturers, concluding that "[p]ublic policy favors the development and marketing of new and more efficacious drugs.... Imposition of such broad liability could have a deleterious effect on the development and marketing of new drugs, especially those marketed generically." *Payton*, 437 N.E.2d at 189-90. To make the point clear, the court added, "[i]ndeed, if a cure for clear-cell adenocarcinoma lies in the development and manufacture of some new drug, imposing market share liability might prevent the marketing of a cure for the very cancer threatening the plaintiffs." *Id.* at 190 n.18. Given its stated policy of declining to extend tort liability where it would detrimentally affect the research and

development of beneficial drugs, Massachusetts is unlikely to deviate from current law and permit third-generation claims that by *definition* extend tort liability beyond traditional bounds.

The chilling effect that unwarranted extensions of tort liability have on research and development of useful products has long been recognized. *See, e.g.*, P.W. Huber, *Liability: The Legal Revolution and Its Consequences* 155 (1988) (describing the loss of innovation in the pharmaceutical industry as a result of the growth of tort liability). As one court explained:

> [T]he ultimate cost of product liability is not usually seen in the closing of existing factories, but rather in research and development *not* pursued, new technologies *not* developed, new products *not* introduced, new factories *not* built, and new jobs *not* created.

*Blankenship v. General Motors Corp.*, 406 S.E.2d 781, 783 n.4 (W. Va. 1991) (citing E.P. McGuire, *The Impact of Product Liability*, Conference Board Report No. 908, at p. 28, Table 30 (1988)) (emphasis in original). Sharing these concerns, courts around the country have routinely refused to extend product liability beyond traditional limits.[7]

Massachusetts has not recognized third-generation torts. Recognition of such claims would run counter to traditional tort doctrines on duty, foreseeability, and causation that have long been embraced in Massachusetts and elsewhere. No other appellate jurisdiction has recognized third-generation DES claims. For all these reasons, Lilly is entitled to partial summary judgment as to the third-generation claims of Brian Manning.

---

[7] *See, e.g.*, *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 282 (1989) (O'Connor, J., concurring and dissenting) (noting that the threat of punitive damage awards "has a detrimental effect on the research and development of new products"); *Conafay v. Wyeth Labs.*, 1985 U.S. Dist. LEXIS 21618 at *8-9 (D.D.C. 1985) (recognizing that imposing strict liability in cases involving drugs "would chill if not smother the research, development, production and marketing of new prescription or experimental drugs necessary to alleviate or cure the ills to which all persons are subject"); *Pollard v. Ashby*, 793 S.W.2d 394, 399 (Mo. Ct. App. 1989) (determining that "withholding a drug from the market ... until scientific skill and knowledge advanced so that additional dangerous side effects might be revealed ... would not serve the public interest").

## CONCLUSION

Lilly is entitled to summary judgment on all claims asserted by Plaintiffs Brenda and Brian Manning because they cannot prove that Lilly manufactured the diethylstilbestrol to which Ms. Manning was allegedly exposed. In the alternative, Lilly is entitled to partial summary judgment as to the claims of Brian manning because Massachusetts law simply does not recognize third-generation torts.

## REQUEST FOR ORAL ARGUMENT

Pursuant to LCvR 7.1(D), Lilly requests a hearing on its Motion for Summary Judgment.

Respectfully submitted,

ELI LILLY AND COMPANY
by its attorneys

/s/ Brian L. Henninger
James J. Dillon (BBO# 124660)
Brian L. Henninger (BBO# 657926)
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

Dated: April 15, 2005

## LR 7.1(A)(2) CONFERRAL CERTIFICATION

I certify that counsel for Lilly contacted Plaintiffs' counsel on April 15, 2005 to attempt in good faith to resolve or narrow the issues addressed in this Motion. The parties were unable to resolve or narrow said issues.

/s/ Brian L. Henninger