# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BRENDA MANNING, Individually    ]
and as Mother, Guardian and Next Friend  ]
of BRIAN STEVEN MANNING, a Minor   ]
                                  ]
          Plaintiffs,   ]
v.                            ]    CIVIL ACTION No. 04-11164-RCL
ELI LILLY AND COMPANY,     ]
                                    ]
          Defendant.   ]

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF**
**OPPOSITION TO DEFENDANT ELI LILLY'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.   PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF
      MATERIAL FACTS ................................................................................................. 2

III.  DEFENDANT HAS NOT MET ITS SUMMARY JUDGMENT THRESHOLD............... 7

IV.   PLAINTIFFS PRESENT AMPLE EVIDENCE TO PROVE SPECIFIC PRODUCT
      IDENTIFICATION IN ADDITION TO LILLY'S 94% OWNERSHIP OF THE
      MASSACHUSETTS DES MARKET ...................................................................... 11

      A.   Plaintiff's Mother's Recollections And Prenatal Records Of The Stilbestrol Pill
           Match Lilly's DES Exclusively.................................................................... 11

      B.   Marsh Parker's Was Not Available When The Plaintiff Was Exposed ........ ........... 12

      C.   Bristol-Myers Squibb's Pill Fits Neither The Mother's Description Nor .... .......... 13
           The Specifications In Her Medical Records

      D.   Mr. Principe, The Director of Pharmacy At Boston Lying-In, Testified That Only
           Eli Lilly's Brand of DES Was Dispensed At that Pharmacy ...................... 14

      E.   The Red Book and Blue Book Proves Nothing............................................ 15

V.    MASSACHUSETTS LAW PROVIDES RECOVERY FOR PRECONCEPTION
      TORTS ................................................................................................................. 16

      A.   Preconception Rights In Massachusetts ...................................................... 16

      B.   Recovery For Preconception Tort is Established Law In Massachusetts.................. 18

      C.   Enright, Grover, Sparapany, Et Al., Concern Different Facts, Different Issues,
           And Different State Laws and are neither Binding nor Relevant ............................ 19

      D.   Plaintiff's Authorities Uphold the DES Preconception Right.................................. 22

VI.   BRIAN MANNING'S ACTION IS NOT REMOTE ............................................. 24

      A.   Brian Manning's Injury Is Foreseeable, Which Establishes Lilly's Duty Of Care ... 25

      B.   Lilly's DES Drug Proximately And Compellingly Caused Brian Manning's
           Injuries...................................................................................................... 27

VII.  BRIAN MANNING'S ACTION WOULD NOT DETER BENEFICIAL DRUGS FROM
      THE MARKET ..................................................................................................... 29

VIII.   CONCLUSION ........................................................................................................ 30

## TABLE OF AUTHORITIES

**CASES**:

Albala v. City of New York, 54 N.Y.2d 269 (N.Y. 1981) .................................... 17-8, 20
Angelini v. OMB Corp., 575 N.E.2d 41 (Mass. 1991)......................................... 16-7
Bergstreser v. Mitchell, 577 F.2d 22 (8th Cir. 1978)........................................... 19
Blankenship v. General Motors Corp., 406 S.E.2d 781 (W.Va.1991)................................. 30
Caldwell v. Fox, 231 N.W. 2d 46 (Mich. 1975)................................................... 8
Cigna Ins. Co. v. Oy Saunatec, 241 F.3d 1 (1st Cir. 2001) ................................... 25
DeMayo v. Schmitt, 5 Pa. D. & C.4th 197 (Pa. Commonp. Ct. 1989) ................................ 23
Doolan v. IVF America (MA), Inc., No. 99-3476, 12 Mass. L. Rep. 482, (2000) .............. 18
Drayton v. Jiffee Chemical Corp., 395 F. Supp. 108 (N.D. Ohio 1975) ............................. 8
E.R. Squibb & Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154 (2d Cir. 2001)........................ 21, 23
Enright v. Eli Lilly and Co., 77 N.Y.2d 377 (1991) ............................................. 19-21, 24
Fithian v. Reed, 204 F.3d 306 (1st Cir. 2000) .................................................. 25
Glick v. Prince Italian Foods, Inc., 902, 514 N.E.2d 100, 102 (Mass. App. Ct. 1987)........ 25
Goldman v. First National Bank of Boston, 985 F.2d 1113 (U.S. Ct. App. 1st Cir. 1993) ... 2
Graham v. Keuchel, 847 P.2d 342 (Okla. 1993)................................................ 19
Great Northern Ins. Co. v. Paino Associates, 364 F.Supp.2d 7 (D.Mass. 2005) ............... 10
Grover v. Eli Lilly & Co., 63 Ohio. St. 3d 756, 591 N.E.2d 696 (Ohio 1992)................... 19, 21
Hegyes v. Unjian Enters., Inc., 234 Cal. App. 3d 1103 (1991) ............................... 17
Hoffman v. Houghton Chem. Corp., 751 N.E.2d 848 (Mass. 2001) ................................ 25
Huber v. Watson, 568 N.W. 2d 787 (S.C. Iowa 1997).......................................... 7
Jean W. v. Commonwealth, 610 N.E.2d 305, 309 n.6 (Mass. 1993)................................ 25
Jorgenson v. Meade Johnson Laboratories, Inc., 483 F.2d 237 (10th Cir. 1973) ............... 18
Kogen v. Eli Lilly, No., SACV 03-0962 (C.D. Cal., July 22, 2003).............................. 14
Kramer v. Weedhopper of Utah, Inc., 490 N.E.2d 104 (Ill. App. Ct. 1986)....................... 8
Lareau v. Page, 39 F.3d 384 (1st Cir. 1994)................................................. 16
Liggons v. Roehm GMBH, 1993 US App Lexis 1335,
aff'd 983 F.2d 1067 (E.D. Mich 1993) ...................................................... 10
Livingstone Flomeh-Mawutor v. Banknorth, N.A.,
350 F.Supp.2d 314, 318 (D.Mass. 2004)....................................................... 10
Loerch v. Eli Lilly and Co., 445 N.W.2d 560 (Minn. 1989) ..................................... 22
Lough v. Rolla Women's Clinic, Inc., 866 S.W.2d 851 (Mo. 1993).............................. 18, 25
Lynch v. Scheininger, 744 A.2d 113, 127 (N.J. 2000) ......................................... 19
McMahon v. Eli Lilly and Co., 774 F.2d 830 (7th Cir. 1985)................................... 15-6, 22-3, 27
McNulty v. McDowell, 613 N.E.2d 904 (Mass. 1993) ........................................... 16-7, 20
Monusko v. Postle, 175 Mich. App. 269, 437 N.W.2d 367 (1989) ................................. 17, 19
Murchison v. Eli Lilly and Company, No. H-88-927 (S.D. Tex 1991) ............................. 22-3
Palsgraf v. Long Island R. Co., 162 N.E. 99 (N.Y. 1928)...................................... 25
Payton v. Abbot Labs, 386 Mass. 540, 437 N.E.2d 171 (1982)  ................................. 27-30
Pitre v. Opelousas General Hosp., 530 So.2d 1151 (La. 1988) .................................. 19
Renslow v. Mennonite Hosp., 367 N.E.2d 1250, 1254-55 (Ill. 1977) ............................ 19, 21, 29
Shields v. Eli Lilly & Co., 895 F.2d 1463, 1465 (D.C. Cir. 1990) ............................. 10
Smith v. Rapid Transit, Inc., 58 N.E.2d 754-5 (Mass. 1945) ................................... 11
Sorrells v. Eli Lilly and Company, No. 60386 (MD. Cir. Ct. Mont. County 1990) .............. 23-3
Sparapany v. Rexall Corp., 249 Ill. App. 3d 388, 618 N.E.2d 1098 (1993)...................... 19, 21
Taylor v. Cutler, 703 A.2d 294 (N.J. Super. Ct. App. Div. 1997)............................... 23-4
Tolentino v. UPS, 98-CV-10369, (2001)....................................................... 25
UAW et al. v. Johnson Controls, Inc., 499 U.S. 187, 111 S.Ct. 1196 (1991) ................... 19
Walker v. Rinck, 604 N.E.2d 591 (Ind. 1992) ................................................. 17-19
Wood v. Eli Lilly & Co., 38 F.3d 510 (10th Cir. 1994) ....................................... 23

**OTHER AUTHORITIES**:

Bongiovanni, A., et al., "Masculinization of the Female Infant Associated with Estrogenic Therapy Alone During Gestation: Four Cases," Journal of Clinical Endocrinology and Metabolism, 19:1004 (1959).

Dieckmann, Davis, Rynkiewicz, & Pottinger, "Does the Administration of Diethylstilbestrol During Pregnancy Have Theraputic Value?" in 66 Am J Obstetrics & Gynecology 1062 (1953).

Enders, R., "Mink Production in Relation to Stilbestrol," The Fur Journal, September/October 1950, 16:(7), pp 4.

Greene, R.,et al., "Experimental Intersexuality: the Paradoxical Effects of Estrogens on the Sexual Development of the Female Rat," in The Anatomical Record, ed. Boyden, Vol. 74, May-Aug., 1939.

Moya, F. And Thorndie, V.,  Am.J.Obstet. & Gynec., Vol. 84, No.11, Part 2, Dec.1962:1778-1798.

Rosenbloom, Gordon et al., "Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol," in West J. Sur. Obst. and Gyn., 55:597, 1947.

Wall Street Journal, May 16, 2005.

I.    **INTRODUCTION**

   Plaintiffs have waived all counts of breach of implied warranty, misrepresentation, and strict liability and proceed only on negligent failure to test and warn.  This is a personal injury and product liability case arising from the birth defects and permanent disability sustained by the infant Plaintiff, Brian Manning, at birth on December 10, 2000 as a result of his mother's, Brenda Manning's, (the DES daughter's) exposure and injury while *in utero*, from Lilly's diethylstilbestrol ("DES").  When marketing DES, the defendant promoted it with the rationale that it would alter the structure of the uterus.  The recipient daughter's uterus was altered and stunted.  That was the same uterus which the infant Plaintiff shared and from which he was prematurely expelled thirty years later because of the DES-caused malformation with catastrophic results of serious and permanent brain damage.

   DES is a mid-20th century fertility drug that has been banned by the Food and Drug Administration (FDA), recalled by the manufacturer (Appendix 35) and branded a carcinogen and teratogen by the World Health Organization, the National Institute of Health (NIH), the American College of Obstetrics and Gynecology, and every health organization devoted to reproductive medicine.  The drug was sold to five to ten million women as a universal remedy to produce plump and healthy babies even though it never worked.  The Defendant failed to conduct any tests to investigate the DES effect on the forming female daughter even though they knew since the 1930s of reports that estrogen in high doses stunted the reproductive organs of the exposed daughter in animals.  See Appendices 5, 7, and 22.

   Plaintiff's prenatal records, Plaintiff's mother's clear memory of the stilbestrol pill she took, the testimony of the managing pharmacist from the dispensing hospital, as well as scientific surveys of the Massachusetts DES market provide evidence of product identification which could lead a

reasonable juror to conclude that the Plaintiff was exposed to Lilly's DES as a result of Defendant's wrongful conduct.

Lilly's principal claim is that in a wrongly called "third-generation," (it is only the second generation) DES action, the duty, foreseeability and causation elements are "impossible to satisfy." [Def. Mem at 3-4]. The Defendant asserts that however directly linked the DES exposure is to the Plaintiff's injuries, it is somehow too "remote" to merit recognition as a matter of law.

While Lilly claims it did not know in 1963 that a drug could cross the placental barrier and injure a developing daughter's reproductive tract, the Manning exposure occurred two year after the national thalidomide crisis in 1962, when it was headline news that a drug could cause malformation of the fetus. Indeed, all of Defendant's authorities that support its third generation arguments occurred prior to the thalidomide crisis.

At this stage of the proceeding, the Plaintiff is entitled to a favorable inference and the benefit of the doubt on the liability issues of negligence, foreseeability and causation. Goldman v. First National Bank of Boston, 985 F.2d 1113 (U.S. Ct. App. 1st Cir. 1993) (summary judgment is viewed in the light most favorable to the nonmoving party). The Plaintiff's evidence herewith submitted is entitled to the presumption of validity, that (1) Brian Manning's injury was foreseeable (see supra Statement of Harris Busch, attached hereto as App. 17), (2) that the manufacturer of drugs used in obstetrics had a duty of care for two patients, mother and child in utero, (3) that the injuries were causally linked to DES exposure, (4) that Lilly could have and should have known at the time it marketed DES, in 1963, to Brenda Manning's mother, Janet Parrella Berg, that its product would target and alter the reproductive tract of the DES daughter and that Lilly failed to adequately test and warn of the risks to the DES daughter.

In 1950, there were over ten reports published (prior to Lilly's marketing of DES), that DES would cross the placenta and alter the structure of the exposed fetus' reproductive tract in animals. In 1959 (four years before the Plaintiff was injured), researchers at Children's Hospital in Philadelphia and at NIH reported an actual DES daughter's malformation. See Bongiovanni, A., et al., "Masculinization of the Female Infant Associated with Estrogenic Therapy Alone During Gestation: Four Cases," Journal of Clinical Endocrinology and Metabolism, 19:1004 (1958) (attached hereto as App. 19). There were fifty-seven reports which Lilly ignored predicting the teratology of DES prior to the exposure in the instant case. (A list of fifty-seven reports attached hereto as App. 20). The Defendant admits in this case that it failed to conduct a single controlled test to determine the effects of DES on offspring in the face of these reports. It did not take a rocket scientist to realize that a DES daughter's stunted uterus may not be able to hold a pregnancy to term thirty years later.

## II.    PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

**Facts Relevant to Product Identification**:

1-3.    Admitted.

4.    Denied as incomplete. Mrs. Berg also remembered that during her pregnancy with the Plaintiff, her daily dosage of stilbestrol increased from one to three pills per day. See Deposition of Janet Berg, T28:20-24, App. 23. Moreover, Mrs. Berg testified that the pill she took did not have any writing on it, that it "did not say anything on it. It just was a little white pill that had an X across it." See Berg Dep, T18:9-10, App. 23. This excludes the Squibb pill which had a "Squibb" imprint on the pill. See Photograph of 100mg Squibb Pill and Bottle, App. 32.

5.    Admitted.

6

6.    Denied as incomplete.  In 1963, Mr. Principe worked as a pharmacist at Mahoney Pharmacy; he then moved to Massachusetts General Hospital and became familiar with ordering, stocking and dispensing of DES sold in the hospitals of the Boston area in that those methods were identical to methods in 1966.  See Deposition of William Principe, T84:12-17, attached hereto as App. 1 & Statement of William Principe, App. 24.  Mr. Principe testified that he remembered only Eli Lilly's brand of DES on the shelves at the Boston Lying In Pharmacy, where Mrs. Berg filled her DES prescriptions.  See Principe Statement, App. 24; Berg Dep., T19:7-9, App. 23.

7.    Denied.  In 1967, when Mr. Principe started working at Boston Lying-In Pharmacy, he determined that Lilly had been the "exclusive" source for DES prior to that time.  He stated: "I think it was that one exclusively (referring to Lilly's DES).  When I took over, I took over and carried on pretty much what had been going on prior to that."  See Principe Dep., T121:7-15, App. 1.  He was able to glean this information from the personnel, customs, detail men, old prescriptions, conversations with prior pharmacists, as well as pharmacy records.  See App. 24.

8.    Denied as incomplete.  Lilly cornered 94% of the DES market in Boston.  See Statement of Harold B. Sparr, R.Ph. D.Ph., M.S., App. 2.  No other company had as wide of reach and market-base than Lilly in the 50's and 60's.  See Amended Statement of Philip J. Cafferty, App. 25.  Most companies were only local and regional, for example, Person & Covey only sold DES to California, Arizona, and Nevada, but never in Massachusetts.  See Dep. of Lorne Person, Sr. in Anderson v. Eli Lilly, No.  04-0401 (D.D.C. 2005), App. 26.  In addition, it is inconceivable that a drug store would stock 103 brands of the same product in six different strengths.  Defendant fails to state that most DES products were in a size different from that given to pregnant women and were regional in distribution.

7

9.     Denied.  Pharmacist Robert Anderson testified to the practice at a different pharmacy in a different town during the wrong years, from 1969-1970, which is six years after the Plaintiff was born in 1963.  <u>See</u> Pharmacist Anderson's Dep., T5:7-15, App. 27.  Defendant further misrepresents Marsh Parker as a viable suspect to Lilly, as it did not even appear in the Blue and Red Book, the pharmacists' purchasing catalogues, until 1964, which means that it became available one year after the Plaintiff was born.  <u>See</u> Blue Book, App. 28; Redbook, App. 31.

10.     Denied as incomplete.  Squibb's white cross-scored Stilbetin was 100mg, not 25mg as ordered in Janet Parrella Berg's prenatal medical records.  <u>See</u> Janet Berg's Medical Records, attached hereto as App. 3 & Photograph of Squibb's 100mg DES pill, App. 32.  Squibb's pill also had the word, "Squibb", written across the pill.  <u>See</u> App. 32.  There was no writing on the stilbestrol pill Mrs. Berg ingested during her pregnancy.  <u>See</u> Berg Dep, T18:9-10, App. 23.

**Facts Relevant to Brian Manning's Cause of Action**

11.     Admitted.

12.     Admitted.

13.     Denied.  The estrogenic effect of DES was such that Brenda Manning's forming reproductive tract, (ultimately the shared organ of Brian Manning), was exposed to DES with the estrogenic effect equivalent of more than fifty-three thousand birth control pills.  (Deposition of Harris Busch referring to Exhibit 6 at pp. 68-70, attached hereto as App. 4).

14.     In 1939, esteemed researchers reproduced and reported a stunted uterus in mammalian daughters exposed to DES *in utero*.  <u>See</u> Greene, R., Burrill, M, Ivy, A., "Experimental Intersexuality: the Paradoxical Effects of Estrogens on the Sexual Development of the Female Rat," in <u>The Anatomical Record</u>, ed. Boyden, Vol. 74, May-Aug., 1939, attached hereto as App. 5.

15.    In 1947, Rosenblum and associates raised the following critical questions as to the efficacy of DES for pregnant women (which Lilly completely ignored):  (1) whether large dosages of DES are unsafe to pregnant women, (2) how DES affects the glandular balance of the child in utero (it malformed the child's uterus), (3) does DES work better than other drugs in preventing miscarriage?  Rosenblum, Gordon et al., "Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol," in the West J. Sur. Obst. and Gyn., 55:597, 1947, attached hereto as App. 6.  Lilly never addressed or answered these questions.

16.    In 1950, Enders reported that female minks who consumed DES in their feed (chicken waste) were unable, or barely able, to reproduce.  Further, that the kits born from those minks had ovaries "injured beyond recognition."  Enders, R., "Mink Production in Relation to Stilbestrol," The Fur Journal, September/October 1950, 16:(7), pp 4, attached hereto as App. 22.

17.    In 1953, Dieckman and associates, well respected authorities in the OBGYN field  at the University of Chicago conducted the first controlled double-blind prospective test of the efficacy of DES, concluding that it was ineffective in preventing the accidents of pregnancy, as there were more births in the women who were not exposed to DES than in the controlled group of DES exposed women.  See Dieckmann, Davis, Rynkiewicz, & Pottinger, "Does the Administration of Diethylstilbestrol During Pregnancy Have Theraputic Value?", Am J Obstetrics & Gynecology 1062 (1953),  attached hereto as App. 7.

18.    In 1962, an AMA publication "The Passage of Drugs across the Placenta" reported that nearly all drugs used in obstetrics are found to cross the placenta to some degree.  Moya, F. And Thorndike, V.,  Am.J.Obstet. & Gynec., Vol. 84, No.11, Part 2, Dec.1962:1778-1798, attached hereto as App. 8.

19.     All of Brian Manning's injuries are a result of his birth uterus' exposure to DES. <u>See</u> Statement of Robin Fischer, MD, attached hereto as App. 9; Statement of Thomas Pinckert, MD, attached hereto as App. 10; Statement of Blaise Bourgeois, MD, attached hereto as App. 11.

20.     There were fifty-seven articles in the scientific literature that were published before the DES exposure in this case (1963) which should have alerted a reasonably prudent manufacturer to the propensity of estrogen or synthetic estrogen to stunt the forming female reproductive tract. <u>See</u> List of DES Studies, App. 20.

21.     In 1959, four years before the exposure in this case, Lilly was on notice of the propensity of DES to cause malformations in the exposed human daughter.  <u>See</u> Bongiovanni, A., et al., "Masculinization of the Female Infant Associated with Estrogenic Therapy Alone During Gestation: Four Cases," <u>Journal of Clinical Endocrinology and Metabolism</u>, 19:1004 (1959), attached hereto as App. 19.

22.     A pharmaceutical manufacturer such as Lilly is required to be a leading expert of the world's literature regarding the drugs they promote.

23.     Tests, animal models, and diagnostic equipment was available by 1963 to determine whether DES given to pregnant women would have had an adverse effect on the exposed daughter's uterus.

## III.     DEFENDANT HAS NOT MET ITS SUMMARY JUDGMENT THRESHOLD

In order to prevail, Defendant Lilly must present to the court a scenario and setting which precludes the possibility that a reasonable juror could find in favor of the plaintiff.  The state of the law is as follows:

A fact question may exist even if identification evidence is less than to an absolute certainty. Although a mere possibility is not enough, absolute certainty is not necessary.  <u>Huber v. Watson</u>,

568 N.W. 2d 787 (S.C. Iowa 1997) ("something stronger than a mere possibility" generates a jury

question).  As a threshold requirement in a products liability case, identification of the injury-

causing product must be established only by a preponderance of the evidence.  <u>Caldwell v. Fox</u>, 231

N.W. 2d 46 (Mich. 1975).

One particularly probative case is <u>Kramer v. Weedhopper of Utah, Inc.</u>, 490 N.E.2d 104 (Ill.

App. Ct. 1986), where the court of appeals reversed the trial court's holding that 9-1 odds were not

sufficient to create a fact issue as to identification.  In <u>Kramer</u>, plaintiff was injured when his

ultralight aircraft crashed.  He sued the company that provided 90% of the bolts used to assemble

the airplane.  Specifically the appellate court said:

> the dispute centers on whether the fact that defendant supplied 90% of the bolts used
> by <u>Weedhopper</u> is sufficient circumstantial evidence to avoid entry of summary
> judgment.  Circumstantial evidence consists of factors or circumstances which give
> rise to a reasonable inference of the truth of the underlying fact… The focus must
> then be on what quantum of evidence is sufficient for an inference to be reasonable.
> This measure has eluded specific standardization and enumeration.  Generally the
> test of reasonableness resolves itself into a question of probability:  is the inferred
> occurrence more probable than not, or is it merely possible.  In the instant action
> there is evidence that
> 1)    defendant supplied 90% of the relevant bolts
> 2)    defendant supplied bolts to meet the general demand
> 3)    other companies provided bolts only when necessary…
> Hughes Aviation was merely a 'possible source' and plaintiff need not, at summary
> decision, disprove that possibility… Defendant was allegedly the most probable
> cause of plaintiff's injury.  The defects in plaintiff's proof are such that affect the
> weight, not whether there is a genuine matter triable question of fact.

<u>Id</u>.

<u>Drayton v. Jiffee Chemical Corp.</u>, 395 F. Supp. 108 (N.D. Ohio 1975), *aff'd* on issue of

product identification, 591 F.2d 352 (6th Cir. 1978), highlights the importance of providing

corroborative evidence.  In that case, a minor plaintiff suffered severe burns from spilled liquid

drain cleaner.  The container was never recovered.  However, plaintiff presented three witnesses to

establish that the drain cleaner which caused plaintiff's injury bore defendant's label 'Liquid Plumr'.  Plaintiff's landlady testified that she had bought a bottle of 'Liquid Plumr' over one year prior to the accident, plaintiff's mother testified that she saw the bottle with the label 'Liquid Plumr' soon before the accident and plaintiff's father testified that he also saw the label prior to the accident.  Defendant introduced expert testimony that both the use of the drain cleaner as described by plaintiff's father and the type of injury caused were consistent with a different drain cleaner.  In finding that plaintiff's evidence was sufficient to establish ID, the court looked at the totality of the evidence and held that for an inference to prevail that defendant's product was not involved, the court would have to find the unequivocal testimony of all plaintiff's witnesses to be incredible.  The court was unwilling to make such a finding.

Finally, Liggons v. Roehm GMBH, 1993 US App Lexis 1335, aff'd (unpublished opinion) 983 F.2d 1067 (E.D. Mich 1993) is a helpful case.  In Liggons, plaintiff sued a handgun manufacturer after she was struck by a bullet fired from a handgun that had fallen to the ground. There was no dispute as to how the accident happened, however the handgun was never recovered. The case against the handgun manufacturer was based on testimony by ballistics experts who opined as to the manufacturer of the handgun based on specific marks on the bullet.  One of plaintiff's experts testified, in part, that there were 83 derringers that possessed the same characteristics shown on the bullet, and 75 of those were manufactured by defendant.  The court noted that although plaintiff had not established to a certainty that defendant had manufactured the handgun that caused the injury, they had produced sufficient evidence to raise a jury question.  The court commented that "plaintiff produced evidence 'tending to show' that defendants manufactured the gun in question."

> Summary judgment should be granted only where the court, viewing the evidence in
> the light most favorable to the non-moving party, determines that no genuine dispute

of material fact exists.... Facts are "material" if they possess "the capacity to sway the outcome of litigation under the applicable law."

Great Northern Ins. Co. v. Paino Associates, 364 F.Supp.2d 7 (D.Mass. 2005). [citations omitted]

> The role of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.... A genuine issue of material fact exists where the evidence with respect to the material fact in dispute" is such that a reasonable jury could return a verdict for the nonmoving party.... The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor.

Livingstone Flomeh-Mawutor v. Banknorth, N.A., 350 F.Supp.2d 314, 318 (D.Mass. 2004). [citations omitted].

> ... In evaluating the nonmoving parties' showing, this court has directed the trial judge to consider the cumulative effect of the evidence, Catrett v. Johns-Manville Sales Corp., 826 F2d. 33, 39-40 (D.C. Cir. 1987), and to grant all reasonable inferences to the nonmoving party, Exxon Corp. v. FTC, 663 F.2d 120, 126 (D.C. Cir. 1980). The trial court, then, may Grant summary judgment only if there is no 'significantly probative" evidence tending to support the complaint.'
>
> * * *
>
> The 'significantly probative' test does not require the nonmoving party to discredit every conceivable alternative theory of causation. As this court noted in Elliott v.Michael James, Inc., 507 F.2d 1179 (D.C. Cir. 1974), 'there is no requirement that the circumstances, to justify the inferences sought, negative every other positive or possible conclusion.' To be significantly probative, evidence need only be sufficient to permit a reasonable juror, indulging all reasonable inferences, to find that the party proved the element at issue....

Shields v. Eli Lilly & Co., 895 F.2d 1463, 1465 (D.C. Cir. 1990).

Plaintiff is entitled to every favorable inference that her mother and other witnesses are correct, accurate and truthful and that foreseeability, as supported by her experts, is proven. She is entitled to knit together the various pieces of evidence to construct a web of information and evidence. Shields, 895 F.2d at 1467.

13

IV.    **PLAINTIFFS PRESENT AMPLE EVIDENCE TO PROVE SPECIFIC PRODUCT IDENTIFICATION IN ADDITION TO LILLY'S 94% OWNERSHIP OF THE MASSACHUSETTS DES MARKET**

A.    **Plaintiff's Mother's Recollections And Prenatal Records Of The Stilbestrol Pill Match Lilly's DES Exclusively**

The Defendant attempts to reduce and generalize Mrs. Berg's testimony to the blue bus case lacks accuracy and relevant comparison.[1]  See Def. Mem. at p. 7; Smith v. Rapid Transit, Inc., 58 N.E.2d 754-5 (Mass. 1945).  The Mannings have a world more than conjecture.  It is uncontroverted that Plaintiff's mother, Janet Berg, was prescribed and ingested 25mg stilbestrol pills in order to prevent miscarriage in 1963 while pregnant with Ms. Manning.  See Berg Dep., T32:7-13, App. 23. Mrs. Berg testified the prescribed stilbestrol was filled at the Boston Lying-In Pharmacy.  Id., T19:7-14, T27:7-20, App. 23.  Mrs. Berg recalls the pill she ingested in 1964 was:  (a)  called Stilbestrol (not Stilbetin by Squibb), (b) about the size of an aspirin, (c) round, (d) white, (e) with an indented X across it, (f) stayed the same through all pregnancies, and (g) had no other writing on the pill.  See Berg Dep., T23:7-19; T24:17-20; T30:7-13, T18:9-10, App. 23.  Mrs. Berg's hospital records indicate that she was prescribed not Stilbetin but Diethylstilbestrol at the dosage of 25mg. See Berg Medical Records, App. 3.

Eli Lilly's 25mg DES pill and bottle solely and exclusively fits the same, exact description. See 1963 PDR, attached hereto as App. 29; Photograph of Eli Lilly's 25mg bottle and DES pill,

---

[1] Even Professor Nesson, the creator of the Blue Bus hypothetical, has explained that:  "At some point, high probability alone is sufficient to produce an acceptable verdict.  In the blue bus hypothetical… evidence indicating a 55% likelihood that the plaintiff should recover presents a problem, whereas evidence indicating a 95% likelihood might not. Reaching a conclusion involves putting doubt aside.  The difficulty of doing so will vary with the intensity of the doubt, the degree to which we are concerned about making a mistake, and the rationalizations we have to help us conclude." The Mannings, in this case, have cumulatively much higher than 95% of evidence in favor of the positive identification of Lilly.  Furthermore, Defendant regardless misuses the hypothetical in this setting.  Professor Nesson has emphasized: "Probability as we use the term in law, particularly in the civil standard of proof, is not a hard-edged mathematical concept.  It is, rather, a concept that incorporates less rigid ideas of justice and reflects the judicial function of resolving disputes in the real world where values shift and knowledge is uncertain.  An outcome is "probable" if it best accomplishes a just and acceptable resolution of the dispute.  Probability as a legal concept in the law of proof, suggests wisdom, probity, and approbation—not favorable betting odds."  Nesson, *Agent Orange Meets the Blue Bus: Factfinding at the Frontier of Knowledge*, 66 B.U.L.Rev. 521, 522, n.3 (1986).

attached hereto as App. 33.  In reality, Lilly's 25mg DES was the only DES product popularly available which was round, white, cross-scored and about the size of an aspirin.  See Sparr Statement, App. 2.  No other popular, commonplace and standard therapy was available.

Based on this positive, definitive identification, a reasonable jury could find that it was more than likely Lilly's DES that proximately caused Plaintiffs' injuries.  In addition, Lilly could only point to two remote alternative DES possibilities in attempt to escape liability-- Marsh Parker and Bristol Myers Squibb-- neither of which are manufactured during the right time or possess the right dosage, specifications and the description of the mother to exonerate Lilly.  In other words, Plaintiffs have proved that it was more likely than not that none of the other cars were white.

### B.      Marsh Parker's Was Not Available When The Plaintiff Was Exposed

Lilly presents no evidence that Boston Lying-In Pharmacy bought or stocked Marsh Parker's generic pill.  In fact, Mr. William Principe, the Director of Pharmacy at Boston Lying-In testified that generics were never used, and that the hospital pharmacy stayed away from generics in the 1960's because they were unregulated and of very poor quality.  See Principe Dep., T81:1-T82:6, App. 1 & Cafferty Statement, App. 25.  Defendant provides no evidence that anyone ever saw a Marsh Parker DES product at Boston Lying-In Pharmacy.

Even more significantly, Defendant misrepresents Marsh Parker as a viable suspect to Lilly, as Marsh Parker's DES did not even appear in the Blue and Red Book, the pharmacists' purchasing catalogues, until 1964.  See Blue Book, App. 28; Red Book, App. 31.  Therefore, the generic Marsh Parker pill was not even available until one year after the Plaintiff was born.  Similarly, Lilly's reliance on the deposition testimony of pharmacist Robert Anderson has no evidentiary value, as Mr. Anderson worked at a different store (Garb) in a different year (1969), which was more than six years after Ms. Manning's *in utero* exposure.  See Pharmacist Anderson's Dep., T5:7-15, T11:9-13,

**15**

App. 27.  Lilly presents no testimony placing the Marsh Parker product in the relevant store at the relevant time.  It could not have been one of the white cars.

### C.    Bristol-Myers Squibb's Pill Fits Neither The Mother's Description Nor The Specifications In Her Medical Records

Similarly, Squibb can be easily excluded as it did not manufacture a product called "Stilbestrol" as prescribed by the mother's doctor—Squibb's synthetic estrogen was called Stilbetin.  See Photograph of Squibb's 100mg bottle and pill, attached hereto as App. 32.  The mother remembered and the medical records showed "stilbestrol" on the prescription, not "Stilbetin".  See Berg Dep., T29:12-17, App. 23; Berg Medical Records, App. 3.

Moreover, Squibb's white cross-scored Stilbetin was in 100mg strength only, and Mrs. Berg's medical records wrote for a 25mg stilbestrol pill.  See Berg Medical Records, App. 3; Photograph of Squibb's 25mg pill, App. 30 (with "Squibb" imprint and without cross-score).  Thus, Mrs. Berg's prescription could not have been filled with Squibb's 100mg pill.  Also, Mrs. Berg testified that the dosage increased from one to three pills a day.  See Berg Dep., T28:20-24, App. 23.  If Squibb was given, that means Mrs. Berg would have been taking 300mg of DES per day, which is obviously contrary to the 25mg stated in her medical records *and* would deviate from any normal DES prescription practices to pregnant women.  See 1963 PDR, App. 29 (indicating only 100mg per day in accidents of pregnancy).  Finally, Stilbetin pills were imprinted with the word "Squibb" (although difficult to see on App. 32).  Mrs. Berg remembers no writing or markup on the pill in addition to the cross-scoring.  See Berg Dep, T18:9-10, App. 23.  Thus, Squibb is effectively eliminated as a possible culprit on multiple grounds.

Lilly with its thousands of salesmen cannot come up with another 25mg DES pill that meets the description by the mother.  The President of the Massachusetts Pharmacy Association testified

that only Lilly had the lions share, if not all of the DES market and the only company that had a 25mg, round, white, cross-scored tablet without any other markings. <u>See</u> Sparr Statement, App. 2.

Courts have routinely ruled that when a mother describes a white cross-scored pill, that white-cross scored pill was DES, that Lilly made such a pill, and that summary judgment is improper on product identification. In <u>Kogen v. Eli Lilly, No.</u>, SACV 03-0962 (C.D. Cal., July 22, 2003), a mother remembered she took a white, cross-scored medicine for spotting but did not recall its name-- evidence was produced that the white-cross scored medicine was DES, and that Lilly made such a white cross-scored medicine. With much weaker evidence than presented here, the court ruled that evidence was credible and sufficient and thus summary judgment was improper. (<u>See</u> Kogen decision, attached hereto as App. 34).

> **D.    Mr. Principe, The Director of Pharmacy At Boston Lying-In, Testified That Only Eli Lilly's Brand of DES Was Dispensed At That Pharmacy**

Mr. Principe has thoroughly elaborated on the pharmaceutical practices at Boston Lying-In Pharmacy, where Mrs. Berg filled her stilbestrol prescription. Mr. Principe explained that no innovations, generic invasions, or significant changes in manner and method of purchasing, stocking and dispensing DES had occurred from 1963 (year of Plaintiff's exposure) to 1966. <u>See</u> Principe Dep., T82:15-T83:4, T120:7-15, App. 1; Principe Statement, App. 24. Further, Mr. Principe remembers only Eli Lilly's brand of DES on the shelves at the Boston Lying-In Pharmacy, and that if a woman came in to fill a prescription for stilbestrol, Lilly's DES would have been dispensed to her. <u>See</u> Principe Statement, App. 24 & Principe Dep., T84:13-18, App. 1. Back then, Mr. Principe remembered that the Boston Lying-In Hospital pharmacy ordered Lilly's brand because Lilly was a reputable manufacturer, and there is no reason to keep more than one particular brand on the shelves. <u>See</u> Principe Dep., T95-T96, App. 1.

As the Director of Pharmacy for multiple healthcare centers and an active Boston pharmacist since 1957, Mr. Principe was familiar and could glean from the personnel records, prescriptions and drugs on the shelves when he arrived, what the Hospital Pharmacy's practice and customary procedures were prior to his arrival, regarding the brand of DES usually and commonly stocked.  A reasonable jury could conclude that based on Mr. Principe's testimony, together with the mother, and pharmacist experts Sparr and Cafferty, that Boston Lying-In pharmacy only carried Lilly's DES because pharmacy practices did not significantly change from 1963-1966, when Mrs. Berg purchased her DES.  If the pharmacy maintained its Lilly-only DES practice from the eight years he was there (1964-1974), why would it have changed before?

**E.    The Red Book and Blue Book Proves Nothing**

The Red Book and Blue Book, Lilly's only alibi, is unsupported by any expert opinion to substantiate, explain, or elucidate their meaning.  It is beyond the purview of the average juror to understand its meaning and import without expert affidavits, it is neither relevant nor admissible.  It is inconceivable that hundreds of brands of DES would be on the shelves of the pharmacy involved. Lilly provides nothing but the geography marketing or supply aspects for patterns which the Red Book addresses.

The subject of adequate proof of identification in a DES case was thoroughly reviewed by the Seventh Circuit in McMahon v. Eli Lilly and Co., 774 F.2d 830 (7th Cir. 1985), attached hereto as App. 14).  There, as here, the plaintiff was unable to provide the written prescription or any record of whose DES she was exposed to.  Id. at 832.  The manager of the relevant pharmacy could not remember any particular brand and could not negate Squibb or other brands.  Id.  Lilly presented two pharmacists who claimed that Squibb's and other brands were purchased by the pharmacy.  Id. at 833-34.  (Something they have not ever tried in this case).  Both testified that

Squibb's was cheaper and would have been used.  Id. at 834.  Ms. Manning has much better

pharmacist evidence than Ms. McMahon had.  Nonetheless, Judge Wiegel, writing for a unanimous

Court, held that it was for the jury to believe or disbelieve this testimony and that plaintiff was

allowed to go to the jury on the testimony of a wholesaler only, who testified that "to the best of his

knowledge," that store bought the Lilly product.

## V.    MASSACHUSETTS LAW PROVIDES RECOVERY FOR PRECONCEPTION TORTS

### A.    PRECONCEPTION RIGHT IN MASSACHUSETTS

Citing Angelini v. OMB Corp., 575 N.E.2d 41 (Mass. 1991), McNulty v. McDowell, 613

N.E.2d 904 (Mass. 1993), and Lareau v. Page, 39 F.3d 384 (1st Cir. 1994), Lilly contends that Brian

Manning has no cognizable cause of action in Massachusetts because no court in the

Commonwealth has ever recognized "third-generation" claims, and that Massachusetts has

considered the viability of preconception torts "several times and rejected them." [Def. Mem. at 10].

Simply put, none of those Massachusetts decisions concern the right of a preconceived child

to sue for an injury caused by a tortfeasor's action where the child was injured directly by the

Defendant's wrongful conduct as has happened here.  They all concern loss of consortium for

emotional injuries - totally irrelevant to the Manning scenario.   In Angelini, the court did not even

consider an action by a preconceived child for his injury.  575 N.E.2d at 41.  Rather, the child was

suing for loss of consortium for his father's injuries that occurred before he was born.  Id. at 653.

Lareau also did not consider a preconception complaint by an injured child.  The court followed

Angelini in denying the right of a child's action for loss of consortium for her mother's brain injury

due to the fact that she was conceived many years after the injury itself, exactly the policy scenario

of a potentially unending stream of healthy litigants appearing on the scene that Angelini sought to

prevent.  Id. at 930.

While the court in <u>McNulty</u> stated that it would not rule on the preconception right of an injured child, it clearly upheld the viability of a preconception tort if justified by the facts of the case.  <u>See</u> 613 N.E.2d at 906-7.  The case turned on the fact that a defendant had no duty of care toward the preconceived child because the child's mother failed to establish a patient-physician relationship with the tortfeasor, her gynecologist.  <u>Id</u>.  The defendant could not have anticipated a pregnancy; plaintiff's only two visits with him were intended to relieve her from discomfort with a contraception device.  <u>Id</u>.  If she had established his duty, he would have been required to administer rubella shots, thereby preventing the resulting injuries that afflicted her fetus due to rubella.  <u>Id</u>. at 907.  Significantly, the Court declared itself open to the imposition of a preconception duty by declaring that "cases involving different allegedly wrongful preconception conduct might well yield different results."  <u>Id</u>.   Further, <u>McNulty</u> rejected any adaptation of <u>Albala v. City of New York</u>, 429 N.E.2d 786 (N.Y. 1981), one of Defendant's authorities, which denied recovery to a child born with defects resulting from damage done to his mother's uterus by the defendant's negligent performance of an abortion four years earlier.  613 N.E.2d at 906.  As noted in <u>McNulty</u>, the <u>Albala</u> court arbitrarily "declined to consider specifically the traditional tort concepts of duty, foreseeability, and causation, and instead created a policy-based rule that no cause of action would lie for negligence allegedly attributable to acts or omissions occurring prior to a plaintiff's conception."  <u>McNulty</u>, 613 N.E.2d at 906 (citing <u>Albala</u>, 429 N.E.2d at 788-9).  <u>McNulty</u> also pointed out that other courts "have not been persuaded by the <u>Albala</u> court's conclusion that preconception torts should be barred absolutely."  <u>Id</u>. (approvingly citing cases upholding the preconception right, including <u>Hegyes v. Unjian Enters</u>., Inc., 234 Cal. App. 3d 1103, 1118, 1124-1126 (1991); <u>Walker v. Rinck</u>, 604 N.E.2d 591, 595 (Ind. 1992); <u>Monusko v. Postle</u>, 175 Mich. App. 269, 275 (1989)); <u>Doolan v. IVF America</u> (MA), Inc., No. 99-3476, 12 Mass. L. Rep. 482,

**20**

2000 Mass. Super. LEXIS 582, at *11 (Nov. 20, 2000) (noting that a claim arising from a preconception tort "is not foreclosed under Massachusetts law," and distinguishing the "wrongful life" action before it from those preconception actions deemed cognizable in other jurisdictions in which "the negligence of the defendant caused the minor plaintiff to be born with severe defects, when he/she would have otherwise been born healthy.").

### B.     RECOVERY FOR PRECONCEPTION TORT IS ESTABLISHED LAW IN MASSACHUSETTS

Lilly argues to this Court that "Massachusetts has never upheld a preconception right" of action to support its contention that "it is highly unlikely" that the Commonwealth would ever recognize Brian Manning's cause of action.  [Def. Mot.10].  The Defendant ignores the prevailing common law rule that a preconception cause of action is viable as a matter of right.  Jorgensen v. Meade Johnson Laboratories, Inc., 483 F.2d 237, 240 (10th Cir. 1973), (tortious conduct occurring prior to conception should be actionable for an infant injured from a defective food product manufactured before his conception or he would be without remedy), Lough v. Rolla Women's Clinic, Inc., 866 S.W.2d 851, 854 (Mo. 1993) (explaining the absurdity of an absolute bar against preconception recovery illustrated by the following scenario:

Assume a balcony is negligently constructed.  Two years later, a mother and her one-year-old child step onto the balcony and it gives way, causing serious injuries to both the mother and the child.  It would be ludicrous to suggest that only the mother would have a cause of action against the builder, but because the infant was not conceived at the time of the negligent conduct, no duty of care existed toward the child.

It is unjust and arbitrary to deny recovery to [a child] simply because he had not been conceived at the time of [the] negligence.);  see also Walker v. Rinck, 604 N.E.2d 591 (Ind. 1992) ("[n]o one would seriously contend that an infant could not recover for injuries sustained as a result

of a defective product, such as an automobile, manufactured prior to the conception of the infant");

see generally International Union, United Auto., Aerospace and Agric. Implement Workers of

America, UAW v. Johnson Controls, Inc., 499 U.S. 187, 213 (1991) (White, J., concurring)

(stressing that "an increasing number of courts have recognized a right to recover even for prenatal

injuries caused by torts committed prior to conception", *citing* 3F Harper, F. James & O. Gray, Law

of Torts §18.3, at 677-78, n.15 (2d ed. 1986)); Renslow v. Mennonite Hosp., 367 N.E.2d 1250,

1254-55 (Ill. 1977) (where relief to an infant for injuries incurred in its pre-viable state make it clear

that a defendant may be held liable to a person whose existence was not apparent at the time of his

act); see also Bergstreser v. Mitchell, 577 F.2d 22, 25, n.4 (8th Cir. 1978) (noting "that the problems

presented by recognition of claims for prenatal and preconception injury have attracted considerable

recent attention from commentators.  The great weight of authorities in America is overwhelmingly

favorable to the trend toward recognition of causes of action for prenatal and preconception

injury"); Lynch v. Scheininger, 744 A.2d 113, 127 (N.J. 2000); Graham v. Keuchel, 847 P.2d 342,

365, n. 125 (Okla. 1993) (noting that "[t]he negligence was actionable since defendants could

foresee that . . . the substandard conduct could harm a later-conceived child"); Walker, 604 N.E.2d

at 591-2 (holding that "a child has a viable cause of action for injuries allegedly resulting from the

negligence of a physician and a medical laboratory prior to the conception of the child"); Pitre v.

Opelousas General Hosp., 530 So.2d 1151, 1157 (La. 1988) (holding that a tortfeasor "owes a duty

to the unconceived child as well as to its parents"); Monusko v. Postle, 437 N.W.2d 367, 369-370,

appeal denied (Mich. 1989) (holding "that defendants owed a duty to the plaintiff, even though she

was not conceived at the time of the alleged wrongful act").

> ## C.    ENRIGHT, GROVER, SPARAPANY, *ET AL.* CONCERN DIFFERENT FACTS, DIFFERENT ISSUES, AND DIFFERENT STATE LAWS AND ARE NEITHER BINDING NOR RELEVANT

Lilly misrepresents the state of the law regarding DES decisions. See *infra*. There are in fact five decisions for the child. The decisions Lilly cites are based on different facts, different times and different issues.

Lilly's reliance upon Enright is misplaced for a number of reasons. 77 N.Y.2d 377 (N.Y. 1991). Enright was rejected by Massachusetts in McNulty, *supra*, because Enright specifically adhered to the New York Albala rule in its bright-line preclusion of all claims for prematurely born injured children from DES on two basis: (1) the doctrine of *stare decisis* for New York law, and (2) that DES defendants should enjoy the same even-handed treatment as the defendant physician in Albala. Id. at 388. Unlike the instant case, Enright was a strict liability case in which negligence based on foreseeability was not even considered. Brian Manning has waived strict liability. The opinion in Enright erroneously asserted that the injurious effects from DES exposure could extend for generations as a "rippling effect," and consequently, it had to set what the court itself acknowledged were "artificial and arbitrary" boundaries. Id. at 387. In reality, the Plaintiff here does not allege any genetic, chromosomal, or generational risk, nor can the defendant even raise that risk. Indeed, neither the Plaintiff nor the Defendant has offered proof of such a risk. Brian Manning will never pass an injured gene to an after-coming generation because his injury stops with him. He was injured from a DES caused T-shaped uterus incapable of carrying him to full term, an injury where his brain was undercooked because his birth uterus was a DES damaged oven. His injury is not genetic, it is environmental. In other words, Enright's "rippling effect" concerns do not apply to this case.

Enright is also inapplicable because of the differences between Massachusetts and New York in its rules on ultimate liability. New York market share law holds the entire industry responsible. The court did not want to hold companies liable when they could not have made the

**23**

particular drug absorbed by the DES daughter.  Id.  Upholding the market share liability, Enright

was hesitant to expand liability any further where DES manufacturers were already collaterally

estopped from contesting liability.  A full decade after Enright, the Second Circuit interpreting New

York law reversed Enright, siding with those jurisdictions "characterizing New York's approach as

'draconian' and holding that DES preconception torts'" can be the basis of liability.  E.R. Squibb &

Sons, Inc. v. Lloyd's & Cos., 241 F.3d 154, 171, n. 6 (2d Cir. 2001), App. 21.

        Grover, which piggybacked on Enright, is fully distinguishable from this case.  That

plaintiff's failure to provide any proof of proximate cause linking Lilly's failures to the child's injury

was the basis of denial.  591 N.E.2d at 700.  However, Grover's DES daughter was exposed in utero

in 1952, before the publication of major studies linking DES with reproductive anomalies and

before the national thalidomide crisis in 1962.  Accordingly, the Grover court was not shown nor

did it consider the overwhelming scientific evidence available to Lilly in 1962 that proves as

foreseeable any resulting premature injury to the children of DES daughters.  In other words, what

was perhaps unforeseeable to Lilly in 1952 had become foreseeable ten years later, after these

studies and other critical information were made public, when Brenda Manning was exposed to

DES in utero.

        Lilly cites Sparapany for its rejection of the cause of action by preconceived children even

though the decision was solely based on the Illinois holding of Renslow, infra, that preconception

torts committed prior to August 8, 1977 were effectively barred.  Renslow, in a peculiarly Illinois

setting, decreed that liability extending to a new class of victims can only apply prospectively. 249

Ill. App. 3d at 393.  Importantly, the court emphasized that "nothing in its opinion" spoke to the

issue of whether a pharmaceutical manufacturer is liable for injuries suffered by preconceived

grandchildren.  Id. at 394, (Greiman, J., specially concurring) (objecting to any "unnecessarily

premature cut-off of claims by DES grandchildren," and agreeing that "'logic and sound policy require a finding of a legal duty in this case.'")

Of little weight to these proceedings are <u>Loerch v. Eli Lilly and Co.</u>, 445 N.W.2d 560 (Minn. 1989) and <u>Wood v. Eli Lilly & Co.</u>, 38 F.3d 510 (10th Cir. 1994). <u>Loerch</u> upheld the district court's grant of summary judgment without opinion pursuant to an evenly divided 4 to 4 vote by the appellate justices. 445 N.W.2d at 560. <u>Wood</u> is also inapplicable to this case because the appellate court's denial of the plaintiff's claims were predicated on the identification issue, not on any 3rd generation issue. 38 F.3d at 513-14. The court refused to adopt the market share formula of assessing manufacturer liability, specifically not ruling on the whether the plaintiff's preconception right was cognizant. <u>Id</u>.

## D.    PLAINTIFF'S AUTHORITIES UPHOLD THE DES PRECONCEPTION RIGHT

Defendant Lilly neglects to mention that at least four trial courts and one appellate court have ruled that children born prematurely from daughters exposed to DES have cognizable claims. <u>Sorrells v. Eli Lilly and Company</u>, No. 60386 (MD. Cir. Ct. Mont. County 1990) (attached hereto as App. 12), <u>Murchison v. Eli Lilly and Company</u>, No. H-88-927 (S.D. Tex 1991) (attached hereto as App. 13), <u>McMahon</u>, 774 F.2d at 830 (attached hereto as App. 14), <u>DeMayo v. Schmitt</u>, 5 Pa. D. & C.4th 197 (Pa. Commonp. Ct. 1989) (attached hereto as App. 15), <u>E.R. Squibb</u>, 241 F.3d at 169 (2d Cir. 2001) (attached hereto as App. 21). Hoping to forestall any further liability, Lilly has strategically declined to appeal any of those decisions to a higher court.

In <u>McMahon</u>, (App. 14), the Illinois appellate court reversed a lower court's directed verdict for the defendant, holding that a jury could find that it was sufficiently foreseeable that Lilly knew or should have known that DES might cause reproductive abnormalities, such as prematurity, in the

female offspring exposed to DES during pregnancy.  774 F.2d at 834.  <u>McMahon</u> noted the significance of experimental data prior to 1955 demonstrating that "exogenous estrogens (including DES) could cause physical abnormalities in the reproductive tracts of animals exposed to the drug *in utero*."  <u>Id</u>.

DeMayo, (App. 15), also rejected the defendant manufacturer's motion for summary judgment, explaining that "if proper animal tests or other research would have shown genital defects in offspring of DES mothers, it would not be unforeseeable that those genital problems could result in premature births and other defects in the grandchildren."  5 Pa. D. & C.4th at 200.  The court in <u>DeMayo</u> concluded, *inter alia*, that "the most reasonable way to approach the problem is to allow recovery for the third generation if the manufacturer negligently failed to learn of genital-tract injuries to the second generation."  <u>Id</u>.

The trial court in <u>Sorrells</u> denied summary judgment for Lilly, finding persuasive plaintiff's argument that the claim was not too remote, and that her injuries were the proximate result of an organ that was malformed due to DES exposure.  <u>See</u> Official Transcript, p. 32, App. 12).

Third-generation recovery in a DES setting was allowed in <u>Murchison</u>, (App. 13), stating that the claim is not remote in that many years pass before the injury becomes known to the DES daughter, that "DES claims are simply different from other tort claims, even other preconception tort claims, in that the damage allegedly caused by DES does not manifest itself until the fetus exposed to the drug becomes a mother."  <u>Id</u>. at 8.  The court handed Lilly a defeat, finding that there would be no "rippling effect" because there was no evidence of genetic damage to the prematurely born child.  <u>Id</u>.  The court in <u>Taylor v. Cutler</u>, also expressed its approval of third generation DES claims, stating:

> [D]ecisions that have recognized or suggested preconception liability in the context of product liability actions, [especially when those] cases have involved the imposition of liability on drug manufacturers of diethylstilbestrol ("DES") for injuries caused to the offspring of women exposed to the drug. [In] those cases, DES was administered to pregnant women to help prevent miscarriages. Female children of mothers who ingested DES (second-generation offspring) and their children (third-generation offspring) have suffered from reproductive problems ranging from infertility to cancer. [The] drug manufacturer's knowledge in producing the drug is inextricably related to the mother's reproductive capacity. Thus, based on the manufacturer's testing of the product, research, and knowledge, the company knew, or should have reasonably perceived, that potential side effects of the drug may cause harm to the mother's future offspring.

Taylor , 703 A.2d 294, 301-02 (N.J. Super. Ct. App. Div. 1997), App. 16.

Lastly and most importantly, the Second Circuit in New York refused to follow Enright and upheld the District Court's ruling in a DES setting. Squibb, 241 F.3d at 154, App. 21. The court stated that "the third-generation claimants' injuries are covered because they were causal consequences of 'occurrences'– in utero injuries-in-fact to the reproductive systems of the second DES generation." Id.

## VI.   BRIAN MANNING'S ACTION IS NOT REMOTE

Lilly argues that Brian Manning cannot demonstrate that Lilly ever owed him any duty, that his injury was "too remote," because it was not reasonably foreseeable when Lilly sold DES that those pills would cause his injuries. [Def. Mem. 13]. This is a classic jury question. In addition to scientific studies, the Plaintiff will present the testimony of two eminent scientists, the chair of the Toxicology Department at Baylor and an OB/GYN professor at George Washington University, who will state that it was, a matter of fact, foreseeable in 1962 that a Brian Manning type scenario would follow from his mother's prenatal DES exposure. See Statement of Harris Busch, hereto attached App. 17 & Statement of Richard J Falk, MD, hereto attached as App. 18. The Plaintiffs' experts are entitled, at this stage, to be given every reasonable inference and to be believed.

### A.    BRIAN MANNING'S INJURY WAS FORESEEABILE, WHICH ESTABLISHES LILLY'S DUTY OF CARE

It has long been held in Massachusetts that tortfeasors have a duty to those foreseeably placed at risk by their misconduct who proximately come to harm. Palsgraf v. Long Island R. Co., 162 N.E. 99 (N.Y. 1928); Cigna Ins. Co. v. Oy Saunatec, 241 F.3d 1, 16 (1st Cir. 2001) (emphasizing that foreseeability is the "cornerstone" of a duty "to eliminate defective products); Fithian v. Reed, 204 F.3d 306, 309 (1st Cir. 2000) (noting that, under a reasonable care standard, defendants have a "duty to prevent foreseeable injury"); Tolentino v. UPS, No. 98-CV-10369, 2001 U.S. Dist. LEXIS 1395, at *20 (D. Ma. Jan. 11, 2001) ("[t]he injury was reasonably foreseeable and therefore a duty of care to the plaintiffs existed"); Hoffman v. Houghton Chem. Corp., 751 N.E.2d 848 (Mass. 2001) (reaffirming that "a supplier of a potentially dangerous product has a duty to warn all foreseeable users of known or reasonably foreseeable hazards of the product's use"); Jean W. v. Commonwealth, 610 N.E.2d 305, 309 n.6 (Mass. 1993) (reaffirming that "foreseeability of the harm was the 'most crucial factor' justifying liability," and that defendants "had a duty to any foreseeable victim of that harm"); Glick v. Prince Italian Foods, Inc., 902, 514 N.E.2d 100, 102 (Mass. App. Ct. 1987) (indicating that a proximate cause finding is warranted when "the general character and probability of the injury [is] foreseeable," and that a "duty [is] owed when the risk which results in the plaintiff's injury [was] one which could be reasonably anticipated by the defendant"); see generally Lough, 866 S.W.2d at 854 (in preconception tort context, stressing that "[a]ny question of duty depends upon . . . the foreseeability of harm and the degree of certainty that the protected person suffered injury," among other factors).

In determining foreseeability, this Court must review what was, or should have been known, to Lilly prior to 1963. By 1963, a number of highly credible scientific studies had been published in

various reputable journals pointing to the potential dangers to the reproductive organs in the offspring of those animals administered DES.

Starting in 1939, researchers uncovered a stunted uterus in the mammalian daughters exposed to DES *in utero*.  *Infra*, Greene, R., Burrill, M, Ivy, A., "Experimental Intersexuality: the Paradoxical Effects of Estrogens on the Sexual Development of the Female Rat,"  The Anatomical Record, Vol. 74, May-Aug., 1939, App. 5.  In 1947, eminent investigators raised the following critical questions in esteemed journals as to the efficacy of DES for pregnant women, specifically:

(1) whether large dosages of DES are carcinogenic and unsafe to pregnant women (it in fact caused cancer for the child *in utero*), (2) how DES will affect the glandular balance of the child *in utero* (it in fact malformed the child's uterus), (3) does DES work better than other drugs in preventing miscarriage (no, it in fact does not).  See Rosenblum, Gordon et al., "Preservation of the Threatened Pregnancy with Particular Reference to the Use of Diethylstilbestrol," West J. Sur. Obst. and Gyn., 55:597, 1947, attached hereto as App. 6.   Defendant Lilly should have answered those questions before promoting DES to pregnant women and their daughters.

In 1950, Enders reported that female minks who consumed DES in their feed (chicken waste) were unable, or barely able (less than 1%), to reproduce.  Significantly, Enders stated that the kits that were born from those minks had ovaries "injured beyond recognition."  *Infra*, Enders, R., "Mink Production in Relation to Stilbestrol," The Fur Journal, September/October 1950, 16:(7), pp 4, App. 22.

In 1953, Dieckman and Associates at the University of Chicago conducted the first controlled double-blind prospective test of the efficacy of DES, (also which Lilly failed to investigate).  They concluded that there were more births in the women who were not exposed to DES than in a control group of DES exposed women.  See Dieckmann, Davis, Rynkiewicz, &

**29**

Pottinger, "Does the Administration of Diethylstilbestrol During Pregnancy Have Therapeutic Value?", 66 Am J Obstetrics & Gynecology 1062 (1953).  In 1962, an AMA publication "The Passage of Drugs across the Placenta" revealed that nearly all drugs used in obstetrics are found to cross the placenta to some degree.  *Infra*, Moya, F. & Thorndike, V., <u>Am.J.Obstet. & Gynec.</u>, Vol. 84, No.11, Part 2, Dec.1962:1778-1798, App. 8.

In 1962, the national thalidomide crisis alarmed that a reproductive drug could cause fetal anomalies as a teratogen and called for a reappraisal of all drugs given to pregnant women.  Again, Lilly's failure and willful refusal to investigate these startling and potentially catastrophic studies is sufficiently brazen in law and justice to hold them responsible for Brian Manning's injuries.  <u>See</u>, e.g., <u>McMahon</u>, 774 F.2d at 835-36 (finding that "[t]here was sufficient evidence from which a jury could reasonably have found that in 1955 Lilly knew or should have known that DES might cause reproductive abnormalities . . . in the female offspring of women exposed to DES during pregnancy").

### B.    LILLY'S DES DRUG PROXIMATELY AND COMPELLINGLY CAUSED BRIAN MANNING'S INJURIES

While foreseeability concerns itself with whether it is reasonable from the defendant's vantage point that his harmful conduct may injure another *at the time he sold his drug*, causation is the more narrow question of whether his dangerous drug can be shown to have brought about Plaintiff's injury.  <u>See</u> Reports of Medical Experts, App. 9-11; <u>Payton v. Abbot Labs</u>, 437 N.E.2d 171 (Mass. 1982) (that causality is the narrow question of whether the plaintiff can prove that a particular defective drug directly caused his injury).

In the instant case, it is uncontested that Brian Manning's injury is the direct consequence of his mother's exposure to DES.  Had she not been exposed, it is more likely than not that Brian would have gone to term.  Janet Parrella Berg ingested DES manufactured by Lilly while she

carried Brenda Manning *in utero*. DES, containing massive amounts of estrogen, stunted the normal embryonic development of Brenda Manning's uterus and cervix, causing her uterus to become hypoplastic and T-shaped, and her cervix undeveloped and immature. See Reports of Medical Experts, App. 9-11. Years later, Brenda Manning conceived Brian Manning in her small and T-shaped uterus, which became Brian Manning's organ for 26 weeks. Id. Because this shared organ had limited expansion capability, Brian Manning was born after only 26 weeks of gestation, and consequently, suffers from cerebral palsy, hemiparseis (partially paralyzed on one side), seizure disorder, and severe ongoing neurological, motor, and developmental delays. See Dr. Bourgeois' Report, App. 11. The nexus between DES and Brian Manning injury, between his mother's malformed uterus and cervix and his prematurity, is proximate with respect to space and time.

The Massachusetts Supreme Court in Payton v. Abbot Labs, considering the question of whether Lilly was liable for harm caused by DES to the child *in utero* (it was), emphasized the efficacy of the finder-of-fact, jury or judge's role in reviewing the evidence and determining the sufficiency of causation; that the plaintiff had the right to prove his case in court. 437 N.E.2d at 183-184. Payton considered the very same argument Lilly raises now, that "recovery should not be allowed because of the practical difficulty of proving causation." Id. The court asserted that medicine and science had made advances "that take care of these arguments," where the plaintiff could show causation through "objective tests," expert witnesses, and scientific exhibits and studies. Id. Unlike emotional harms, the court stated it was "convinced" that there should be no bar to plaintiff's action for "injuries that can be demonstrated to exist by medical evidence, and *for all harm to the plaintiffs that is naturally and reasonably related to those injuries*. (emphasis added)." Id. Indeed, Payton chronicled a number of cases in Massachusetts history, noting the clear legal trend in favor of permitting recoveries based on advances in objectively proven theories of

31

causation.  Id.  Agreeing with Payton, the court in Renslow, *infra*, proclaimed its confidence that when a preconception case is presented, "the judiciary will effectively exercise its traditional role of drawing rational distinctions, consonant with current perceptions of justice, between which are compensable and those which are not."  67 Ill. 2d at 358.

## VII.    BRIAN MANNING'S ACTION WOULD NOT DETER BENEFICIAL DRUGS FROM THE MARKET

Lilly claims that allowing Brian Manning's cause of action would have "detrimental effect on research and development of new and useful drugs" without a single supporting authority or fact. [Def. Mem. at 10].   The Defendant simply makes the bare assumption that somehow compensating Brian Manning will be the death knell of research of new or helpful products.

Lilly misleads this Court by offering selected quotes from their citations by asserting that courts only consider the policy dangers of "over-deterring" drug companies from distributing useful drugs into market.

In Blankenship v. General Motors Corp., 406 S.E.2d 781 (W.Va.1991), the court expanded comparative accident liability against General Motors for defective automobile design after considering the public policy considerations of deterring defective products against any possible "over-deterrence" effect.  406 S.E.2d at 783 (Lilly neglected to give us the first part of its citation that "…most large companies with established products consider product liability a minor annoyance.")

Payton similarly balances both public policy arguments (which Lilly again neglects to tell the court), but in the context of whether to expand DES liability to a market share analysis in product identification, not on how DES affected two plaintiffs, a mother and her son.  437 N.E.2d at 190.  The difference in deterrence, recognized by Payton, is critical because that court had to

32

determine industry-wide liability - a generalized mass of pills (including generic pills) made by known and unknown manufacturers in market share, while in the instant case, only one company furnished the DES to Mrs. Berg.  Id.  In other words, Payton's decision would have affected, besides Lilly, numerous other manufacturers, most of whom could not have sold the drug in question.  Here, only Lilly can be held liable for Plaintiffs' injuries, if it is found that they made the drug in question.

## VIII.  CONCLUSION

For the reasons set forth, Defendant Lilly's motion for summary judgment should be denied or alternatively, the preconception tort issues should be certified as a question of law to the Massachusetts Supreme Court.

Respectfully submitted,

_____  /s/ Alan L. Cantor

ALAN L. CANTOR, BBO #072360
SWARTZ & SWARTZ
10 Marshall Street
Boston, MA  02108
(617) 742-1900

AND

Aaron M. Levine, Esq.
AARON M. LEVINE & ASSOCIATES
1320 Nineteenth Street, N.W. 5th Floor
Washington, D.C. 20036
(202) 833-8040

Counsel for Plaintiffs

33