Case 1:04-cv-11164-MBB   Document 28-14   Filed 05/31/2005   Page 1 of 7

Page 1

774 F.2d 830, *; 1985 U.S. App. LEXIS 23576, **;
CCH Prod. Liab. Rep. P10,668

LEXSEE 774 F.2D 830,AT 835

**MARY McMAHON, et al., Plaintiffs-Appellants and Cross-Appellees, v. ELI LILLY AND COMPANY, Defendant-Appellee and Cross-Appellant**

Nos. 84-2721, 84-2896

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

774 F.2d 830; 1985 U.S. App. LEXIS 23576; CCH Prod. Liab. Rep. P10,668

May 29, 1985, Argued
October 9, 1985

**PRIOR HISTORY:** [**1]

Appeal from the United States District Court for The Northern District of Illinois. No. 82 C 2822- Frank J. McGarr, Judge.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Robert A. Filpi, Stack & Filpi, Chicago, Illinois, for Plaintiff.

Steven C. Parrish, Shook, Hardy & Bacon, Kansas City, Missouri, for Defendant.

**JUDGES:**

Flaum and Easterbrook, Circuit Judges, and Weigel, Senior District Judge. *

* The Honorable Stanley A. Weigel, Senior District Judge of the Northern District of California, is sitting by designation.

**OPINIONBY:**

WEIGEL

**OPINION:**

[*831] WEIGEL, Senior District Judge.

In proceedings below, plaintiffs Mary McMahon and her husband Francis sued in their individual capacities and as representatives of their deceased son. They claimed that the Eli Lilly and Company ("Lilly"), a pharmaceutical manufacturer, failed to warn adequately of the dangerous propensities [*832] of diethylstilbestrol (DES). n1 This failure to warn, plaintiffs claimed, rendered DES an unreasonably dangerous product, so that Lilly should be held strictly liable for injuries allegedly caused by the drug.

 n1 DES is a synthetic hormone (estrogen) once commonly prescribed to prevent miscarriage.

[**2]

Mrs. McMahon has found it difficult to achieve full-term pregnancies and normal deliveries. Several of her children have been born prematurely. One premature infant son died. During each of her later pregnancies, Mrs. McMahon was bedridden throughout the final months. Plaintiffs claim that these difficulties were caused by her exposure to DES prenatally when her mother ingested the drug.

The case was tried to a jury. After the jury was unable to reach a verdict, the district court granted defendant's motion for a directed verdict. First, the court ruled that plaintiff "has not made out a *prima facie* showing that the defendant Lilly manufactured the drug she took." Second, it ruled "Plaintiff did not establish a *prima facie* case that Lilly knew or should have known of a risk of pre-term labor or prematurity among children of those women who in 1955 had ingested DES during pregnancy."

Plaintiffs appeal. Lilly cross-appeals, arguing that plaintiffs' claims are barred by Illinois' product liability statute of repose.

I.

Case 1:04-cv-11164-MBB   Document 28-14   Filed 05/31/2005   Page 2 of 7

Page 2

774 F.2d 830, *; 1985 U.S. App. LEXIS 23576, **;
CCH Prod. Liab. Rep. P10,668

A motion for directed verdict raises only a question of law -- not a mixed question of law and fact. *See General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc., 695 F.2d 281, 285 (7th Cir. 1982).* [**3] When ruling on such a motion, the trial judge does not exercise discretion, but rules as a matter of law.

In this diversity action, Illinois law governs the standard for taking a case away from the jury. *Lykos v. American Home Ins. Co., 609 F.2d 314, 315 (7th Cir. 1979), cert. denied, 444 U.S. 1079, 100 S. Ct. 1030, 62 L. Ed. 2d 762 (1980).* The Illinois standard, as formulated in *Pedrick v. Peoria and Eastern R.R., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967),* is that "verdicts ought to be directed . . . only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." The district court's Memorandum Opinion and Order do not reveal whether this strict standard was applied in granting Lilly's motion for directed verdict. Therefore, we undertake an independent review of the record. *See General Foam Fabricators, Inc. v. Tenneco Chemicals, Inc., supra, at 286.*

a. **Product Identification**

We consider first whether the district court correctly directed a verdict [**4] on the ground that plaintiffs failed to demonstrate that the DES ingested by Mrs. McMahon's mother was manufactured by Lilly. This issue turns on the proof adduced by plaintiffs and the credibility of Lilly's witnesses.

Mrs. McMahon's mother and father testified that one Dr. Eskridge, now presumably deceased, prescribed DES for Mrs. McMahon's mother during the second month of her pregnancy -- approximately April 1955. She filled the prescription at the Conrad-Marr Drug Store in Midwest City, a suburb of Oklahoma City, Oklahoma.

No record of that purchase survives. Nor are there any records of the brands of DES stocked by the store in 1955. At trial, plaintiffs read the deposition of Daniel B. Casey, who was manager of the Conrad-Marr drug store beginning in March, 1955. Mr. Casey recalled filling prescriptions for Dr. Eskridge, although he did not remember any particular prescriptions.

Mr. Casey's managerial duties included purchasing prescription pharmaceuticals. He testified that he was certain that he had purchased DES for the Conrad-Marr store in 1955, and that he had stocked the Lilly brand. "The only brand I recall is the Lilly Brand. That is not to say that we didn't [**5] have another brand, but that's the only one [*833] I recall." He stated that the store "probably most likely" bought the DES from McKesson & Robbins, a pharmaceutical wholesaler, because "we bought the majority of our drugs from McKesson & Robbins." Mr. Casey testified that McKesson & Robbins and Fox Vliet were "the only two wholesalers we used." He was certain the store had bought DES from McKesson & Robbins in 1955: "As I say, I don't recall specifically, but I'm sure we did because we had it in stock." He did not recall ordering DES from anybody else in 1955.

Plaintiffs put in evidence the affidavit of Stanley Chrisman, who described himself as the pharmaceutical buyer for Foremost-McKesson, Inc. from 1951 until 1957, and as "familiar with the purchases and sales made by Foremost-McKesson, Inc. at that time, including sales made to the pharmacy from whom Mary Dunne allegedly purchased DES in 1955." Mr. Chrisman stated that, to the best of his knowledge, "the DES sold by Foremost-McKesson, Inc. to the pharmacy from whom Mary Dunne purchased DES in 1955 was manufactured by Eli Lilly & Company," and that "the only DES sold by Foremost-McKesson, Inc. to any pharmacy in Oklahoma [**6] City in 1955 was manufactured by Eli Lilly & Company." n2

  n2 The affidavit was properly admitted into evidence because defendant Lilly's counsel waived the hearsay objection, and because, while the affidavit refers to Oklahoma City rather than Midwest City, the latter city was officially part of the former. We also note that it appears that all parties assumed, and this Court finds no reason to disagree, that Foremost-McKesson, Inc. is the successor corporation of McKesson & Robbins.

Finally, plaintiffs read into evidence Lilly's responses to two interrogatories. These responses indicated that Lilly had no information or records suggesting that DES manufactured by any drug company other than Lilly was sold by McKesson & Robbins, Fox Vliet, or any other wholesale pharmaceutical distributor in the area of Oklahoma City in 1954-1955.

To refute plaintiffs' claims Lilly's presented the testimony of two pharmacists from Bonham, Texas, n3 who claimed they worked at the Conrad-Marr Drug Store in Midwest City in [**7] 1955, though not during April, when the DES taken by Mrs. [*834] McMahon's mother was purchased. The first pharmacist, Seth Taylor, testified that he had been responsible for ordering drugs at the store. He stated that he worked for the store in early 1955, but was not there when Mr. Casey began in March 1955. The second pharmacist, Clarence Countryman, testified that he generally placed orders for drugs when the store manager, Mr. Casey, was unavailable. He began working at the store in fall of 1953.

  n3 Plaintiffs characterize the two pharmacists

Case 1:04-cv-11164-MBB    Document 28-14    Filed 05/31/2005    Page 3 of 7

Page 3
774 F.2d 830, *; 1985 U.S. App. LEXIS 23576, **;
CCH Prod. Liab. Rep. P10,668

as "surprise witnesses," because Lilly first disclosed their existence in its May 23, 1984, pretrial submission. Through a supplemental interrogatory, plaintiffs learned the general nature of the pharmacists' intended testimony on May 30, 1984, just eleven days before trial. Plaintiffs deposed the pharmacists only on the morning before they testified at trial.

Plaintiffs would have had an opportunity to depose the pharmacists earlier if Lilly had responded forthrightly to plaintiffs' interrogatory asking "whether Lilly has any information indicating that . . . any other wholesale pharmaceutical distributor sold DES other than that manufactured by Lilly in the area of Oklahoma City, Oklahoma in 1954-1955." Lilly denied having any such information, and now claims that its response was proper because Taylor and Countryman testified at trial that they bought DES directly from Squibb, a "manufacturer," rather than a "wholesale pharmaceutical distributor." Lilly concedes that Squibb distributed pharmaceutical products in the wholesale market.

Lilly argues that any surprise associated with the pharmacists' testimony is attributable to plaintiffs' inadequate discovery efforts. This claim is disingenuous at best. Lilly's counsel flatly mischaracterized his witnesses' testimony, telling the district court that at deposition "they testified that their drugstore, Conrad-Marr, bought Squibb's DES, stilbestrol, directly from E.R. Squibb and not from any wholesaler." In fact, *both* pharmacists had testified a few hours earlier that they had ordered DES from wholesalers. Taylor stated that Fox Vliet was "the only one I ever remember talking to," and Countryman stated that DES "would have been ordered from Fox Vliet or McKesson." Had the pharmacists not changed their stories when they testified at trial that afternoon, their testimony would have *directly* contradicted Lilly's response to plaintiff's interrogatory.

Taylor testified at his deposition that Lilly's attorneys first contacted him in 1983. Even if it is true, as Lilly claims, that Lilly "first learned of the nature of their testimony in April, 1984," Lilly was "under a duty seasonably to amend" its response to plaintiffs' interrogatory. *See F.R. Civ. P. 26(e)(2)(B)*.

Because no transcript of the two pharmacists' depositions was available to verify plaintiff's recollection of the deposition testimony, the district court did not abuse its discretion by permitting Taylor and Countryman to testify at trial. *See generally*, 8 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2050 (1970 & Supp. 1985) (and cases cited therein).

[**8]

Both pharmacists testified that Conrad-Marr had stocked DES manufactured by the Squibb Company and other pharmaceutical manufacturers, as well as DES produced by Lilly. They testified that Lilly's DES was available only through wholesalers, while Squibb's DES could be purchased directly from the manufacturer. n4 Both pharmacists claimed they remembered the relative prices of Squibb's and Lilly's DES in the Conrad-Marr store in 1955.

> n4 Since Taylor and Countryman were not deposed until the morning of their testimony at trial, no transcript was available for impeaching their credibility.

Taylor and Countryman both testified that they would have filled any prescription for DES with Squibb's DES, since Squibb's was cheaper for the *customer* than Lilly's. Plaintiffs' counsel challenged Taylor's credibility on cross-examination, and on redirect, Taylor changed his testimony, asserting that Squibb's DES had been cheaper for the *store*. Countryman testified on cross-examination that Squibb's DES was "cheaper [**9] to the customer" and that he did not believe that it was "a great deal" cheaper to the store. n5

> n5 Plaintiffs' counsel confronted Mr. Taylor with a copy of the 1954-1955 American Druggist Blue Book (a price list), and Mr. Taylor acknowledged that Squibb and Lilly DES were "fair-traded" -- that is, both products carried the same minimum retail price, except for certain dosages. Similarly, Mr. Countryman conceded on cross-examination that "Fair Trading sets the price at which you would sell the product. . . ."

The testimony of Mr. Taylor and Mr. Countryman was the only direct evidence offered to show that the Conrad-Marr drugstore carried DES manufactured by any company other than Lilly. A reasonable jury could have disbelieved these witnesses altogether, even though the full extent of the contradictions in the witnesses' testimony was not before the jury. *See supra* notes 3 & 4. They could have noted the uncanny similarities in the witnesses' testimony, which both witnesses changed, regarding the relative [**10] prices of Squibb's and Lilly's DES. The jury might also have questioned the remarkable specificity of the witnesses' memories about a

774 F.2d 830, *; 1985 U.S. App. LEXIS 23576, **;
CCH Prod. Liab. Rep. P10,668

product sold at a store where they had worked more than a quarter century ago. In assessing Mr. Taylor's credibility, the jury may also have noted that he could not recall the address of his residence when he lived in Midwest City. And finally, the jury could have given some weight to the fact that only plaintiffs' witness, Mr. Casey, worked at the Conrad-Marr store in April 1955, when the DES taken by Mrs. McMahon's mother was purchased.

As with other elements of proof in a civil action, product identification need only be established by a preponderance of the evidence. *See Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 553, 356 N.E.2d 779, 784, 1 Ill. Dec. 497 (1976). The question in this case is a close one. However, we have concluded that the testimony of Daniel B. Casey and Stanley Chrisman was sufficient to support a jury verdict identifying the DES as Lilly's.

**b. Foreseeability**

Plaintiffs introduced expert testimony reviewing and summarizing published medical research available prior to 1955. These publications reported [**11] experiments showing that exogenous estrogens (including DES) could cause physical abnormalities in the reproductive tracts of animals exposed to the drug *in utero*. The literature before 1955 contained suggestions that the experimental results for laboratory animals might portend dangers for humans as well. On this basis, plaintiffs' expert testified that Lilly and other manufacturers should [*835] have included a label warning physicians of these experimental results. On cross-examination, plaintiffs' expert acknowledged that Lilly could not have specifically foreseen that DES might cause the problem of prematurity, from which Ms. McMahon suffers, in daughters of women using the drug.

Lilly presented expert testimony minimizing the significance of animal experiments. Lilly's experts testified that it was not reasonably foreseeable, in 1955, that the use of DES during human pregnancy might cause abnormalities of the female reproductive tract or future problems during labor and delivery.

In granting Lilly's motion for directed verdict, the district court ruled that plaintiffs had failed to prove that "Lilly knew or should have known of a risk of pre-term labor or prematurity [**12] among children of those women who in 1955 had ingested DES during pregnancy." n6 This ruling frames the question of foreseeability far too narrowly. Under Illinois precedent, to prevail on a failure to warn claim, a plaintiff must show "that the manufacturer knew or should have known of the danger presented by the use or consumption of the product" and that the manufacturer did not warn of the product's "dangerous propensities." *Woodill v. Parke Davis & Co.*, 79 Ill. 2d 26, 402 N.E.2d 194, 198, 37 Ill. Dec. 304 (1980). Plaintiffs need not prove that Lilly should have anticipated the precise injuries allegedly suffered, so long as the injuries lay within the scope of the known dangerous propensities of DES. n7 *See Ferebee v. Chevron Chemical Co.*, 237 U.S. App. D.C. 164, 736 F.2d 1529, 1537 (D.C. Cir.), cert. denied, 469 U.S. 1062, 105 S. Ct. 545, 83 L. Ed. 2d 432 (1984) ("Absent a general warning about the relationship between such exposure and lung complications . . . [defendant] cannot escape its duty to warn by asserting that it had insufficient knowledge of the *particular* way in which [the injuries] came about.") (emphasis [**13] in original).

n6 Lilly's makes a similar argument on appeal. But it also emphasizes that plaintiffs did not prove that Mrs. McMahon has suffered from any particular *physical* abnormality (such as abnormal cells, anatomical defects, etc.) in her reproductive tract. Lilly contends that even if evidence linking DES to physical abnormalities was available in 1955, Mrs. McMahon suffers "purely physiological injury."

This contention scarcely merits consideration. Lilly does not offer serious legal argument supporting its distinction between physical and physiological injury, and the distinction contributes little to analyzing the problem of reasonable foreseeability.

n7 Plaintiffs must also prove that Mrs. McMahon's injuries were caused by her mother's ingestion of DES. Although the district court did not reach this question, it intimated that plaintiffs' evidence was insufficient. Mrs. McMahon's treating physician, an expert witness, testified that it was "more likely than not" that Mrs. McMahon's injuries were caused by prenatal exposure to DES. This testimony was sufficient to allow the jury to consider the question.

[**14]

As with most other questions of proximate causation, no simple legal formula exists for precisely fixing the scope of a product's known dangerous propensities. *See Prosser and Keeton on the Law of Torts*, § 43 at 297 (5th ed. 1984). It was for the jury to determine whether Mrs. McMahon's injuries were within the scope of the known "dangerous propensities" about which Lilly had a duty to warn the public. *See Ferebee v. Chevron Chemical Co., supra*, at 1534 ("Judges . . . have no special competence to resolve the complex and refractory causal issues raised by the attempt to link low level exposure to toxic chemicals with human disease. On questions such as these, which stand at the frontier of current medical and epidemiological inquiry, if experts are willing to testify that such a link exists, it is for the

774 F.2d 830, *; 1985 U.S. App. LEXIS 23576, **;
CCH Prod. Liab. Rep. P10,668

jury to decide whether to credit such testimony"); *cf. Jackson v. Johns-Manville Sales Corp.*, 750 F.2d 1314, 1320 (5th Cir. 1985) (*en banc*) ("In establishing the scope of a manufacturer's duty to warn, therefore, evidence of all known or foreseeable hazards posed by the product is relevant.").

There was sufficient evidence from which a jury could [**15] reasonably have found that in 1955 Lilly knew or should have known that DES might cause reproductive [*836] abnormalities, such as prematurity, in the female offspring of women exposed to DES during pregnancy.

II.

In its cross-appeal, Lilly claims that plaintiffs' claim is barred by Section 13-213 of Chapter 110, Ill. Rev. Stat. 1984, Minichello & Orpett, *Beat the Clock: The New Products Liability Statute of Limitations in Illinois*, 67 Ill. B. J. 414, 414 n. 2 (1979) (hereinafter *Beat the Clock*). n8 The statute of repose, Lilly argues, provides an additional basis for affirming the district court's directed verdict.

n8 Ill Rev. Stat. 1984, Ch. 110, para. 13-213 (*formerly* Ill. Rev. Stat. 1979, Ch. 83, para. 22.2) provides in relevant part:

> (b) . . . No product liability action based on the doctrine of strict liability in tort shall be commenced except . . . within 12 years from the date of first sale, lease or delivery of possession by a seller or 10 years from the date of first sale, lease or delivery of possession to its initial user, consumer, or other non-seller, whichever period expires earlier, of any product unit that is claimed to have injured or damaged the plaintiff, unless the defendant expressly has warranted or promised the product for a longer period and the action is brought within that period.
>
> . . .
>
> (d) Notwithstanding the provisions of subsection (b) . . . if the injury complained of occurs within any of the periods provided by subsection (b) . . ., the plaintiff may bring an action within 2 years after the date on which the claimant knew, or through the use of reasonable diligence should have known, of the existence of the personal injury, death or property damage, but in no event shall such action be brought more than 8 years after the date on which such personal injury, death or property damage occurred.

[**16]

Plaintiffs respond that Lilly waived this affirmative defense by concealing it from the court and plaintiffs until after the close of plaintiffs' evidence at trial.

The "repose" provisions of Section 13-213 bar product liability actions based on strict liability unless suit is filed within ten years from the date when the consumer took delivery of the allegedly defective product. This ten year period may be extended for up to eight more years for injuries, such as a slowly advancing chronic illness, sustained within the ten year period but not immediately discoverable. In addition to its "repose" provisions, Section 13-213 includes a conventional statute of limitations, which requires that an action be brought within two years from the date on which injury is discovered. *See Beat the Clock, supra*, at 414.

The present action was filed on May 5, 1982, some 27 years after Mrs. McMahon's mother took the DES that allegedly caused the injuries to Mrs. McMahon.

Lilly first brought Section 13-213 to the court's attention at the close of plaintiffs' evidence, when it moved for directed verdict. The court erroneously rejected the motion on its merits, ruling that Section 13-213 did [**17] not bar plaintiffs' action. Under the repose provisions of Section 13-213, this action could not be brought after the end of 1973, because the DES taken by Mrs. McMahon's mother was purchased in 1955. [Section 13-213 allows a theoretical maximum of eighteen years from the date of purchase]. n9

n9 Plaintiffs argue that Section 13-213 does not apply to the case at bar because the statute, which became effective January 1, 1979, is only partially retroactive. Effective January 1, 1980, Ch. 110 para. 13-213 was amended to add subsection (g), which provides:

> (g) The provisions of section 13-213 of this Act apply to any cause of action accruing on or after July 1, 1979, involving any product which was in or entered the stream of commerce prior to,

774 F.2d 830, *; 1985 U.S. App. LEXIS 23576, **;
CCH Prod. Liab. Rep. P10,668

on, or after January 1, 1979.

Ill. Rev. Stat. 1984, Ch. 110, para. 13-213(g).

Plaintiffs claim that, for purposes of subsection 13-213 (g), their cause of action accrued prior to July 1, 1979, and therefore Section 13-213 does not apply. However, if indeed plaintiffs' cause of action accrued prior to July 1, 1979, their suit, which was filed on May 5, 1982, was barred by Illinois' two-year statute of limitations for such claims. *See Williams v. Brown Mfg.*, 45 Ill. 2d 418, 432, 261 N.E.2d 305, 312 (1970).

In *Moore v. Jackson Park Hosp.*, 95 Ill. 2d 223, 447 N.E.2d 408, 69 Ill. Dec. 191 (1983), upon which plaintiffs rely, the Illinois Supreme Court ruled that the state's statute of repose for medical malpractice claims did not bar an action for injuries that were sustained before, but discovered after, the statute's effective date. In *Moore* the Illinois court acknowledged that a "cause of action *accrues* when the plaintiff knows or reasonably should know of an injury and also knows or reasonably should know that it was wrongfully caused." *Moore, supra, 95 Ill. 2d at 232, 447 N.E.2d at 411* (emphasis added). But, the court held, "we do not agree that a cause of action is *nonexistent* prior to the time of accrual." *Moore, supra, 95 Ill. 2d at 232, 447 N.E.2d at 412* (emphasis added).

In the case at bar, only the date on which plaintiffs' cause of action *accrued* is at issue; it is immaterial whether plaintiffs' cause of action *existed* prior to July 1, 1979. While the statute under consideration in *Moore* contained no explicit provision regarding retroactivity, subsection 13-213 (g) explicitly provides that Section 13-213 applies to "any cause of action *accruing* on or after July 1, 1979." (emphasis added).

There is no merit in plaintiffs' contention that it would be unconstitutional to apply Section 13-213 to bar their claim. *See City of Aurora v. American LaFrance Corp.*, No. 81-C6638, slip. op. at 3-4, n. 2 (N.D. Ill. Jan. 6, 1984); *Kline v. J. I. Case Corp.*, 520 F. Supp. 564, 565-66 (N.D. Ill. 1981); *Thornton v. Mono Mfg. Co.*, 99 Ill. App. 3d 722, 425 N.E.2d 522, 525, 54 Ill. Dec. 657 (1981); *see also Mathis v. Eli Lilly and Co.*, 719 F.2d 134, 141 (6th Cir. 1983); *Pitts v. Unarco Indus., Inc.*, 712 F.2d 276, 279 (7th Cir. 1983), cert. denied, 464 U.S. 1003, 104 S. Ct. 509, 78 L. Ed. 2d 698.

[**18]

[*837] But Lilly did not seasonably raise Section 13-213 as an affirmative defense. The complaint states that Mrs. McMahon's mother took DES in 1955. Therefore, Lilly could have determined from the face of the complaint that plaintiffs' claim was barred by either Section 13-213, or, if the claim accrued before July 1, 1979, by the Illinois statute of limitations, Ill. Rev. Stat. ch. 83 para. 15 (*see supra* note 8). Lilly could have raised this defense in a motion to dismiss under *Rule 12(b) (6) of the Federal Rules of Civil Procedure*. n10

n10 Contrary to plaintiffs' assertion, *Federal Rule of Civil Procedure 12(g)* does not bar Lilly from raising its statute of repose defense in a later motion. *Fed. R. Civ. P. 12 (h)(2)*.

The record clearly reveals that Lilly knew of this defense from the time it filed its Amended Answer to Amended Complaint, n11 that it failed to list the statute of repose as a controlling legal issue in its pretrial submission, and that it concealed its position from the court and [**19] from plaintiffs until the close of plaintiffs' evidence. During plaintiffs' case at trial, the court asked, "There is no statute of limitations problem in the case then . . . ?" Lilly responded:

My point, your Honor, is that there may be, there may or may not be. There very well may be a situation where we believe all or part of the cause of action may be barred, but it doesn't have anything to do with when Mrs. McMahon or Mr. McMahon may have discovered some alleged cause of action.

The court responded:

You are preserving some theoretical cause of action limitation or reservation which neither [plaintiffs' counsel] nor I can figure out. That is what is going on here. The record is quite clear as to the point you have made, and the time that the witness discovered this is within the statute of limitations, so there is no problem there.

n11 In its amended answer, Lilly modified its first affirmative defense to read as follows: "Plaintiff is barred from recovery against this defendant by reason of the applicable Statute of

774 F.2d 830, *; 1985 U.S. App. LEXIS 23576, **;
CCH Prod. Liab. Rep. P10,668

Limitations *and/or Statute of Repose* and/or the doctrine of estoppel, waiver and/or laches." (added language italicized).

Section 13-213 is not titled "Statute of Repose" or anything similar. The amended answer hardly seems to have been intended to notify either plaintiffs or the court of this defense.

[**20]

Lilly's failure to promptly bring its affirmative defense to the attention of the court and its evasive responses to the court's questions needlessly prolonged this litigation. Had Lilly made a timely motion, the entire trial of plaintiffs' strict liability claim could have been avoided.

It is difficult to understand Lilly's delay in raising its Section 13-213 defense. The delay may well have been deliberate in order to keep plaintiffs from amending their complaint to allege a second claim for relief for *negligent* failure to warn. n12 A [*838] claim for negligent failure to warn would not be barred by the repose provisions of Section 13-213. Equitable considerations persuade this Court that Lilly has waived this defense for purposes of this appeal. n13 *See Heiar v. Crawford, 746 F.2d 1190 (7th Cir. 1984).* However, this court's finding of waiver on appeal does not preclude Lilly from raising its Section 13-213 defense on remand. Plaintiffs should be allowed to amend their complaint to allege a claim for negligent failure to warn.

n12 The elements of negligent failure to warn are very similar to those of failure to warn in strict liability. *See Woodill v. Parke Davis & Co., 79 Ill. 2d 26, 35, 402 N.E.2d 194, 198, 37 Ill. Dec. 304,* (1980); *see also Prosser and Keeton on the Law of Torts, supra,* at 697 ("Although [liability for failure to warn] is sometimes referred to as strict liability, it is really nothing more than a ground of negligence liability described as the sale of a product in a defective condition, subject, however, only to the defenses and other limitations on liability applicable to strict liability rather than negligence."). [**21]

n13 The district court may wish to consider imposing sanctions against defendant's attorneys for their conduct in defending this action.

III.

For the above reasons, IT IS HEREBY ORDERED that:

1. The judgment of the district court is reversed and the action remanded for further proceedings not inconsistent with this opinion.

2. Plaintiffs' shall be permitted to amend their pleading to include a claim for negligent failure to warn.