# Manning, et al.
## vs.
## Eli Lilly and Company

# Deposition of William R. Principe, R.PH.

Volume 1

March 25, 2005
pp 1-136

**JonesReporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Page 78

1   A. I can't speak to what other places do or have
2   done.
3   Q. Okay. Do you know how many pharmacies
4   existed in Massachusetts in the 1960s?
5   A. There were a multitude of them.
6   Q. Do you know if they were over 1,000?
7   A. I can't tell you the specific number, but
8   there were a large number of independents, and chain
9   stores hadn't made headway into the state because at
10  that time there was maybe a lobby against it,
11  against chains coming in because the independents
12  were adamant about not having to destroy their
13  businesses.
14  Q. That certainly changed, hasn't it?
15  A. Yes.
16  Q. Were there any other pharmacies that you went
17  behind the counter in the 1960s?
18  A. No.
19  Q. Did you ever have occasion to go behind the
20  counter of a pharmacy that you did not work in?
21  A. No.
22  Q. If you can refer on the next page, the second
23  paragraph of Paragraph 8, where it reads, "In the
24  period 1963 to 1966, there were no innovations,

Page 79

1   generics invasions, or significant changes in the
2   manner and method of purchasing, stocking and
3   dispensing drugs, in general, and DES in
4   specifics."
5   A. Hmm-hmm.
6   Q. Do you recall that statement?
7   A. Having read it, yeah.
8   Q. What pharmacies does that statement apply to?
9   A. The ones that I was working in.
10       MR. LEVINE: It applies to the
11  pharmacies that he knows about.
12       THE WITNESS: Exactly, where I worked
13  and, you know...
14  Q. Did you intend for that statement to apply to
15  any other pharmacies in which --
16       MR. LEVINE: It's not what he intends,
17  but what we intend.
18  A. I can't speak to other pharmacies.
19       MR. LEVINE: His meeting with pharmacy
20  trade organizations, his meeting with detail men,
21  his review of pharmacy literature. Just get into
22  the statement, what kind of DES did they have at
23  Boston Lying-In and let the man go home.
24  Q. Is that your answer, that you can't speak to

Page 80

1   other pharmacies with regard to this statement?
2   A. I can't speak as to what other pharmacies did
3   at that time. I'm sure there are differences
4   between different places. I can't -- I can only
5   speak to what I did and what I know prior to my
6   coming here.
7   Q. So focusing on the time period from 1963 to
8   1966, there were no innovations in pharmacy during
9   that time period?
10       MR. LEVINE: You are talking about DES?
11       MS. SNYDER: No. It's a general
12  question.
13  A. There were innovations.
14       MR. LEVINE: You are taking the
15  statement out of context. The statement applies to
16  DES.
17  Q. You can answer.
18  A. There were innovations in antibiotic
19  therapies, for instance. That was pretty much a lot
20  of the focus at that time. New antibiotics were
21  coming on, specifically, Keflin, which is a Lilly
22  product. I can't recall of any other dramatic
23  innovations at that time.
24  Q. How about generic invasions? To the best of

Page 81

1   your recollection, were there any generic invasions
2   at all?
3   A. There were generics around at that time, but
4   I wouldn't touch a generic at that time. In my
5   estimation they were of very poor quality and grade
6   and the FDA -- I'm not sure what their role was at
7   that particular time in terms of good manufacturing
8   procedures, et cetera, et cetera, et cetera, but as
9   far as I was concerned, a lot of the generics at
10  that time were junk, and I wouldn't touch them.
11       And the other thing at that particular
12  time, too, was that the law was such that if a
13  particular product was written by trade name, you
14  could not substitute in the retail community, and
15  that is because you would be into patent
16  infringement.
17       In the hospitals we had a little
18  different situation. We operated on what was called
19  a formulary service system whereby physicians would
20  all sign off on the fact if we were able to purchase
21  a particular product which was generically
22  equivalent and it was of good quality, then we would
23  purchase it from a reputable company. That's pretty
24  much the standard we used. We had a formulary

Page 82

1  committee, which was a group of physicians, nurses,
2  and pharmacists got together and discussed the kinds
3  of materials that would be put on the formulary for
4  the hospital.  The quality was of utmost
5  importance, so we stayed away from generics.  It's a
6  different story today.
7      Q. Yes, it certainly is.
8          The reference in this paragraph to
9  "significant changes in the manner and method of
10 purchasing, stocking and dispensing drugs," what do
11 you define as "a significant change"?
12     A. I didn't say there were any.
13     Q. Looking at this statement in your affidavit
14 where it says that in the period 1963 --
15     A. There were no innovations, generic invasions,
16 or significant changes in the manner and method.
17 There were none.
18     Q. How would you define "a significant change"?
19         MR. LEVINE:  He would define it the same
20 way a dictionary would.  Come on.
21     A. A significant change would be if something
22 outrageous happened and we had no alternative other
23 than to do something different, then we would do
24 that; but I don't have any recollection of that

Page 83

1  happening.
2      Q. So if a manufacturer started offering a
3  particular drug, would you describe that as a
4  significant change?
5          MR. LEVINE:  It depends on the drug for
6  what is the indication and what dosage.
7      A. If it were new and innovative?
8      Q. No.  Let's say that you have a particular
9  drug like aspirin --
10     A. Right.
11     Q. -- and there are a number of manufacturers in
12 the marketplace.  If a new manufacturer came in and
13 also began distributing that drug, would that be a
14 significant change in the manner and method of
15 purchasing, stocking and dispensing?
16     A. No.
17     Q. How about if a manufacturer stopped producing
18 a certain drug that was offered by other
19 manufacturers?  Would that be a significant change?
20     A. If we were purchasing it, sure.
21     Q. To the pharmacy it would be a significant
22 change?
23     A. Yes.
24     Q. Would it be a significant --

Page 84

1          MR. LEVINE:  You are arguing with the
2  witness now.  A significant change would be
3  something like today where everything is a chain.
4      Q. Would it be a significant change in terms of
5  pharmacy generally?
6      A. No, not necessarily.
7      Q. So each pharmacy's methods and manner of
8  purchasing, stocking and dispensing drugs in
9  general, do you have any knowledge other than the
10 pharmacies that you worked in?
11     A. No.
12     Q. So if we can move on to Paragraph 9, where it
13 says, "The custom and ordinary practice for the
14 practices of pharmacy at a retail pharmacy in the
15 Boston area, at least as it concerned ordering,
16 stocking and dispensing of DES, was identical in
17 1963 as it was in 1966."
18     A. I would say that that's true.
19     Q. Is that true of the pharmacies --
20         MR. LEVINE:  You ought to finish the
21 sentence.
22     Q. Is that true of the pharmacies that you
23 worked in?
24     A. Yes.

Page 85

1      Q. Did you know if that is true in other
2  pharmacies that you did not work in?
3      A. I would assume so because, again, the law is
4  pretty rigid in terms of substitution, so that in
5  most retail communities pharmacies they would have
6  had to have stocked brand names because if a
7  physician wrote a brand name, you had to by law
8  dispense a brand name.  I would assume that was
9  pretty uniform.  That was the way things were at
10 that time.
11     Q. So if -- so when you refer to the custom and
12 ordinary practices for the practice of pharmacy, can
13 you describe what it is you are referring to?
14     A. I'm talking about custom and ordinary
15 practices of pharmacy is dispensing usually, okay,
16 based on physicians' prescriptions and the law,
17 okay?
18     Q. And are you referring in that statement -- I
19 realize this wasn't a statement you wrote.  When I
20 say "are you," I mean your understanding of the
21 statement that you signed.  It states:  "The custom
22 and ordinary practice of pharmacy."
23         Does that include particular
24 manufacturers that were coming on and off the

Page 94

1  occasion to visit the McKesson facilities --
2  A. No.
3  Q. -- or warehouses?
4  A. No.
5  Q. Do you know where they were located in the
6  1960s?
7  A. I think it was Woburn, but I'm not sure.
8  Q. Could there have been more than one?
9  A. Possibly.
10 Q. Have you ever reviewed any McKesson
11 purchasing or sales records?
12 A. No.
13 Q. Have you reviewed any documents that are
14 within McKesson's control?
15 A. No.
16 Q. Do you know how many brands of
17 diethylstilbestrol were offered by McKesson?
18 A. No.
19 Q. Do you know if there was more than one?
20 A. I don't.
21 Q. Do you know if McKesson distributed its own
22 line of diethylstilbestrol?
23 A. No.
24 Q. If you can refer to Paragraph 7 of your

Page 95

1  supplemental statement, for the record I will read
2  it in.
3     "I recall that at that time, DES was
4  ordered through McKesson, a Lilly wholesaler.
5  McKesson always, regularly and usually shipped a
6  Lilly product in response to an unspecified
7  stilbestrol order."
8  A. Hmm-hmm.
9  Q. What is your understanding about that
10 statement?
11 A. Well, again, we went by reputation of the
12 manufacturer when we purchased, okay, and I do have
13 a recollection of ordering Lilly stilbestrol or
14 diethylstilbestrol, DES.
15 Q. So to clarify, does this statement just refer
16 to the unspecified stilbestrol orders that you or
17 your pharmacies placed?
18 A. I'm not sure what you mean by "unspecified."
19 I mean DES is DES. When we quoted DES, we got
20 Lilly's.
21 Q. That's part of why we are here to sort of get
22 some clarification.
23    MR. LEVINE: You got the clarification
24 20 times. How many more times do you want it?

Page 96

1     THE WITNESS: Right. We ordered --
2  again, we would sign a contract with the rep for
3  certain products for a particular period of time,
4  and that's essentially what we ordered. I mean
5  there is no reason to stock any more than one
6  particular brand because particularly in a hospital
7  where our focus was to keep our costs down, and you
8  don't do that by putting duplicates on the shelf.
9     Where we operated under the formulary
10 system, we weren't bound by the trade restrictions,
11 so if a doctor wrote for Achromycin, we could
12 dispense Sumycin, which is Squibb's brand. We
13 always went with the brand name company, never a
14 generic.
15 Q. Do you know if McKesson had a policy to
16 always regularly and usually ship a Lilly product?
17 A. No, I don't know that.
18 Q. So you don't intend for the statement to mean
19 McKesson's policies?
20 A. No.
21 Q. This is just --
22    MR. LEVINE: You have the statement from
23 McKesson that that was their policy, Counsel.
24 Q. You can answer.

Page 97

1  A. Again, I'm not sure I understand the
2  question.
3  Q. Is it possible that at some point McKesson
4  had a policy of shipping a Squibb product in
5  response to an unspecified order?
6  A. Not to my knowledge.
7     MR. LEVINE: This is a fact witness.
8  It's possible for anything. Please conclude the
9  matter.
10 Q. Do you know anything about the contracts
11 between Lilly and McKesson?
12 A. No.
13 Q. Have you ever seen a contract --
14 A. No.
15 Q. -- between McKesson and Lilly?
16 A. No.
17 Q. Did Mr. Sparr tell you anything about them?
18 A. No.
19 Q. Do you know when the pharmacy at the Boston
20 Lying-In Hospital was first established?
21 A. No.
22 Q. Now, when I say "the pharmacy at the Boston
23 Lying-In Hospital," I would like to focus on the
24 time period before the merger, so before the time

William R. Principe, R.PH.

### Page 98

1  that Boston Lying-In became part of the Boston
2  Hospital for Women. Is that definition clear?
3     A. Hmm-hmm.
4     Q. Okay. When did you first set foot in that
5  pharmacy?
6     A. The Lying-In?
7     Q. Yes, which was located at Longwood Avenue.
8     A. Right. That would be 1966.
9     Q. Is that when you went to work for the Free
10 Hospital for Women?
11    A. I'm sorry. I'm sorry. It was 1967 because
12 shortly thereafter, right, I started out at the Free
13 Hospital in '66. I became the director for both
14 hospitals, so it was '67.
15    Q. So the first time you actually physically
16 visited the Boston Lying-In Hospital Pharmacy was
17 when you became the director of pharmacy after the
18 merger?
19    A. Right.
20       MR. LEVINE: Are you excluding a visit
21 or incidental trip?
22    Q. Mr. Principe --
23    A. No, I hadn't been there before that.
24    Q. Did the Boston Lying-In Hospital Pharmacy at

### Page 99

1  that time sell anything other than pharmaceuticals?
2     A. No.
3     Q. Did it sell sundries?
4     A. No, no. We weren't a retail pharmacy, so we
5  had to deal with only our patients in-house and
6  dealt with their pharmaceutical needs.
7     Q. You testified before about formularies, and
8  at Mass. General did you have a formulary?
9     A. All hospitals have formularies.
10    Q. Can you define what a formulary is?
11    A. A formulary is a compilation of medications
12 that are approved by a pharmacy and their
13 therapeutics committee for use in the hospital or
14 the institution.
15    Q. When you say "a compilation of medications,"
16 is that like what medication would be prescribed for
17 a certain indication?
18    A. No. It doesn't specify indications. It
19 specifies products that would be stocked and used
20 depending on the needs of the physicians and the
21 patient at the time. Every new product added had to
22 go through a formulary review.
23    Q. What was the purpose of that review?
24    A. One, to determine whether or not the drug was

### Page 100

1  necessary; and, two, to establish its use and who
2  may or may not use it in some cases, particularly if
3  you are dealing with some of the more potent drugs.
4  You don't let anybody use it. Certain specialties
5  had certain needs. And three, cost reduction of
6  maintaining or trying to keep your costs in check.
7     Q. Was cost a big issue for the hospitals'
8  pharmacies?
9     A. It always is.
10    Q. Do you have a copy of the formulary that
11 existed at Mass. General Hospital?
12    A. No.
13    Q. How about at Boston Lying-In Hospital before
14 the merger, do you know if they had a formulary?
15    A. All hospitals have formularies.
16    Q. Did you ever see a copy of that formulary?
17    A. Yes, I did.
18    Q. Do you have a copy of it?
19    A. No, I don't.
20    Q. When did you first see a copy of that
21 formulary?
22    A. When I first went there, I had to review it.
23    Q. Did you ever have occasion to review
24 formularies at hospitals that you did not work in?

### Page 101

1     A. Occasionally I would look at others to see
2  how they are set up and what some of the products on
3  board would be.
4     Q. Did the formularies specify manufacturers --
5     A. No.
6     Q. -- for certain products?
7     A. Formularies dealt in generic names only.
8     Q. So for example, a formulary would say
9  "diethylstilbestrol"?
10    A. Correct.
11    Q. But it wouldn't specify the manufacturers for
12 diethylstilbestrol?
13    A. Correct, right.
14    Q. When was the last time that you reviewed the
15 formulary at Boston Lying-In Hospital?
16    A. I can't remember.
17    Q. What would happen if a physician wanted to
18 prescribe off of the formulary?
19    A. Generally, we try to discourage it and talk
20 to the physician and ascertain as to why. If there
21 was a legitimate reason -- in some instances we had
22 restrictions whereby the physician would have to
23 contact the chairman of the pharmacy therapeutics
24 committee and justify it, and then if that person

26 (Pages 98 to 101)

Page 118

1  Q. Have you ever heard of a publication called
2  the "Blue Book"?
3  A. Yes.
4  Q. Can you describe that publication?
5  A. Similar to this.
6  Q. Are there any differences between the Red
7  Book and the Blue Book?
8  A. I really don't remember. As far as I'm
9  concerned, they are essentially the same.
10 Q. Do you remember if you ever had occasion to
11 look up diethylstilbestrol in the Blue Book?
12 A. No.
13 Q. I'm going to show you what we will mark as
14 Exhibit 5.
15     (Marked, Exhibit 5, 1966 Blue Book.)
16     MS. SNYDER: Aaron, I'm showing the
17 witness the 1966 Blue Book.
18 Q. Does this refresh your recollection about
19 whether you ever looked up diethylstilbestrol?
20 A. I never looked up diethylstilbestrol. I
21 think the only time I ever looked up
22 diethylstilbestrol was in a Lilly catalogue.
23 Q. And so I counted up about 20 companies listed
24 under "diethylstilbestrol." Do you have any reason

Page 119

1  to doubt that statement, looking at the Blue Book?
2  A. No.
3  Q. Okay.
4      MS. SNYDER: So then I will mark as
5  Exhibit 6, which is the 1962-1963 Blue Book.
6      (Marked, Exhibit 6, 1962-1963 Blue
7  Book.)
8  Q. Does this refresh your recollection about
9  whether you ever looked up diethylstilbestrol in the
10 1963-1963 Blue Book?
11 A. No.
12 Q. As part of your role as a director of
13 pharmacy, did you compare prices among various
14 manufacturers?
15 A. We looked at brand names pretty much
16 exclusively, so all of these, Acme and whatever the
17 hell you got here, I wouldn't even look at at that
18 time.
19 Q. What resource did you use to compare prices
20 among manufacturers in the 1960s?
21 A. Pretty much their catalogues. This is an
22 indication of the average wholesale price, and it is
23 not the price or the cost, the actual acquisition
24 cost, so you wouldn't use that as a cost basis.

Page 120

1  Q. Do you remember generally what the cost was
2  of Lilly's diethylstilbestrol --
3  A. No.
4  Q. -- in 1966?
5  A. It was inexpensive.
6  Q. In the 1960s do you remember if there were
7  cost variations amongst the major various brand name
8  manufacturers who made diethylstilbestrol?
9  A. I never compared them.
10 Q. When I say "major brand name manufacturers,"
11 I'm referring to the brand name manufacturers that
12 you had described as manufacturers offered by the
13 hospital pharmacies in which you worked, Squibb, for
14 example.
15 A. Again, I never compared...
16 Q. How many manufacturers of diethylstilbestrol
17 were stocked at the Mass. General Hospital that you
18 are aware of?
19 A. I don't know.
20     MR. LEVINE: He told you one.
21 A. I don't know that. As far as I know, it was
22 one.
23 Q. Do you know if Lilly was stocked at MGH?
24 A. I think it was --

Page 121

1  Q. Do you know for sure?
2  A. I don't know for sure.
3  Q. Is it possible that other manufacturers --
4  A. Of course.
5  Q. -- were stocked?
6  A. Of course it is.
7  Q. How about at the Boston Lying-In Hospital
8  before the merger? So before you actually went to
9  work for the Boston Hospital for Women, do you know
10 how many manufacturers of diethylstilbestrol they
11 carried?
12     MR. LEVINE: He told you it was one.
13 A. I think it was one exclusively. When I took
14 over, I took over and carried on pretty much what
15 had been going on prior to that.
16 Q. So in 1963 is it possible that they carried
17 another major brand name manufacturer of
18 diethylstilbestrol?
19 A. It's possible.
20 Q. How about in 1964?
21 A. It's possible.
22     MR. LEVINE: But it's not likely. The
23 longer you stretch this out, the more I'm going to
24 have to try and make some sense out of it.

31 (Pages 118 to 121)

JONES REPORTING COMPANY
617-451-8900