UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRENDA MANNING, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>ELI LILLY AND COMPANY,<br><br>  Defendant. | CIVIL ACTION No. 04-11164 (RCL/MBB) |

## ELI LILLY AND COMPANY'S MOTION TO STRIKE
## STATEMENT OF HAROLD SPARR

Defendant Eli Lilly and Company ("Lilly") hereby moves this Court to strike the "expert" statement of Mr. Harold Sparr ("Mr. Sparr"). Any testimony from Mr. Sparr is unreliable and adds no value to this case.

Plaintiff Brenda Manning ("Ms. Manning") alleges injuries caused by *in utero* exposure to a DES product taken by her mother Janet Berg ("Ms. Berg") in 1963. Minor Plaintiff Brian Manning ("Brian") alleges injuries caused by his premature birth, which was allegedly caused by Ms. Manning's *in utero* exposure to DES. Ms. Berg testified at deposition that she filled her DES prescription at the Boston Lying-In Pharmacy in Boston, Massachusetts. In order to prove that the Boston Lying-In Pharmacy dispensed a Lilly product to Ms. Berg, Plaintiffs have introduced a statement from Mr. Sparr on the Massachusetts DES market during the 1960's.

This Court should bar Mr. Sparr's statement for several reasons. Mr. Sparr is not an expert on the stocking and dispensing practices of Massachusetts pharmacies. Mr. Sparr is a retired pharmacist who works as an investigator for Plaintiffs' attorney, Aaron Levine. In that role, Mr. Sparr sought out pharmacists in cases Mr. Levine filed against Lilly, interviewed them with no set list of questions and no organized notes, and solicited their help by a letter

referencing a suit involving the "Liability Insurance Company who insured Eli Lilly & Co." Mr. Sparr then supplied those pharmacists who agreed to identify Lilly with a printed affidavit form to complete. This work on litigation has none of the hallmarks of scientific surveying that would support an expert opinion.

Further, Mr. Sparr has no background or experience in scientific surveys. The "survey" Mr. Sparr participated in was designed by Mr. Levine. This "survey," addressed below, is flawed in many ways, not least by a selection process of happenstance, coincidence and convenience, not science. The resulting sampling of approximately 1.5% of the pharmacists that Mr. Sparr testified were practicing in Massachusetts during the years supposedly surveyed (1963-'67) is clearly insufficient to aid a trier of fact in determining the issues presented in this case. Notably, only 76 of the 376 pharmacists surveyed were licensed at anytime in 1963. There is no indication that any of these pharmacists responded to Mr. Sparr's questionnaire, or what they might have said. Clearly, any information from pharmacists who were not licensed in 1963 is irrelevant to this case. Mr. Sparr has no training in survey or market study techniques, has never completed any coursework in these areas, and completed his work for this litigation with constant oversight, direction and guidance from Plaintiffs' attorney. His statement will not aid the Court in ruling on Lilly's Motion for Summary Judgment, nor could it aid a jury at trial.

Finally, Mr. Sparr never worked at the Boston Lying-In Pharmacy in Boston and has no personal knowledge of the stocking and dispensing practices of that store. Therefore, Lilly respectfully requests that this Court strike Mr. Sparr's statement from the record.

I.   **MR. SPARR'S STATEMENT IS UNRELIABLE AND MUST BE EXCLUDED PURSUANT TO F.R.E. 702 AND DAUBERT.**

Mr. Sparr's statement concerning the market share for DES products in Massachusetts during the time period relevant to this case is inadmissible. The Court should bar the Sparr

statement as unreliable and irrelevant under the standards set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

Mr. Sparr is a pharmacist, not a market researcher. *See* Transcript of Deposition of Harold Sparr ("Sparr Tr.") in *Bohlin v. Eli Lilly and Company*, 03-CV-11577 (MEL) at 5-7, 116-119 (attached as Exhibit 1 to the Affidavit of Brian L. Henninger in Support of Eli Lilly and Company's Motion to Strike the Statement of Harold Sparr ("Henninger Aff.")). He holds no degree in survey research, has completed no courses in survey techniques, and has never conducted a survey outside of the context of this litigation; he has no experience in the very field in which he is being offered as an expert. *See id.* at 126-128. Any methodology employed by Mr. Sparr was designed by Plaintiffs' attorney, as set out in correspondence from Plaintiffs' counsel to Mr. Sparr. *See* May 5, 2004 Letter from Aaron M. Levine, Esq., to Harold B. Sparr, R.Ph., D.Ph., M.S. ("Survey Letter") (attached as Exhibit 2 to Henninger Aff.); *see also* Sparr Tr. at 159-163 (Henninger Aff., Ex. 1). The survey was designed by Mr. Levine specifically for DES cases against Eli Lilly. *See* Survey Letter (Henninger Aff., Ex. 2). Although Mr. Sparr testified that he has "perused" one text on survey techniques, *see* Sparr Tr. at 77 (Henninger Aff., Ex. 1), this does not change the fact that he is a pharmacist, not a market researcher.

Additionally, Mr. Sparr works as an investigator for Plaintiffs' attorney. Interviews of pharmacists conducted by Mr. Sparr at the direction of Plaintiffs' counsel were completed in cases in which Lilly was a defendant for the purpose of developing evidence to show that the DES involved in that case was made by Lilly. *See id.* at 92-93.

Mr. Sparr's experience can only speak to the pharmacies where *he actually* worked. As Ms. Berg did not fill her prescription for a DES product at a facility where Mr. Sparr was an employee, his testimony is irrelevant to this case. For these reasons, this Court should strike Mr.

Sparr's statement regarding Lilly's market share for DES products in the Commonwealth of Massachusetts.

### 1. Federal Rule of Evidence 702 and *Daubert* Set the Standard for the Admissibility of Expert Testimony in this Case.

"Federal Rule of Evidence 702 'assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000) (quoting *Daubert*, 509 U.S. at 597). The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court established the gate-keeping role of trial judges in evaluating the admissibility of scientific evidence pursuant to Federal Rule of Evidence 702. *Daubert,* 509 U.S. 579, 592-5 (1993). The court set forth guidelines for federal judges in their evaluation of expert testimony under a two-pronged test to determine (1) whether the theory or methodology underlying the testimony is reliable and (2) whether the expert's theory or methodology will assist the fact-finder. *See id.*

Rule 702 and *Daubert* aid judges to ensure that proffered expert testimony "is the product of reliable principles and methods." Fed. R. Evid. 702. "[T]he trial court must decide whether the proposed testimony, including the *methodology* employed by the witness in arriving at the proffered opinion, 'rests on a *reliable foundation* and is *relevant* to the facts of the case.'" *Ed Peters Jewelry Co. v. C. & J. Jewelry Co.*, 124 F.3d 252, 259-60 (1st Cir. 1997) (citing *Daubert*,

509 U.S. at 597) (expert testimony that was "internally inconsistent and unreliable" excluded) (emphasis in the original).

The focus of the analysis under *Daubert* is on the principles and methodology used by the expert, not the actual conclusions reached by the expert. *See Daubert,* 509 U.S. at 595. The reliability requirement ensures that an expert's analysis is based on the scientific method and supported by appropriate validation. *See id.* at 590. Requiring that testimony be relevant to the facts of the case ensures that such testimony will assist the fact-finder to understand the evidence or to determine a fact in issue, instead of prejudicing the other party or confusing the court. *See Kumho Tire Co. v. Carmicheal*, 526 U.S. 137, 152 (1999); *Daubert*, 509 U.S. at 590-2, 595. Federal District Courts serve as the gatekeepers to ensure that any expert testimony advances the issues in dispute at trial. *See Daubert,* 509 U.S. at 597. The trial court's role as gatekeeper prevents "….the introduction of evidence that is not relevant or is not reliable." *U.S. v. Patrick,* 6 F.Supp. 2d 51, 55 (D. Mass. 1998).

Courts typically consider several factors when assessing the reliability of proffered expert testimony. These factors, derived from *Daubert*, include:

> (1) whether the opinion can be or has been tested; (2) whether the theory or technique on which the opinion is based has been subjected to peer review and publication; (3) the technique's known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operations; and (5) "general acceptance."

*Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655, 661 (D. Mass. 1997); *see also united States v. Sampson*, 335 F. Supp. 2d 166, 218-219 (D. Mass. 2004) (identifying the five *Daubert* factors). *Daubert* requires that the expert testimony offered be based on a technique that can be or has been tested by the community of which the expert is or purports to be a member. In Mr. Sparr's case, his survey and other market research "investigations" have not been subjected to

5

any such evaluation. As a result, Mr. Sparr's testimony would contravene this central requirement of *Daubert* because upon even a brief review it becomes clear that Mr. Sparr's survey is not based on *any* theory or test. *See* 509 U.S. at 593.[1] Viewing Mr. Sparr's lack of credentials and "survey" through this framework demonstrates the unreliability and, therefore, inadmissibility of his proffered testimony.

### 2. Mr. Sparr's "Survey" Was Designed by Plaintiffs' Counsel.

Mr. Sparr's experience in carrying out the "survey" designed by Plaintiffs' counsel does not make him an expert in the field of survey research. One study, completed at the direction of Plaintiffs' lawyer, to a design and to an end specified by counsel, does not transform a pharmacist into a market researcher who can aid a trier of fact through "expert testimony" in determining complex issues regarding the market share of DES products. *See* Survey Letter (Henninger Aff., Ex. 2).

#### a. The Selection of Pharmacists to Survey Was Not Random.

The "market study" about which Mr. Sparr would testify began when surveys were sent to a *total* of approximately 376 pharmacists. The only two parameters in distributing these surveys were that the individual was first licensed in Massachusetts from 1963 through 1967 *and* was still practicing in 2004. *See* Sparr Tr. at 141-144, 156 (Henninger Aff., Ex. 1). Mr. Sparr testified at deposition that approximately 4500-5000 pharmacists were licensed from 1963 through the present. *See id.* at 156-157. The determining criteria for the sample, then, aimed to survey pharmacists who were *first* licensed in years that Mr. Sparr considered -- on no known evidence -- the "peak" years of DES use and who were *still* licensed in 2004. Longevity of service is not related to the quality of the information available from those pharmacists first

---

[1] Mr. Sparr's opinion regarding Lilly's DES market share also fails to satisfy *Daubert's* requirement that an expert's study be subject to peer review and publication. *See Daubert*, 509 U.S. at 593-95.

licensed between 1963 and 1967; this is selection by convenience, not science. Further, selection of pharmacists first licensed from 1963 through 1967 serves no informational purpose either. When a pharmacist was "first licensed" adds nothing to the likelihood that he or she will have knowledge on the subject of the market share for DES products. Again, convenience is the only criteria apparently applied by Mr. Sparr. This selection is not scientific, is based on no theory or process, and is completely unreliable for determining a proper sample of pharmacists. This unscientifically selected population was not tested in any way to see if it represented the pharmacist population of Massachusetts for "the 1960s." Nor was it tested against any geographical distribution of pharmacists in the state.

Additionally, as noted earlier, only 76 of the 376 pharmacists surveyed were licensed at anytime in 1963. *See* List of Pharmacists Surveyed by Harold Sparr, dated April 23, 2004 (attached as Exhibit 3 to Henninger Aff.). No information from a pharmacist first licensed after 1963 could have any bearing on this case, but Mr. Sparr's report makes no attempt to break out the data, of any, provided by the small cadre of pharmacists licensed in 1963. There is no indication that any of the 1963 group even responded to the survey and, in any event, the small size of the group means that nothing credible about Massachusetts "market-share" could be established by Sparr's survey.

The limitations of the sample as to representativeness and distribution preclude reliance on data for any time. Did the respondents work in retail pharmacies or in the industry? Did they work in areas representative of the use of DES in Massachusetts during the "1960s"? These are two of the many issues left unanswered by Mr. Sparr's survey. There was no initial attempt to define a population that mirrored all pharmacies in Massachusetts. The population was instead defined by convenience -- pharmacists who were *still* licensed in 2004 who had first been

7

licensed in 1963 to 1967. The longevity of a pharmacist's practice is simply no guide to the randomness of the study group. The only "randomness" in the study was in who responded to the questionnaire.

### b. The "Survey" Did Not Ask the Question that Mr. Sparr Attempts to Answer.

The survey *did not ask* what brand of DES each pharmacy stocked. Instead, the only relevant question was:

> If a customer's prescription read "DES" "Stilbestrol" or "diethylstilbestrol" (in pregnancy sizes 5mg or 25mg) but no brand name was indicated, what brand would have been *primarily* dispensed? (emphasis in original).

Statement of Harold Sparr, Attachment 1 -- "Stilbestrol Survey for Pharmacists" ("Questionnaire") (attached hereto as Exhibit 4 to Henninger Aff.). If a store received prescriptions for DES, or stilbestrol, or diethylstilbestrol that *did* name a brand, this survey in no way elicits information on the brand dispensed. *See* Sparr Tr.. at 213-215 (Henninger Aff., Ex. 1). Further, the dosages of 5mg and 25mg had other uses and were "pregnancy doses" only in the terms of the Questionnaire. *See id*. at 167-174. Mr. Sparr did not determine whether the responding pharmacists carried the particular dosages of DES for other purposes besides treating accidents of pregnancy, such as the suppression of lactation, postpartum observation, malignant neoplasms, breast cancer, types of bone cancer, hemorrhage problems, and prostate cancer. *See id*. at 165-166. DES products were prescribed for other conditions in the dosages included in the Questionnaire, but this "survey" would sweep all sales into a "market share" for use in pregnancy. Finally, there is *no* space provided in the Questionnaire to invite data on a pharmacist's practice for filling brand name prescriptions or for identifying the types of other brands. Brand name specific prescriptions are simply excluded from the survey altogether.

Just as importantly, what does "primarily" dispensed mean? If the store carried three brands, should the responding pharmacist name one if it was used 35% of the time? If a pharmacy stocked two brands, should the pharmacist name the likely 51% choice? The Questionnaire is, in fact, useless to inform upon the question Mr. Sparr claims to pursue -- Lilly's share of the DES product market in 5mg and 25mg dosages dispensed in Massachusetts.

        c.        <u>Mr. Sparr Failed to Confirm the Accuracy of the 40 Year Old Memories of those who Responded to the Survey</u>.

The survey purports to show what DES products were stocked in Massachusetts stores based on the 40-year-old memories of only those pharmacists who responded. Mr. Sparr did nothing to confirm the accuracy of *any* of the responses that he received regarding an individual's memory of events occurring almost a half century ago. *See id*. at 160-161, 221-223. Further, Mr. Sparr did nothing to guard against outside resources influencing the results of the survey. He failed to confirm that the pharmacists surveyed were not consulting with others while answering the questions and "assumed they did it themselves." *See id*. at 160-161. In fact, the survey presents no method to judge whether the memory of the respondent is based on *anything*. While DES products were taken off the market for pregnancy use by 1972, DES drugs were still dispensed for other purposes from that time until 2000. Nothing in the survey guarantees that those Massachusetts pharmacists who did respond were recalling their pharmacy work from the 1960s and not their work over the subsequent three decades.

        d.        <u>The Response to the Survey is Completely Inadequate to Aid a Trier of Fact in Reaching a Conclusion Regarding the Market Share for DES Products in Massachusetts in the 1960s</u>.

Mr. Sparr's "expert qualifications" regarding his ability to testify on Lilly's market share for DES products in Massachusetts rest largely on one survey for Plaintiffs' counsel. The problems described above demonstrate the failure of the survey. The survey was designed by

9

Plaintiffs' attorney with an aim at identifying Lilly's product. The sample group who received the survey is, in the first instance, insufficient to allow Mr. Sparr -- or anyone else -- to reach any conclusions regarding the market for DES products in Massachusetts during the 1960s. The sample group chosen was not random, and did not account for geographical differences or for differences in prescribing practices from one area to another. The process took no steps to confirm the accuracy of the 40-year-old recollections of the few who did respond, or to determine whether those who *did not* respond failed to do so because they could not recall the answers sought. Added to the fact that the central question of the survey is completely ambiguous regarding the brands of DES carried by a pharmacy, the unreliability of this survey becomes clear. In short, the "survey" shows no regard for any standards or techniques whatsoever.

Approximately 148 pharmacists responded to the survey. Faced with the limitations described above, only 79 responded that they worked in a Massachusetts store that stocked DES in the dosages about which the survey inquired. *See* Survey Results to the Report of Harold Sparr, dated October 12, 2004, ("Survey Results") (attached as Exhibit 5 to Henninger Aff.). Only 71 of those surveyed named Lilly as the brand "*primarily*" dispensed. These 71 respondents represent approximately 1.4% of the total of 4500-5000 pharmacists that *Mr. Sparr* thought were practicing in Massachusetts during the "1960s." These responses, arrived at from an originally flawed sample population through ambiguous questions without any follow-up regarding the accuracy of the results, can give no sensible data to inform the jury. Therefore, the survey cannot serve as a basis for Mr. Sparr to testify as an expert on survey standards and techniques and, consequently, the market for DES products in Massachusetts. *See Daubert*, 509 U.S. at 593-5.

### 3. Mr. Sparr's Additional "Expert" Experience is Limited to Interviews for Plaintiffs' Lawyer in Cases Involving Lilly and Lack Any Scientific Methodology.

Mr. Sparr claims additional experience regarding the market share for DES products from two sources: the pharmacist interviews that he has conducted and the pharmacist statements and deposition testimony that Mr. Sparr has reviewed, all during his employment as an investigator for Plaintiffs' counsel. All of these interactions and "market research" took place in the context of specific cases against Eli Lilly and, as with the survey, were conducted at the direction of Plaintiffs' lawyer.

Over the course of his involvement with Plaintiffs' attorney, Mr. Sparr has conducted interviews with pharmacists in relation to specific cases. These interviews would be conducted at Plaintiffs' attorney's direction, *see* Sparr Tr.. at 15, 18 (Henninger Aff., Ex. 1), and, as Mr. Sparr testified, involved cases primarily against Lilly. *See id*. at 16. Further, when asked whether Plaintiffs' counsel, in directing Mr. Sparr to conduct these interviews, was interested in a specific company, Mr. Sparr responded, "Absolutely….Eli Lilly and Company." *Id.* at 15. Mr. Sparr stated that he conducted "maybe three dozen" such interviews for Plaintiffs' counsel in connection with specific cases involving Lilly. *See id*. at 19. Beside the fact that these isolated "investigations" conducted at the direction of Plaintiffs' counsel cannot possibly be used to extrapolate any information about the wider market for DES products in Massachusetts beyond the specific pharmacies involved, the complete lack of methodology requires their exclusion from this Court's consideration of Mr. Sparr's credentials.

First, Mr. Sparr's clearly stated goal was to determine whether the pharmacist recalled *Lilly's* product. *See id*. at 57. He couldn't recall what materials were shown to which pharmacists, and stated that he maintains no formal notes recording his actions in this respect. *See id*. at 21-23, 55-57. However, Mr. Sparr did recall that any pill pictures or other materials

11

that he brought with him to these interviews were of Lilly products and no others. *See id.* at 57. While Mr. Sparr acknowledged that "at least a hundred" other companies manufactured DES products during the 1960s, he made no effort to determine the market for any of these other drugs. *See id.* at 65-66, 106-107. Mr. Sparr stated that when he spoke to pharmacists over the phone, he would have mentioned Lilly but no other companies. *See id.* at 65-66. Correspondence from Mr. Sparr to another pharmacist following up on Mr. Sparr's work for Plaintiffs' counsel clearly states that the inquiry related to lawsuits involving "the Liability Insurance Company who insured Eli Lilly & Co." S*ee* Letter from Harold Sparr to George Friedman, dated December 5, 2003 (attached as Exhibit 6 to Henninger Aff.). When a pharmacist identified Lilly, Mr. Sparr then mailed a pharmacist statement form created by Plaintiffs' attorney for use in the specific matter. *See* Sparr Tr. at 21 (Henninger Aff., Ex. 1).

Second, Mr. Sparr did not use a script in interviewing pharmacists. *See id.* at 17, 83. He failed to take organized notes of all of his conversations with subjects, sometimes jotting bits and pieces of information on envelopes, and disregarded responses if they were not going to be helpful, eliminating any ability to retest his work. *See id.* at 21-23. If a pharmacist could not remember whether the pharmacy where that individual had worked stocked DES products, *and* what dosage was stocked, *and* the brand, *and* the wholesaler that the pharmacy used during the 1950s and 1960s, Mr. Sparr *discarded* the response and discarded that pharmacist's store from his analysis. *See id.* Hence, responses naming a company other than Lilly were discarded if the pharmacist did not recall the wholesaler who supplied the store.

As with the "survey," Mr. Sparr did nothing to confirm the accuracy of *any* of the responses that he received regarding an individual's memory of events occurring 40 years or more in the past. *See id.* at 94-97. In fact, when directly asked, "Did you do anything to find out

12

if their memory about the DES they had in their store during the 1950s and 1960s was accurate?" Mr. Sparr responded, "No. How could I?" *Id.* Mr. Sparr could have searched for the prescription and purchase records of the stores in question; these steps were not taken. Any conclusions based on Mr. Sparr's interviews as described above must be excluded from this Court's determination of his qualifications as an expert.

The final purported area of experience that Mr. Sparr claims establishes his qualifications as an expert focuses on his review and follow-up interviews related to approximately 200 sworn, "randomly" collected statements and deposition transcripts. As with the other resources that supposedly qualify Mr. Sparr as an expert in the field of market research, all of these materials were provided to Mr. Sparr from Plaintiffs' counsel. *See id*. at 109. Of these 200 statements, only 20 were from individuals practicing in Massachusetts. *See id*. at 111. The statements were collected by Plaintiffs' counsel for prior cases, mainly against Lilly, and suffer from at least the same random sample and memory problems as Mr. Sparr's other sources of information. Litigation investigations aimed to identify Lilly as a proper defendant are neither random nor scientific, and provide no basis for qualifying Mr. Sparr as an expert to testify in this case.

### 4. Mr. Sparr's Personal Experience is Limited to Two Pharmacies.

Finally, Mr. Sparr's only other experience regarding pharmacy stocking and dispensing practices in Massachusetts is limited to his work at Sparr's Drugstore and Robert's Pharmacy, from 1958-1971. *See* Sparr Tr. at 6-8, 69-76, 116-118 (Henninger Aff., Ex. 1). As a result of the problems with Mr. Sparr's qualifications as an expert discussed above, any testimony that he could give in this case would be limited to his experience at his own drug stores. As Ms. Berg did not fill her prescription for a DES product at either of the pharmacies where Mr. Sparr worked, his personal experience and recollections represent inadmissible lay opinion testimony pursuant to Fed. R. Evid. 602 and 701. *See, e.g., Swajian v. General Motors Corp.*, 916 F.2d 31,

13

35 (1st Cir. 1990) (lay witness could not give opinion whether wheel separated from truck before truck rolled over when he did not see wheel leave vehicle and could not recall whether wheel was still on vehicle when he saw it rolling over; fundamental requirement of personal perception was missing); *see also, e.g. TLT-Babcock, Inc. v. Emerson Elec. Co.,* 33 F.3d 397, 400 (4th Cir. 1994) (witness obtained information on which opinion was based through reports he received from his staff and not through personal observations; witness's lay opinion, therefore, was not admissible.).

## CONCLUSION

For the foregoing reasons, Lilly respectfully requests that the Court strike Mr. Sparr's Statement from the record. Lilly submits that Mr. Sparr's Statement is unreliable and will not assist the Court in understanding the evidence, thus warranting its exclusion pursuant to Federal Rule of Evidence 702 and *Daubert*.

## REQUEST FOR HEARING

Pursuant to LR 7.1(D), Lilly requests a hearing on its Motion to Strike the Statement of Harold Sparr.

        Respectfully submitted,

        ELI LILLY AND COMPANY
        by its attorneys

        /s/ Brian L. Henninger
        James J. Dillon (BBO# 124660)
        Brian L. Henninger (BBO# 657926)
        Foley Hoag LLP
        155 Seaport Boulevard
        Boston, MA 02210-2600
        (617) 832-1000

Dated: July 26, 2005

## LOCAL RULE 7.1(A)(2) CERTIFICATION

I hereby certify that I contacted counsel for Plaintiffs on July 6, 2005 to confer about the above Motion to Strike the Statement of Harold Sparr. Plaintiffs' counsel indicated that Plaintiffs would oppose Lilly's Motion.

        /s/ Brian L Henninger