**EXHIBIT 1**

1

1      VOLUME   I

2          PAGES   1 - 237

3          EXHIBITS  Per Index

4

5      UNITED STATES DISTRICT COURT

6        DISTRICT OF MASSACHUSETTS

7  -------------------------------x

8  NANCY A. BOHLIN, INDIVIDUALLY,

9  AND AS MOTHER AND NEXT FRIEND OF

10  SAMANTHA A. BOHLIN, A MINOR,    Civil Action

11    Plaintiff          No. 03-CV-11577

12    v.              (MEL)

13  ELI LILLY AND COMPANY,

14    Defendant

15  -------------------------------x

16

17      DEPOSITION OF HAROLD B. SPARR

18        Tuesday, December 7, 2004

19          Foley Hoag, LLP

20          155 Seaport Boulevard

21          Boston, Massachusetts

22

23      REPORTER:  Virginia L. Barry, RPR/CSR

24

**Sparr, Harold (12/7/04)**                    **Page 1**

5

1   Attorney Patricia Stanford?

2      A.  About 11 months.

3          MR. LEVINE:  I think you mean

4   retained, as opposed to employed.  We don't take out

5   taxes.

6          THE WITNESS:  Right.

7      Q.  So Mr. Levine's interjection is that

8   you're an independent contractor employed by him; is

9   that correct?

10     A.  Correct.

11     Q.  And is that your only employment at

12  present, working for these two attorneys?

13     A.  Well, I'm an on call pharmacist at a

14  hospital in Brookline, but I haven't been called in

15  the past year.

16     Q.  I'm going to go back to your employment by

17  these two attorneys in a minute.  Let me go through

18  a little bit about my understanding about your

19  background.  Am I correct, sir, that you attended

20  and graduated from the Massachusetts College of

21  Pharmacy, graduating in 1955?

22     A.  That's correct.

23     Q.  Am I correct also in looking at an exhibit

24  to your report that following that graduation you **(2/7/04)**                    **Page 5**

6

1  served in the United States Army; is that correct?

2      A.  Correct.

3      Q.  So that was from 1956 to 1958; is that

4  correct?

5      A.  Correct.

6      Q.  And you were in Germany at that time?

7      A.  For one year.

8      Q.  For those two years am I correct in

9  understanding that you were not practicing as a

10  pharmacist in Massachusetts?

11      A.  I was practicing as a pharmacist in

12  California and in Germany.

13      Q.  And you were not practicing as a

14  pharmacist in Massachusetts for those two years; is

15  that correct?

16      A.  That's correct.

17      Q.  Now, your CV or resume states that between

18  1958 and 1969 you were at Sparr's Pharmacy in

19  Boston, Massachusetts?

20      A.  Sparr's Drugstore.

21      Q.  I'm sorry, Sparr's Drugstore in Boston,

22  Massachusetts; correct?

23      A.  Correct.

24      Q.  And was that the pharmacy or drugstore **12/7/04)**              **Page 6**

7

1  where you practiced pharmacy between 1958 and 1969?

2      A.  Yes.

3      Q.  And your resume also indicates that in

4  1970 you were at Robert's Pharmacy in Belmont; is

5  that correct?

6      A.  That's correct, I purchased it.

7      Q.  And you purchased it in 1970?

8      A.  In December, '69.

9      Q.  And after you made that purchase did you

10  practice as a pharmacist at the Robert's Pharmacy in

11  Belmont, Massachusetts?

12      A.  That's correct.

13      Q.  And for 1970 was that the only pharmacy

14  where you practiced pharmacy?

15      A.  Yes.

16      Q.  How long did you stay at the Robert's

17  Pharmacy?

18      A.  Until 1976.

19      Q.  Now, between 1958 and 1971, I'm going to

20  be, I realize that you have experience after that,

21  but between 1958 and 1971 is it accurate to say that

22  your experience as a practicing pharmacist was

23  limited to first the Sparr's Drugstore and then

24  Robert's Pharmacy?    **Sparr, Harold (12/7/04)**          **Page 7**

15

1  was?

2      A.  This information was valuable in

3  determining pharmacists' market share of the

4  particular drug, and some of these statements were

5  to be used in certain cases.

6      Q.  And for the statements that were to be

7  used in particular cases were you directed to try

8  and find pharmacists from a particular location,

9  from a particular pharmacy?

10      A.  Yes.

11      Q.  And that direction would come from

12  Mr. Levine's office; is that correct?

13      A.  Yes.

14      Q.  And with respect to the other part, the

15  market share, what was your understanding of what

16  "market share" meant?

17      A.  The percentage of prescriptions that a

18  particular company had.

19      Q.  And were you aware of any particular

20  company that Mr. Levine was interested in examining?

21      A.  Absolutely.

22      Q.  And what was the name of that company?

23      A.  Eli Lilly and Company.

24      Q.  And why did Mr. Levine tell you that he

16

1  wanted to examine Eli Lilly and Company?

2      A.  Because 98 percent of the people that I

3  spoke to, pharmacists that I had spoken to have told

4  me that that was the brand that they used.

5      Q.  Now, that's after the fact, this is after

6  you spoke to people; is that correct?

7      A.  Correct.

8      Q.  So before you did any of your interviews,

9  what did Mr. Levine tell you about his interest in

10  Eli Lilly and Company and its market share?

11      A.  He told me that there was ongoing

12  litigation with plaintiffs that have been harmed by

13  their mothers ingesting the diethylstilbestrol.

14      Q.  Yes.  And what else did he tell you?

15      A.  He asked me to get statements from

16  pharmacists that were working during the 1950s and

17  the 1960s.

18      Q.  With respect to Eli Lilly and Company,

19  what else did Mr. Levine tell you about Lilly and

20  the litigation interest he had in Eli Lilly and

21  Company?

22      A.  He just told me that the majority of the

23  cases that he had was against Eli Lilly.

24      Q.  Now, in terms of -- I'll come back to **Id (12/7/04)**          **Page 16**

17

1   this, let me just drop that for a minute.

2            After this meeting with Mr. Levine in

3   November, approximately, of 2003, what was the next

4   thing you did with respect to the work for

5   Mr. Levine?

6     A.  I started calling pharmacists that I knew

7   that were either classmates of mine or other

8   pharmacists that I knew through the organizations

9   that I belong to and that I'm friendly with, and I

10  asked them if they would sign a statement.

11    Q.  Did you have a script that you used?

12    A.  I did not.

13    Q.  Did you ask them the same thing every

14  time?

15    A.  Yes.

16    Q.  What did you ask them?

17    A.  I asked them if they remembered what brand

18  of di -- I asked them if they stocked

19  diethylstilbestrol, and if they said yes, I asked

20  them what brand of diethylstilbestrol did they

21  stock, and I also asked them what wholesaler they

22  had purchased from.

23    Q.  Is that the only thing that you asked

24  them?                **Sparr, Harold (12/7/04)**              **Page 17**

18

1    A.  Well, I asked them what year they

2  graduated from college, what college they graduated

3  from.  I asked them -- well, I knew what their names

4  were.  I asked them their address, and where the

5  store was located.

6    Q.  How did you select the people that you

7  were calling on this?

8    A.  I, through my activities in the alumni

9  association, the Mass. College of Pharmacy, I knew a

10  lot of pharmacists, and I just started calling at

11  will.

12    Q.  And did you ask these pharmacists what

13  dosages of the DES they had?

14    A.  Yes.

15    Q.  So, okay, and what did you -- did you

16  prompt them at all about any of the doses?

17    A.  Absolutely not.

18    Q.  You're clear about that, you wouldn't have

19  asked people if they had 5-milligram, for example,

20  or .5-milligram?

21    A.  I asked them what strengths they had in

22  the store.

23    Q.  And if they didn't remember, did you say

24  anything to help them to remember what dosages the/**04)**                    **Page 18**

19

1  drug came in?

2    A.  No.

3    Q.  Are you sure that you didn't do

4  anything --

5        MR. LEVINE:  You don't have to ask him

6  is he sure, he's answering under oath, he knows what

7  an oath is.

8    Q.  Okay.  How many -- I'm sorry.  How many

9  pharmacists did you call up in the course of

10  investigations directed by Mr. Levine for particular

11  cases?

12    A.  I don't have an exact number, but if you

13  want me to guess, I would probably say about three

14  dozen.

15    Q.  Well, let me take that group for a little

16  bit.  How would your investigations for a particular

17  case in a particular identification project begin,

18  how did it start?

19    A.  Well, I would receive a letter or a phone

20  call from Aaron Levine's office, and I would go to

21  the computer, and I would go to mass.gov, and go to

22  Occupations, and go to the Board of Pharmacy, and

23  that gave me information about pharmacists and

24  pharmacies, and I would type in the name of the 12/7/04)                    **Page 19**

21

1    Q.  And did you -- I'm sorry, you already

2  answered that you said you kept a copy of the

3  statements that you obtained from pharmacists; is

4  that right?

5    A.  Yes, correct.

6    Q.  And that pharmacist statement, was that on

7  a form that you used?

8    A.  Yes.

9    Q.  And was that form supplied by Mr. Levine?

10    A.  Yes.

11    Q.  Did you keep notes of your conversations

12  with the pharmacists that you spoke to?

13    A.  Some of them.

14    Q.  And so I take it you didn't keep notes on

15  all of the conversations; is that right?

16    A.  Correct I made notations in my date book

17  as to who I spoke to that day.

18    Q.  Did you attempt to record what you learned

19  from the pharmacists that you were interviewing?

20    A.  Well, I would know whether or not to go

21  forward with that particular pharmacist or try a

22  different avenue if I couldn't get a positive

23  result.

24    Q.  For the ones that you didn't get a **arold (12/7/04)**                    **Page 21**

22

1  positive result on, did you keep any notes about

2  your conversations with them?

3      A.  No, I basically just crossed them off the

4  list.

5      Q.  When you said you didn't get a positive

6  result on some, how did you define a "positive

7  result," Mr. Sparr?

8      A.  If they could recall stocking the

9  diethylstilbestrol, and if they could recall what

10  brand they had on the shelf, and if they recalled

11  what strengths they had.

12      Q.  So you would need to have all three of

13  those things before it was a positive result; is

14  that correct?

15      A.  Yes, and what wholesaler.

16      Q.  And for the wholesaler, was that also --

17  now there are four items that are important for

18  there to be a positive result, wholesaler,

19  strengths, stocking DES --

20      A.  And brand.

21      Q.  -- and brand?

22      A.  That's correct.

23      Q.  I'm sorry, I need to go back to this for a

24  minute, but with respect to any pharmacist who **12/7/04)**                    **Page 22**

23

1  didn't hit all of those four criteria for a positive

2  result, did you retain, are there any of those that

3  you -- I'm sorry, would it be your practice to keep

4  notes for the pharmacist who did not meet those four

5  criteria for a positive response?

6      A.  Some I did and some I didn't, only because

7  I would write information on an eight-and-a-half by

8  11 sheet or the back of an envelope, I would cross

9  out certain ones.

10     Q.  And have you retained those notes that you

11  took in the course of these interviews by phone?

12     A.  Repeat the question, please.

13     Q.  Yes.  Have you kept the notes?

14     A.  I have some of them.

15     Q.  Is there any pattern that determined how

16  you kept the notes or is it simply a relatively

17  random factor about having notes or not having

18  notes?

19     A.  It was a random factor.

20     Q.  Now, for Mr. Levine, let me now ask about

21  a different category.  You mentioned that there were

22  some pharmacist's interviews that you did for

23  particular cases, and we've just been talking about

24  that.  What was the other categories of **arold (12/7/04)**          **Page 23**

55

1          MR. LEVINE:  Of all the investigations

2  he's done?

3      Q.  Of all the investigations he's done for

4  Mr. Levine?

5          MR. LEVINE:  He must have gotten

6  photographs of a hundred different manufacturers,

7  and he's seen the book.

8          MR. DILLON:  Mr. Levine, Mr. Sparr is

9  going to have to answer the questions.

10         MR. LEVINE:  He said some of them, now

11  you're --

12     Q.  Mr. Sparr --

13     A.  Yes.

14     Q.  -- in this case, in respect to this letter

15  of April 20th, Mr. Levine sent you a photograph of

16  Lilly's DES bottle and 25-milligram pills?

17     A.  Correct.

18     Q.  What did you use that photograph for?

19         MR. LEVINE:  If you recall?

20     A.  I don't recall.

21     Q.  Did you use that photograph?

22     A.  I might have.

23     Q.  And if you might have, in what context

24  would you have used it?     **Sparr, Harold (12/7/04)**          **Page 55**

56

1    A.  As a reference.

2    Q.  Would you have used it to show to any

3  pharmacist who might be interviewed about this

4  particular case?

5    A.  I might have.

6    Q.  Would you show it to the plaintiff's

7  mother that she might have her memory --

8    A.  No.

9    Q.  You would not, you would not deal with the

10  plaintiff's mother?

11    A.  No.

12    Q.  But when you got this photograph, that

13  would suggest that if you could show it to a

14  pharmacist, that some of these interviews that you

15  did were in person?

16    A.  That what?

17    Q.  Some of the interviews that you did were

18  in person; is that correct?

19    A.  Correct, but I didn't necessarily show

20  them the picture.

21    Q.  Are there any instances you can remember

22  where you brought the picture to an interview with a

23  pharmacist and showed it to them?

24    A.  I can't remember.    **Sparr, Harold (12/7/04)**                    **Page 56**

57

1    Q.  You can't remember one way or the other;

2  is that correct?

3    A.  I can't remember who I showed pictures to

4  and who I didn't show pictures to.

5    Q.  So I take it that you do remember there

6  were some instances when you did show the pharmacist

7  the picture?

8    A.  A few.

9    Q.  When you went to interview those

10  pharmacists, did you carry with you photographs of

11  any DES other than Eli Lilly and Company's?

12    A.  No.

13    Q.  Did you understand when you were

14  interviewing those pharmacists that the goal was to

15  see if the pharmacist would remember Eli Lilly and

16  Company as the drug that they had?

17    A.  Yes.

18      MR. LEVINE:  That's not what you just

19  told him before.  You just told him you were asked

20  about what brands they have.  He's trying to make

21  you out as a Lilly attacker.

22      MR. DILLON:  Mr. Levine, I'd really

23  like Mr. Sparr, who is designated as an expert

24  witness, to be able to answer these questions.1 (12/7/04)              **Page 57**

65

1  company?

2    A.  No.

3    Q.  Okay.  And what is the basis for your

4  belief that the lawsuits involved the insurance

5  company at all?

6    A.  Because normally manufacturers had

7  liability insurance.

8    Q.  Did you tell -- did you tell the

9  individuals that you called in your telephone

10  solicitations that you were involved in a particular

11  lawsuit on behalf of a particular individual against

12  Eli Lilly and Company?

13        MR. LEVINE:  He's not involved --

14    A.  I never mentioned the individual.

15        MR. LEVINE:  He's not involved in the

16  lawsuit.

17    Q.  I may have misphrased it, but I see.  So

18  both in this letter to Mr. Friedman and in the

19  telephone inquiries, did you mention this fact that

20  you believed that the lawsuits involved liability

21  insurance for Eli Lilly and Company's insurers?

22    A.  Maybe once or twice.

23    Q.  Did you ever mention that they involved

24  liability insurance for Bristol-Meyers Squibb **1 (12/7/04)**                    **Page 65**

66

1   insurance companies?

2      A.  No.

3      Q.  Did you ever mention that it may involve

4   liability insurance coverers for Merck?

5      A.  No.

6      Q.  Or Abbott Laboratories?

7      A.  No.

8      Q.  Or American Pharmaceutical Corporation?

9      A.  No.

10     Q.  Or Premo Pharmaceutical?

11     A.  No.

12     Q.  If you mentioned it at all, the only one

13  you mentioned was Lilly; is that right?

14     A.  Correct.

15        MR. DILLON:  I'm going to have a

16  photocopy of this and mark this as Exhibit 5.

17        (Letter, 12/5/03 marked as Exhibit No.

18  5 for identification.)

19     Q.  Mr. Sparr, in that same envelope there is

20  a photocopy of a newspaper article, and it says,

21  Nicholas Fornaro; can you tell me what that is,

22  please?

23     A.  This is an article that appeared in The

24  Patriot Ledger about a particular pharmacist that    2/7/04)              **Page 66**

67

1  contacted, and it was sent to me from another

2  pharmacist.

3    Q.  And you would have that information so

4  that you could be informed about the individuals you

5  were talking with?

6    A.  Correct.

7    Q.  Mr. Sparr, in this envelope there's also a

8  letter, November 21st, I believe it's 2003; could

9  you tell me what that is, please, it's addressed to

10  you?

11    A.  This is concerning a case that Mr. Levine

12  sent to me where the prescription was filled at

13  Sparr's Drugstore.

14    Q.  And lastly in this pile, Mr. Sparr, there

15  is a yellow pad, lined yellow pad; could you tell

16  me, please, what this is?

17    A.  These are names of some pharmacists that I

18  contacted, some information about one of the cases.

19    Q.  And could you tell me what case that's

20  about, I'm trying to figure out, because I'm going

21  to ask you about, in summary, about the notes that

22  you have for interviews; do you know what the case

23  was that those notes --

24    A.  The first one was a Jennifer Maitre, **ld (12/7/04)**                    **Page 67**

68

1   M A I T R E, the second one was Jennifer Jameson,

2   and the third one was Michelle Anderson.

3      Q.   Anderson, did you say?

4      A.   Yes.

5          MR. LEVINE:  Are any of these Patty's

6   cases?

7          THE WITNESS:  I don't believe so.

8          MR. DILLON:  Not so far.

9          MR. LEVINE:  Don't say anything if

10  it's Patty's case.

11     A.   This page contains information about the

12  prescription that I filled, and this, I believe, is

13  the Wilson case.  There's some names of some doctors

14  that were in an OB/GYN group in Quincy, and some

15  information about Henry Estaman's store in Quincy.

16     Q.   And Henry Estaman, that's the name that's

17  on the outside of this envelope, and from whom, can

18  you tell from whom you were receiving information

19  about Henry Estaman's store in Quincy?

20     A.   From him.  And there's another one about

21  Michelle Anderson.  I don't know, this is a piece, a

22  little piece of paper concerning -- there's a phone

23  number on it; I'm not sure which case it was.  And

24  that's it.          **Sparr, Harold (12/7/04)**                **Page 68**

69

1    Q.  Now, is it fair to say that this yellow

2  pad reflects notes that you took in the course of

3  your investigations for Mr. Levine into particular

4  case pharmacies?

5    A.  Yes.

6        MR. LEVINE:  You're keeping this stuff

7  in a pile, I assume.

8        MR. DILLON:  I'm keeping this stuff in

9  a pile, and all of this --

10        MR. LEVINE:  Are you going to copy it

11  at lunch and give it back to him?

12        MR. DILLON:  Yes, I am.

13    Q.  I think the last thing that was in that

14  envelope, I believe, was this, and I wondered, it is

15  one sheet of paper, I guess a folded over sheet of

16  paper, and then three sheets of typed pages; can you

17  tell me what that is, please?

18        MR. LEVINE:  If it's Patty's, don't go

19  into it.

20    A.  Well, there probably are a few on there --

21    Q.  I'm sorry, Mr. Sparr, I couldn't hear you,

22  could you repeat that?

23    A.  Well, the bulk of these are pharmacists

24  that I got from Mr. Levine, statements from **Id (12/7/04)**         **Page 69**

70

1  pharmacists.  There probably is some in here from

2  Patty Stanford.

3     Q.  So that's a list of, the three-page list

4  of pharmacists that you interviewed; is that right?

5     A.  Correct, some more names of classmates,

6  former classmates of mine.

7     Q.  And that is on the single sheet of paper

8  that's attached to this group; is that right?

9     A.  Yes.

10     Q.  And then there's a folded over piece of

11  paper?

12     A.  And then there's a name, there's some

13  names of DVDs that we were going to rent.

14     Q.  I take it that that's you and your wife,

15  unrelated to this investigation?

16     A.  Assassination Tango; and there's a list of

17  four pharmacists on a separate piece of paper, and I

18  contacted one of them.

19     Q.  And are those materials also notes of

20  your --

21     A.  Yes.

22     Q.  -- investigations for Mr. Levine?

23     A.  Yes.

24     Q.  Amending that, that it's possible that**d (12/7/04)**          **Page 70**

71

1 some of these pharmacists listed on the three pages

2 relate to Miss Stanford; is that correct?

3     A.  Yes.

4     Q.  I think that the next thing that was given

5 to me was another version of this December, sorry,

6 November 17, 2003 letter that we've already marked,

7 so I don't think we need to mark it again.

8     A.  That's correct.

9     Q.  And there's also, also dated November 17,

10 2003, a statement from Harold Sparr; is this

11 something that you prepared, sir?

12    A.  Yes.

13    Q.  Did you type that up yourself?

14    A.  I believe my wife did, she's the typist.

15    Q.  And then we have, I'm not going to try to

16 count them up, but we have a number of statements of

17 pharmacists, which I'm going to clip together, if I

18 may, and I'm going to ask you if these are all

19 pharmacist statements that you obtained in the

20 course of your work?

21        (Witness perused documents.)

22    A.  No, these were all prior to my coming on.

23 I did not get these statements.

24    Q.  So these statements, can you tell me how **(2/7/04)**        **Page 71**

72

1  you came to have these pharmacist statements?

2      A.  I believe they were sent to me by

3  Mr. Levine so that I wouldn't duplicate any of the

4  statements.

5      Q.  And the last category, sir, is these were

6  clipped together when I got them, and I will just

7  tell you that it begins with some statements, some

8  pharmacy statements, and then there are some other

9  materials behind it.  Can you tell me, please, what

10  that is?

11          (Witness perused documents.)

12      A.  These are statements from pharmacists

13  before I came on the scene, and, actually, there's

14  an exhibit, copy of an exhibit sticker on here, so

15  this is from before.

16      Q.  Before the time when you were engaged to

17  do investigations; is that correct?

18      A.  Correct.

19      Q.  And did all of those materials, including

20  the attachments behind it, come to you from

21  Mr. Levine?

22      A.  Yes.  And there is a publication here from

23  the APAJ, and some promotional material from Eli

24  Lilly, and something, some pages from, I believe **2/7/04)**          **Page 72**

73

1  it's a PDR -- no, this is, actually, hold on, these

2  are all Eli Lilly promotional pieces that appeared

3  in various publications.

4      Q.  Now, Mr. Sparr, I think you've told me

5  that you got those all from Mr. Levine.  Did you

6  make any use of the Lilly materials that you've been

7  describing in that clipped together package, did you

8  make any use of that in your survey?

9      A.  I read them.

10      Q.  Yes.  Did you make reference to them as

11  any part of your work for Mr. Levine?

12      A.  The only thing I referenced was the form A

13  from Eli Lilly and Company concerning distributing

14  and selling service as it applies to, I believe,

15  wholesalers.

16      Q.  Okay.  And is there a date on that form

17  that you've got?

18      A.  Looks like the 5th of May, 1959.

19      Q.  Are there any other -- we'll come to the

20  wholesale things, but when you said you made

21  reference to that, in what way did you reference

22  that wholesaler agreement?

23      A.  Because I was able to contact a trained

24  order picker from McKesson & Robbins that was a **7/04)**                **Page 73**

74

1  Lilly distributor, a full line wholesaler.

2      Q.  And was that Mr. Dellavolpe?

3      A.  Yes.

4      Q.  We'll come to him in a little bit.  Thank

5  you.  Now, what I'm going to do is this, I've now

6  had copies made, so I can return to you your copies

7  of what are now Exhibits 2 and 3.  I'm going to ask

8  the court reporter when we go off the record to mark

9  Exhibit 2 and Exhibit 3.  And Exhibit 5, I still

10  haven't got a copy of it, so I'm going to hold that.

11  And I'm going to ask someone to come in and make

12  photocopies of this pile of material that you gave

13  me.  Now --

14      A.  This is mine, too.

15      Q.  No, that's actually --

16      A.  I gave you that.  This was folded up.  You

17  can see where it was folded, that's how it was

18  delivered to me.

19      Q.  I thought I gave you my copy of the

20  subpoena.

21      A.  No.

22          MR. DILLON:  I'll have this copied, as

23  well, then.  Off the record.

24          (Discussion off the record.)  **Harold (12/7/04)**          **Page 74**

75

1          (Recessed at 1:33.)

2          (Resumed at 2:12.)

3      Q.  Mr. Sparr, I've taken the materials that

4   you brought in response to the subpoena, and I'm

5   having photocopies made, and I'll get your originals

6   back to you before the end of this deposition.

7          Let me ask, is there anything else

8   that you -- do you have a copy of Exhibit 4 or is

9   that being copied?  Is there anything else that you

10  made reference to or relied upon in the course of

11  your work for Mr. Levine in the survey besides the

12  materials that you produced just before we took our

13  break and that are now being photocopied?

14         MR. LEVINE:  And his report, and the

15  appendices.

16     Q.  And the appendices in the report; is there

17  anything else?

18     A.  No.

19         MR. LEVINE:  And these books.

20     Q.  Let's just talk about those books for a

21  minute.  May I have those for a second?  Mr. Levine

22  has now handed me three books.  The first is called,

23  DES, The Complete Story.  And, Mr. Sparr, have you

24  reviewed this book?          **Sparr, Harold (12/7/04)**                    **Page 75**

76

1    A.  I've read it several times.

2    Q.  I beg your pardon?

3    A.  I've read it several times.  It was

4  written by my sister-in-law's ex-sister-in-law.

5    Q.  Okay.  And when did you first read this

6  book?

7    A.  Probably in January of this year.

8    Q.  And how did you come to read this book?

9    A.  My sister-in-law in Florida gave me a

10  signed copy that I returned to her when I was

11  through with it, and I went out and bought this

12  secondhand.

13    Q.  And your sister-in-law gave you this copy

14  in January or so of this year; is that correct?

15    A.  Yes.

16    Q.  And did you ask her for this copy, for

17  this book?

18    A.  Well, she knew what I was doing, so she

19  asked me if I wanted to borrow it.

20    Q.  And this book was published in 1981; is

21  that correct?

22    A.  Correct, I guess, I'll take your word.

23    Q.  You can take my word for that, it says

24  1981 inside.  And I take it that between 1981 and **2/7/04)**                    **Page 76**

77

1   2004 you had not read it; is that correct?

2       A.  Correct.

3       Q.  The second book is, The Survey Research

4   Handbook by Pamela Alreck.  And can you tell me when

5   you obtained a copy of this book?

6       A.  Sometime last spring.

7       Q.  Sometime in the spring of 2004?

8       A.  Correct.

9       Q.  And how did you come to find and obtain

10  this book?

11      A.  Mr. Levine provided it.

12      Q.  Have you read this book, Mr. Sparr?

13      A.  I have perused it, and I have used it for

14  references.

15      Q.  In what context have you used it for

16  references?

17      A.  For the survey that I conducted.

18      Q.  Why don't you take a look at it, if you

19  would?  Are there any particular parts of this book

20  that you have perused and used as a reference point

21  in the survey?

22      A.  I read Chapter 1, Chapter 2, Chapter 3,

23  Chapter 4, Chapter 7, Chapter 11; that's about it.

24      Q.  May I see that again, please, Mr. Sparr.**(12/7/04)**          **Page 77**

83

1   which helped me to decide on some of the questions

2   that were asked.

3       Q.  Now, now that we've gone through these

4   three books that we've identified, is there anything

5   else that, and the materials that you gave me, and

6   your report, is there anything else that you used in

7   conjunction with your work as doing surveys for

8   Mr. Levine?

9       A.  No.

10      Q.  Now, I think I may have covered some of

11  this before, but let me shift topics a little bit,

12  I'll come back to the survey.  But let me ask about

13  the interviews that you did, these are described in

14  paragraph 2 of Exhibit 1, your report, these are

15  personal conversations of research and

16  investigations, contacting hundreds of Massachusetts

17  pharmacists; okay?

18      A.  Um-hmm.

19      Q.  I think you told me that you did not have

20  a script that you used; is that correct?

21      A.  That's correct.

22      Q.  And any notes that you have, I take it,

23  you've already given me in response to the subpoena;

24  is that correct?                    **Sparr, Harold (12/7/04)**                    **Page 83**

92

1  contains all of the statements that you have

2  obtained, either for particular investigations or

3  generally asking about DES; is that correct?

4      A.  That is correct.

5      Q.  And am I correct that, to be clear about

6  this, because there's another paragraph that I want

7  to ask you about, but that folder that you've got

8  there, those are exclusively ones that you have

9  obtained; is that correct?

10     A.  That is correct.

11         MR. DILLON:  Well, let me do this, let

12  me hold a place as Exhibit 6, I believe, for that

13  folder and its contents.

14     Q.  And, Mr. Sparr, I'm going to ask you to

15  hang on to that.  I need to ask you some questions

16  about it.  I would, obviously, like to review that

17  and take a look at it.  Am I correct in

18  understanding that you have been instructed by

19  Patricia Stanford to not produce any materials that

20  relate to work that you have done for her; is that

21  correct?

22     A.  That is correct.

23     Q.  And do I understand further that while not

24  all of the statements in that manila folder that **(12/7/04)**              **Page 92**

93

1  we're holding a place for Exhibit 6 for, that not

2  all of them are for Miss Stanford, some of them are,

3  and you're not able as we're sitting here to

4  separate out those that are and aren't?

5     A.  That is correct.

6        MR. DILLON:  Well, we'll just hold a

7  spot in the record for Exhibit 6, because I'm sure

8  we'll have a chance to look at that later on.

9     Q.  Now, Mr. Sparr, when you made these

10  inquiries about all of the statements that are in

11  this manila folder, Exhibit 6, did you tell them

12  that you were doing this in connection with

13  litigation?

14     A.  I told them that I was working for an

15  attorney who represented DES daughters, and there is

16  a possibility that they may be deposed.

17     Q.  Did you tell them that you were working on

18  cases in which the defendant was Eli Lilly and

19  Company?

20     A.  No.

21     Q.  Were you aware of the fact or are you

22  aware of cases in which the defendant was Eli Lilly

23  and Company?

24     A.  Yes.        **Sparr, Harold (12/7/04)**        **Page 93**

94

1    Q.   Now, Mr. Sparr, did any of these

2    pharmacists that you interviewed tell you that their

3    memory wasn't really that great or it may be vague

4    about what they were dispensing in the 1950s and

5    1960s?

6    A.   Those pharmacists I did not take

7    statements from.

8    Q.   Did any of the pharmacists tell you in the

9    first instance that their memories were vague, and

10   then you refreshed their recollection --

11   A.   No.

12   Q.   -- or memory with them?

13   A.   No.

14   Q.   Did you have any conversation with them at

15   all about the companies that were out there making

16   DES?

17   A.   Absolutely not.

18   Q.   Have you ever run across the idea of false

19   memories, Mr. Sparr?

20   A.   I don't know what you mean by "false

21   memories."

22   Q.   Well, let's take an everyday example, do

23   you ever tell a story and have your wife correct you

24   on the facts?          **Sparr, Harold (12/7/04)**          **Page 94**

95

1    A.  All the time.

2    Q.  I can't say I'm stunned to hear that,

3  Mr. Sparr, and I think none the less of you for

4  that.  But have you, in your experience, then, found

5  occasions when you have a memory of something that

6  turns out on further investigation or corroboration

7  to be inaccurate?

8    A.  Not to my knowledge.

9    Q.  So, to your knowledge, your memory of

10  events is infallibly correct; is that right?

11    A.  Yes.

12    Q.  And is that true about your memory of

13  events in the 1950s and 1960s?

14    A.  Correct.

15    Q.  As well as of today; is that correct?

16    A.  Correct.

17    Q.  So in those instances when your wife

18  corrects you, have you found your wife to be the one

19  who is incorrect about the factual corrections?

20    A.  Occasionally.

21    Q.  And on the occasions when she's not at

22  fault or not in error, do you find that you have

23  been mistaken about the facts?

24    A.  Occasionally.    **Sparr, Harold (12/7/04)**              **Page 95**

96

1    Q.  Did it occur to you that pharmacists who

2  were being asked about a particular set of

3  prescriptions from the 1950s and 1960s from memory

4  might sometimes have a fallible memory?

5    A.  No.

6    Q.  So your assumption was that none of their

7  memories were fallible; is that right?

8    A.  Correct.

9    Q.  Did you take any steps to corroborate the

10  assumption that none of these pharmacists had in any

11  way an incomplete or wrong memory?

12       MR. LEVINE:  Well, if they said they

13  didn't remember, as he said some of them said,

14  that's an incomplete memory, so fix your question.

15       MR. DILLON:  I'm not talking about

16  that.

17    A.  I would ask them a series of questions,

18  and I would ask them if they stocked

19  diethylstilbestrol.  I would ask them, Do you recall

20  what brand it is, and then I would ask them, Who was

21  your wholesaler.

22    Q.  Okay.

23    A.  And if they answered those three questions

24  without hesitation, I would mail them a statement./7/04)

**Page 96**

97

1     Q.  Did you do anything to find out if their

2   memory about the DES they had in their store in the

3   '50s and '60s was accurate?

4     A.  No.  How could I?

5     Q.  Well, when you worked for Mr. Goslin, one

6   of the things that was involved was review of

7   particular scripts; did you ever have occasion to

8   review any scripts?

9     A.  Yes.

10     Q.  All right.  Ever have any occasion to

11   review any scripts from these pharmacists that gave

12   you statements to find out if they had accurately

13   described the DES?

14     A.  Not from any of these statements, but from

15   other pharmacists.

16     Q.  So with respect to the statements that you

17   have, though, did you ask any of them to go back and

18   see if they had any purchase records or scripts that

19   might confirm or refresh their memory?

20     A.  They all told me -- well, they're only

21   required by the Board of Registration of Pharmacy to

22   keep the prescriptions for two years, however, if

23   it's a Medicaid prescription, they have to keep it

24   for seven years.  So most of these pharmacists do   2/7/04)          **Page 97**

106

1   make any effort to find out how many different

2   companies listed DES or diethylstilbestrol for sale

3   in these national publications, The Red Book or The

4   Blue Book?

5      A.  I had copies of one of the two books.

6      Q.  Yes.  Did you make any effort to find out

7   how many companies listed their DES products for

8   sale on a national basis?

9      A.  I didn't count them.

10     Q.  Was it your impression that there were

11  hundreds of such companies?

12     A.  Probably at least a hundred.

13     Q.  And was it your impression as you reviewed

14  this that those companies would list their products

15  in more than one year, in several years?

16     A.  Yes.

17     Q.  Did you form the view that those companies

18  were listing the products in these national

19  publications because they were, in fact, selling

20  some of those products?

21     A.  I would assume so.

22     Q.  And it wouldn't make sense for them to

23  continue to list it if they weren't selling any; is

24  that correct?          **Sparr, Harold (12/7/04)**              **Page 106**

107

1   A.  That's correct.

2   Q.  When you did your survey, did you factor

3   in at all the fact that there were in your view at

4   least a hundred, and I will represent to you

5   actually several hundred companies, that listed

6   their DES products for sale nationally in The Red

7   Book and The Blue Book?

8   A.  Did I know it?

9   Q.  Did you factor it in at all to your

10  investigation about --

11  A.  Yes, because the survey didn't direct

12  pharmacists to answer in a particular manner.

13  Q.  Okay.  Now, Mr. Sparr, from your

14  experience as a pharmacist and your conversations

15  with others, did you run across any pharmacists that

16  might use, let's take DES, one brand of DES for

17  filling unspecified prescriptions and another brand

18  available in case a doctor did specify?

19  A.  Yes.

20  Q.  And did you run across any of these

21  companies, any of these pharmacists who had a sort

22  of non famous name pharmaceutical company as the

23  brand that they dispensed in the course of dealing

24  and dispensing generic prescriptions?**Harold (12/7/04)**                              **Page 107**

109

1  for me to review?

2     A.  I have 148 in that folder, and I believe

3  you took some from me, and I also looked at some in

4  Mr. Levine's office.

5     Q.  When you say he took some from you,

6  meaning?

7     A.  You.

8     Q.  I see.  So in the materials that you

9  brought that are now being photocopied there is some

10  additional statements there; is that correct?

11     A.  That's correct.

12     Q.  And when you say "randomly selected," who

13  did the random selection, sir?

14     A.  I did.

15     Q.  And how did you make a random selection,

16  sir?

17     A.  I would call different pharmacists that

18  graduated in different years, I would call them at

19  random.

20     Q.  In this paragraph No. 3, talking about a

21  review of 200 sworn statements, I take it, then,

22  that what you're telling me is that the random

23  selection, the "random" refers to your calls to

24  individuals; is that what you mean?, **Harold (12/7/04)**            **Page 109**

111

1  industry, I wasn't interested, if they were a detail

2  man, I wasn't interested.  I was only interested in

3  community pharmacists.

4      Q.  So after you called them up you would make

5  an inquiry as to whether they were a community

6  pharmacist; is that correct?

7      A.  Correct.

8      Q.  But when you decided to call them, what

9  criteria did you have to let you think that these --

10     A.  Normally just the date that they

11  graduated.

12     Q.  And, Mr. Sparr, of these 200 or so, how

13  many of those represented statements that were from

14  pharmacists not practicing in Massachusetts?

15     A.  Maybe 20.

16     Q.  And did you rely on those non

17  Massachusetts pharmacists to help you form your

18  opinion about market share in Massachusetts?

19     A.  Not in Massachusetts.

20     Q.  You also mention in this paragraph 3 some

21  deposition testimony; what deposition testimony did

22  you review, sir?

23     A.  The deposition testimony that was provided

24  by Aaron Levine.       **Sparr, Harold (12/7/04)**              **Page 111**

116

1  records about the prescriptions from individuals?

2      A.  Well, it was between me and the trash can.

3      Q.  Let's begin to turn to your personal

4  experience as a basis for this.  This is really in

5  paragraph one of your letter of October 12, 2004,

6  which is deposition Exhibit 1.

7          In what way, Mr. Sparr, did your

8  personal experience as a retail practicing

9  pharmacist bear on your ability to conclude that

10  Lilly, as you conclude, had 94 percent of DES sales

11  in Massachusetts?

12          MR. LEVINE:  Pregnancy sales.

13      A.  It was based on the, both on the surveys

14  and on the statements that I received.

15      Q.  I'm going to do the survey, and we've

16  talked about the statements you received.  But in

17  paragraph one of your letter you talk about your

18  personal experience --

19      A.  Yes.

20      Q.  -- as a retail practicing pharmacist as

21  one of the bases for your opinion.  And I'm asking

22  you, what is it about your experience as a

23  practicing retail pharmacist at the Sparr Drugstore?

24      A.  Sparr's Drugstores and Robert's Pharmacy2/7/04)        **Page 116**

117

1  we only stocked Lilly brand.

2      Q.  So you can tell from that that for the

3  stores that you were the proprietor of, you only

4  stocked Lilly; is that correct?

5      A.  That's correct.

6      Q.  But from that experience at Sparr's and at

7  Robert's, you would not be able to tell anything

8  else about what any other store did; isn't that

9  right?

10      A.  Except from the statements that I received

11  from pharmacists that practiced in the '50s and

12  '60s.

13      Q.  So your personal experience as a retail

14  practicing pharmacist really gives your experience

15  at Sparr's Drugstore and at Robert's Pharmacy; is

16  that right?

17      A.  Correct.

18      Q.  Let me ask about being a teacher of

19  pharmacy over the past 49 years.  First of all, in

20  what sense were you a teacher of pharmacy over the

21  last 49 years?

22      A.  I was a preceptor for over 650 last year

23  pharmacy students from Mass. College of Pharmacy and

24  Northeastern.        **Sparr, Harold (12/7/04)**            **Page 117**

118

1    Q.   And what does being a preceptor mean?

2    A.   They had to do a five-week externship in a

3    hospital pharmacy, so the schools would send me

4    students on a regular basis.

5    Q.   So this would be while you were working at

6    the hospital pharmacies that we talked about after

7    the '70s; is that right?

8    A.   Correct.

9    Q.   So in that context, you were not involved

10   in seeing or dispensing prescriptions for DES for

11   the use in accidents of pregnancy; isn't that right?

12   A.   Pardon me?

13   Q.   In the hospital pharmacy context after the

14   1970s you would not have been involved in seeing or

15   filling any prescriptions for DES for the use in

16   accidents of pregnancy?

17   A.   That is correct.

18   Q.   Now, you mentioned being a preceptor for

19   students while you were working in the hospital

20   pharmacies.  Is there any other aspect of teaching

21   pharmacy that you want to call my attention to as a

22   basis for your opinions in this case?

23   A.   I worked for about five semesters as an

24   adjunct professor in the pharmacy practice lab at **2/7/04)**                    **Page 118**

119

1  Mass. College of Pharmacy.

2    Q.  And about when was this, please?

3    A.  '90, '91, '92.

4    Q.  And, I take it, then, that at that period

5  of time in the '90s nothing about your teaching

6  would have had anything to do with seeing or filling

7  prescriptions for DES in relation to accidents of

8  pregnancy?

9    A.  That's correct.

10       MR. LEVINE:  You're entirely ignoring

11  the historical aspect of these positions.

12       MR. DILLON:  I'm just asking the

13  questions.

14       MR. LEVINE:  Okay, but you're asking

15  the wrong questions.  I get to ask the questions

16  when I'm qualifying him, and I will be able to show

17  that in this preceptorship and in the adjunct

18  professor he did come into contact with the

19  historical aspects of pharmacy and DES, but you

20  don't want to do it, it's your deposition.

21       MR. DILLON:  I think that that's

22  something that I'll let you worry about.

23       MR. LEVINE:  Okay.

24    Q.  Is there anything else that you want to **(12/7/04)**        **Page 119**

126

1    A.  Correct.

2    Q.  So in terms of designing a survey, I take

3  it that you had never before attempted or been

4  involved in designing a survey to develop market

5  share; is that right?

6    A.  No.

7    Q.  Am I incorrect, you have been involved in

8  designing a survey?

9    A.  No, I have not, I was not.

10    Q.  I take it that you haven't done any

11  publications on survey research; is that correct?

12    A.  That's correct.

13    Q.  And have you ever taken any course work in

14  survey design?

15    A.  No.

16    Q.  Have you ever taken any, received any

17  training in psychology?

18    A.  I believe I took a psychology class when I

19  was at Mass. College of Pharmacy.

20    Q.  Were you ever involved in a class involved

21  in psychology or sociology related to survey

22  research?

23    A.  No.

24    Q.  How about marketing, have you ever taken (7/04)        **Page 126**

127

1  any, ever received any training in marketing?

2    A.  I went to Babson when I was working

3  towards an MBA degree, I went there for

4  three semesters, and several of the courses that I

5  took were in marketing.

6    Q.  And I take it you did not decide to

7  complete that degree at Babson; is that right?

8    A.  That's right, it interfered with my work

9  schedule.

10    Q.  Have you had any formal training in

11  statistics?

12    A.  No.  I started a statistic course at

13  Babson, but that's when I dropped out.

14    Q.  Before you got involved in this project

15  did you have any experience in sampling; in other

16  words, in deciding what sample out of a larger group

17  would accurately reflect the findings that you would

18  get in the larger group?

19    A.  Yes.

20    Q.  And in what way did you do that?

21    A.  In the survey I, we decided what year that

22  we were going to determine to be the midline of

23  popularity.

24    Q.  Okay.  I really wanted to ask, I did not  **(12/7/04)**          **Page 127**

128

1  ask the question clearly, before you got involved in

2  this survey for Mr. Levine had you ever been

3  involved in attempting to design a sampling

4  methodology?

5      A.  No.

6      Q.  Okay.  Now, you mentioned about sampling

7  in this one that you would attempt to define a

8  midpoint, as it were, for popularity; is that what

9  you tried to do?

10     A.  Yes.

11     Q.  And what did you determine the mid point

12  was?

13     A.  I looked at the matrixes of California and

14  New York.

15     Q.  And the matrixes, each of them give the

16  market share, as it were, for each of the companies

17  involved in those proceedings; is that correct?

18     A.  Yes.

19     Q.  And how did you use the matrices to decide

20  where the peak of demand was or peak of use?

21     A.  Well, I personally remembered it from

22  dispensing when it started to decline and when it

23  became really popular.

24     Q.  And what did you remember about -- so the **7/04)**          **Page 128**

141

1          MR. LEVINE:  But was it a nurse?

2          THE WITNESS:  I don't know.

3     Q.  Whatever it was, this list of 370 is a

4  list that you got from Mr. Levine's office; is that

5  correct?

6     A.  Correct.

7     Q.  And what, if anything, did you do to find

8  out if that, in fact, represented the list, what it

9  said to be, those who got a license during those

10  years, '63 to '67, for the first time and were still

11  practicing in Massachusetts; what did you do to test

12  that?

13     A.  Well, I recognized the fact that the

14  licensees, I was able to go to the alumni directory

15  and look in there by year, and I saw the names, the

16  names popped up from Mass. College of Pharmacy, but

17  there were other schools of pharmacy where people

18  became registered.

19     Q.  What did you do to find out that the list

20  of names you got from Mr. Levine accurately

21  reflected that category of people who were first

22  licensed between 1963 and 1967 and who were also

23  still practicing in Massachusetts?

24     A.  I would see absolutely no reason why they 2/7/04)          **Page 141**

142

1    would lie.

2        Q.  So you didn't do -- you didn't see the

3    need to do anything to test them?

4        A.  No.

5        Q.  So you were not actually trying to find

6    out about pharmacists who were simply licensed

7    between 1963 and 1967, you also had this additional

8    condition that to qualify for this study they had to

9    also still be practicing; is that right?

10       A.  That's correct, because the disk only has

11   those currently licensed.

12       Q.  So there were a number of pharmacists, I

13   take it -- so, I'm sorry, the disk only has those

14   currently licensed?

15       A.  That's correct.

16       Q.  I see.  So there were pharmacists who

17   were, in fact, licensed between 1963 and 1967 who

18   either stopped the practice of pharmacy or moved

19   somewhere else, but wouldn't show up in your group;

20   is that right?

21       A.  That's correct.

22       Q.  And how many were those?

23       A.  I have no idea.

24       Q.  Who was it who felt that this category --**12/7/04)**         **Page 142**

143

1  let me back up.  Who was it who decided that this

2  category of pharmacists who were first licensed in

3  1963 to 1967 and were still current was a group that

4  was an adequate sampling frame or survey population

5  for your study, who did that?

6      A.  I determined it.

7      Q.  You determined that?

8      A.  Yes.

9      Q.  And what were the criteria that you used

10  to determine that?

11      A.  I knew the popularity of the drug peaked

12  in 1965, around 1965, so I went back two years

13  before '65 to two years after '65.

14      Q.  And that is the only criteria you had; is

15  that correct?

16      A.  Yes.

17      Q.  Did you have any basis to decide that the

18  people that were still practicing accurately

19  reflected that cadre of pharmacists who were first

20  licensed between 1963 and 1967?

21      A.  It was a representation.

22      Q.  How do you know that?

23      A.  Because I do know some of them that are

24  still working.        **Sparr, Harold (12/7/04)**              **Page 143**

144

1    Q.  So --

2    A.  They're younger than I am.

3    Q.  What was the basis on which you decided

4  that this was a, you know, an adequate snapshot, an

5  accurate snapshot of what that group of newly

6  licensed pharmacists between '63 and '67 looked

7  like; how did you decide that?

8    A.  I decided that the peak period was 1965,

9  and I went two years on either side of that.

10    Q.  I understand that part, but now you've got

11  this extra thing, which is a dividing line that

12  you're now not dealing with everybody whose been

13  licensed between '63 and '67, but only that part of

14  that group that's still practicing in 2004.

15    A.  Correct.

16    Q.  All right.  How did you decide that those

17  who still were practicing in 2004, whatever that

18  group was, was representative of the group that was

19  first licensed in '63 and '67; how did you decide

20  that?

21    A.  Well, I felt that because they were still

22  licensed, that the majority of them were still

23  working, and they would have good knowledge of what

24  transpired back in the '60s. **Sparr, Harold (12/7/04)**          **Page 144**

156

1    A.  My personal experience I know.

2    Q.  Okay.  I don't want your personal

3  experience to interfere with this question.  I

4  understand you have personal experience, and I

5  understand that you have other surveys and

6  interviews that you've done besides the survey.  But

7  with respect to the survey we've been talking about,

8  where the first entrant, okay, was licensed on

9  January 1, 1963, do you agree with me that that

10  survey standing alone, that survey alone cannot

11  supply you with any information about practices in

12  Massachusetts before January 1, 1963?

13    A.  It only gives me information from '63 to

14  '67.

15    Q.  Okay, thank you.  That's really all I

16  wanted.  Now, Mr. Sparr, if we take your assumption

17  that there were, approximately, between 4500 and

18  5000 pharmacists practicing in Massachusetts between

19  1963 and 1967, 370 is a pretty small percentage of

20  that; isn't it?

21    A.  You have to consider that pharmacists in

22  order to get licensed have to have 1500 hours of

23  explorational training, and they get that, they

24  usually start working in their first year a**rold (12/7/04)**                **Page 156**

157

1  pharmacy school in a pharmacy, that's a requirement,

2  so they would know what went on prior to 1963.

3  Those people that got registered, licensed in 1963,

4  they would have known since '59.

5    Q.  Okay.  Now, Mr. Sparr, when you're a

6  student at the college --

7      MR. LEVINE:  You're arguing with him

8  now.

9    Q.  When you're a student at the College of

10  Pharmacy, Mr. Sparr, are you allowed to fill

11  prescriptions?

12    A.  Yes.

13    Q.  You can fill prescriptions from the first

14  year?

15    A.  Yes.

16    Q.  And are you allowed to purchase

17  prescriptions and buy them, order them?

18    A.  Yes.

19    Q.  And has that happened in your store, at

20  the Sparr Drugstore, did you let students from the

21  pharmacy school fill prescriptions in your store?

22    A.  I was the only student.  I didn't dispense

23  it, I filled it; there's a difference.

24    Q.  I see.  I'm sorry.  So dispensing the **old (12/7/04)**          **Page 157**

159

1  made, and I'll come back to it, because I don't

2  think we're going to get done here.

3          MR. LEVINE:  On that respect let me

4  say that you do not have an unlimited amount of

5  time.  Now, six hours, I think, is plenty.

6          MR. DILLON:  Well, I'm on page --

7          MR. LEVINE:  You've got two hours.

8          MR. DILLON:  Mr. Levine, I'm going to

9  take the deposition that I'm going to take, and I

10  have a rather lengthy outline.  I have a lot of

11  questions to ask Mr. Sparr.

12          MR. LEVINE:  Now that you're paying

13  Mr. Sparr, and as soon as he provides you with his

14  rates for his testimony, you can go forward.

15     Q.  Mr. Sparr, let me go back to your

16  statement, which is Exhibit 1 to the deposition, and

17  Exhibit 4 to that is this letter of May 5th, 2004,

18  to you, from Mr. Levine.

19     A.  From me, to Mr. Levine?

20     Q.  No, from Mr. Levine, to you, May 5th.

21     A.  Correct.

22     Q.  Now, Mr. Sparr, in the second paragraph

23  there, this letter talks about the trustworthiness

24  of the survey depending on a well grounded sampling(04)    **Page 159**

160

1    and minimization of hearsay dangers; in your study

2    what did you do to minimize hearsay dangers?

3        A.   There's absolutely no mention --

4            MR. LEVINE:  It's not only his study,

5    but it's a study of three people.  It's not his

6    study.  The primary statistical brains behind it was

7    Doctor Vanderschmidt.  But go ahead.

8        Q.   Okay.  Well, you mentioned three people,

9    it's Doctor Vanderschmidt, Mr. Sparr, and

10   Mr. Levine; is that right?

11       A.   Mr. Steer.

12       Q.   Okay.  What, if anything, did you do to

13   minimize the hearsay dangers?

14       A.   Made sure that there weren't anything in

15   the questions that would lead them to answer it

16   incorrectly.

17       Q.   And what was it about the questions that

18   you put in there to avoid hearsay problems?

19       A.   They weren't leading questions.

20       Q.   Is there anything in this survey that you

21   did that would make sure that the pharmacist was

22   answering from their own personal experience, as

23   opposed to information that they may have gotten

24   from somebody else?    **Sparr, Harold (12/7/04)**          **Page 160**

161

1    A.  I didn't go to each one of their houses to

2    see if they filled it out without asking anybody

3    else.  I assumed they did it by themselves.  It's

4    really not a very tough questionnaire.

5        Q.  The next thing in that paragraph is about

6    protecting against the relative susceptibility of

7    the faulty memory.  Now, what, if anything, did you

8    do to guard against susceptibility of faulty memory?

9        A.  If they couldn't remember, they couldn't

10   fill it out.

11       Q.  Is there any other aspect of memory, I

12   think we talked about this before, about people who

13   have memories that, in fact, don't correspond to the

14   actual fact, is there anything you did to try and

15   find out if any of the respondents to this survey

16   had a flaw in their memory or were incorrect?

17       A.  No.

18       Q.  Why don't you tell me everything you can

19   tell me about the universe that you defined as

20   listed on there, on Mr. Levine's letter to you and

21   request, there is importance to have a properly

22   defined universe, and is there anything about the

23   universe that you wanted to define for me that you

24   haven't told me before?    **Sparr, Harold (12/7/04)**                    **Page 161**

162

1    A.  Well, in my travels for the National

2  Association of Boards of Pharmacy I have spoken to

3  pharmacists from East Coast to West Coast, from

4  north to south, and it all comes out the same.

5    Q.  Do you understand what Mr. Levine was

6  talking about in this letter of May 5th when he

7  talked about, "a properly defined universe"?  Well,

8  let me ask a different question, what do you

9  understand by the term, "a properly defined

10  universe"?

11    A.  I take it to understand that within the

12  confines of the United States the practice of

13  pharmacy was the same in all 48 states.

14    Q.  And that is your assumption; is that

15  correct?

16    A.  That's correct, that's my opinion.

17    Q.  Now, a representative sampling of that

18  universe, is there anything about the reasons why

19  you chose the sample that you did that you want to

20  tell me besides what you've said?  I mean, what

21  you've told me so far, to sum it up --

22    A.  No.

23    Q.  To sum it up to be clear, though, we're on

24  the right same page, you thought that the peak **(12/7/04)**                    **Page 162**

163

1  period was, approximately, 1965 in terms of use of

2  the drug, and that you chose '63 to '67 to try and

3  go around that perception of peak use, and that's

4  what you did; is there anything else you want to

5  tell me about sampling besides that?

6      A.  No.

7      Q.  Now, were any of the people who appeared

8  on this list of 370 or so, were any of those people

9  who you had previously spoken to and gotten a

10  statement from?

11      A.  I don't know, because I didn't see the

12  labels.  I didn't see who it was until after they

13  returned them.

14      Q.  Okay.  So do I take it, then, that you

15  never saw the list of 370 people who were mailed

16  this?

17      A.  That's correct.

18      Q.  I was going to ask, because I believe on

19  your report it says something about the list

20  attached, and I don't see a list within your report,

21  Exhibit 1 to this deposition, which tells me the 370

22  people who got this?

23      A.  No, these are the people that replied.

24      Q.  Do you have the list of the 370 people who/**7/04**)        **Page 163**

165

1  Complete Story; what, if any, other investigation

2  did you do about DES?

3      A.  I read a lot of information about DES on

4  the Internet; you just have to put in

5  diethylstilbestrol.

6      Q.  What, if anything, did you do to find out

7  what indications DES was prescribed for between 1955

8  and 1971?

9      A.  I had a copy of the PDR.

10     Q.  And what copy of the PDR did you have?

11     A.  '69.

12     Q.  Are there any other PDRs that you made

13  reference to besides the 1969 PDR?

14     A.  No.

15     Q.  Are you aware of something called the

16  National Disease and Therapeutic Index?

17     A.  I've heard of it.

18     Q.  And is that a survey that is done?

19     A.  I believe it is.

20     Q.  And do you know if that is something that

21  allows you to figure out what particular medications

22  have been prescribed for?

23     A.  Not to my knowledge.

24     Q.  Have you ever used the National **rold (12/7/04)**        **Page 165**

166

1  Therapeutic Index?

2     A.  No.

3     Q.  Were you aware of DES being prescribed for

4  the suppression of lactation?

5     A.  Yes.

6     Q.  And were you aware of it being prescribed

7  for postpartum observation?

8        MR. LEVINE:  What's postpartum

9  observation?

10    A.  Postpartum observation?

11       MR. LEVINE:  Observation?

12    Q.  That's what I'm reading, postpartum

13  observation.  How about for malignant neoplasms;

14  were you aware it was used for that?

15    A.  I know it was used for prostate cancer.

16    Q.  And do you know if it was used for breast

17  cancer in women?

18    A.  Yes

19    Q.  And do you know if it was used for any

20  kind of bone cancers?

21    A.  No.

22    Q.  You don't know one way or the other about

23  that; is that right?

24    A.  I don't know if it was used for bone **old (12/7/04)**          **Page 166**

167

1  cancer.

2    Q.  Do you know if it was used for menopausal

3  symptoms?

4    A.  Yes.

5    Q.  Do you know if it was used for trying to

6  correct hemorrhages?

7    A.  I believe it was.

8    Q.  Do you know what dosages of DES were

9  prescribed for the various things I've just

10  mentioned?

11        (Witness perused documents.)

12        MR. DILLON:  While Mr. Sparr is

13  reading let the record show that he has turned to

14  one of the exhibits to his statement that he's

15  reading, I take it, excerpts from the 1969 PDR.

16    A.  I know it was used for senile vaginitis.

17  I know that it was used for engorgement, and for

18  controlling uterine bleeding, prostate and breast

19  cancer.

20    Q.  And do you know what dosages were used for

21  those indications that you just mentioned?

22    A.  Menopausal symptoms was 0.2 milligrams to

23  0.5 milligrams daily, and can be increased as

24  needed.  Senile vaginitis was 0.5 milligrams daily,/7/04)        **Page 167**

168

1   Painful engorgement of the breast postpartum was

2   5 milligrams, one to three times daily, a total of

3   30 milligrams.  And functional uterine bleeding, it

4   was usually 5 milligrams, three to five times a day.

5   Carcinoma of the prostate was 1 to 3 milligrams

6   daily, in advanced cases, the dose may be reduced to

7   an average of 1 milligram daily.  Cancer of the

8   breast was 15 milligrams --

9          MR. LEVINE:  You're reading the

10   manufacturer's recommendations.

11          THE WITNESS:  Correct.

12          MR. LEVINE:  He asked you what was

13   used by doctors.

14      Q.  I was about to ask you, but I wanted you

15   to carry on for a bit, what are you reading in order

16   to get the indication that you just read?

17      A.  PDR.

18      Q.  You were reading the PDR?

19      A.  Yes.

20      Q.  And what part of the PDR are you reading?

21   Are you reading Lilly's entry in the PDR?

22      A.  Yes.

23      Q.  Have you compared that to any other

24   company's entry in the PDR in any year?**rold (12/7/04)**          **Page 168**

169

1    A.  No.

2    Q.  Do you have any idea how much of the DES

3  that was sold was used for, to suppress lactation?

4    A.  No.

5    Q.  If I told you that in 1961 63 percent of

6  the DES sold was used to suppress lactation, would

7  that surprise you?

8    A.  Yes.

9    Q.  And why would it surprise you?

10    A.  Because we used a lot of the 5 and

11  25-milligram tablets in the store for problem

12  pregnancies.

13    Q.  Now, you used a lot of those things, and

14  how do you know they were for problem pregnancies?

15    A.  Well, they were coming from the Boston

16  Lying Inn maternity clinic.

17    Q.  So some of those could have been for

18  suppressing lactation; isn't that right?

19    A.  Could have been.

20      MR. LEVINE:  That's administered in

21  the hospital.  You get that the day after in the

22  hospital; you don't go out to the store.

23      MR. DILLON:  Mr. Levine, I'm sure that

24  Mr. Sparr, who is supposed to be the expert here, **2/7/04)**      **Page 169**

170

1  can tell us all these things.

2     Q.  But have you made any effort to find out

3  the various uses of DES and their percentage use; in

4  other words --

5     A.  No.

6     Q.  -- how much of it was used for suppressing

7  of lactation, how much for carcinoma?

8     A.  No.

9     Q.  If it is true that it has purposes beyond

10  the use in accidents of pregnancy, isn't it clear

11  that just knowing that a drugstore had DES in the

12  store wouldn't tell you necessarily about DES that

13  was used in accidents of pregnancy?

14     A.  But I knew people coming into the store,

15  patients coming into the store from the Boston Lying

16  Inn maternity department were taking it for problem

17  pregnancies.  I have friends that have taken it.

18     Q.  I'm sure that you do have all that

19  information, but now we're talking about the

20  statements that you've got and the survey and the

21  broad opinions that you're giving, which are broader

22  than the Sparr Drugstore.  So for that, isn't it

23  clear, sir, that establishing, by whatever quality

24  of memory there is, that a drugstore had DES in it/7/04)          **Page 170**

171

1  in the 1950s and 1960s, doesn't correspond to DES

2  being used for the treatment of accidents of

3  pregnancy?

4      A.  Well, in my opinion, I feel that most of

5  it that was prescribed was for accidents of

6  pregnancy, pregnancy accidents.

7      Q.  So that's what you feel based on your

8  experience at the Sparr Drugstore?

9      A.  That's correct, and Robert's Pharmacy, and

10  conversations with other pharmacists.

11     Q.  And Robert's Pharmacy.  Now, early on in

12  this deposition I think you told me that a

13  pharmacist wouldn't necessarily know the indication

14  for which a drug was being prescribed; isn't that

15  right?

16     A.  I don't believe I told you that.

17     Q.  Well, I thought that you agreed with me

18  when I told you that when a pharmacist would receive

19  a prescription, and it would have a drug and a

20  dosage strength on it, and that was to be filled

21  without necessarily there being any indication of

22  why the drug was prescribed?

23     A.  That's correct.

24     Q.  So, is it still true, then, that a    **Harold (12/7/04)**                    **Page 171**

172

1  pharmacist wouldn't necessarily know the purpose for

2  which the drug was being prescribed by a doctor?

3      A.  But we know through experience that it was

4  being prescribed for problem pregnancies.

5      Q.  Mr. Sparr, I understand that you believe

6  that you know that from your experience at the Sparr

7  Drugstore --

8      A.  And other pharmacists that I've spoken to.

9          MR. LEVINE:  Anybody who has a woman

10  with a big belly knows what's going on.

11     Q.  Mr. Sparr, what, if any, steps did you

12  take to satisfy yourself that the people who

13  responded to the inquiries you make to individual

14  pharmacists at the behest of Mr. Levine and those

15  people who respond to the questionnaire that you

16  sent out, what steps did you take to find out if

17  they dispensed DES for use in accidents of

18  pregnancy, as opposed to some other indication?

19     A.  Because the questionnaire, I believe,

20  says, No. 8, "Was the pregnancy size 5-milligram or

21  25-milligram diethylstilbestrol stocked and

22  dispensed at the store in the '60s?"

23     Q.  So you've asked on the questionnaire,

24  which is Exhibit 1 to your statement, about the **(12/7/04)**        **Page 172**

173

1  pregnancy size 5-milligram or 25-milligram; isn't

2  that correct?

3      A.  Correct.

4      Q.  Now, isn't it clear to you just from what

5  you were looking at that DES had, in those dosages

6  had other uses besides pregnancy use?

7      A.  Yes, but I never saw them.

8      Q.  Okay.  Whether you saw them or not, the

9  fact that they had other uses may, in fact, mean

10  that a pharmacist who received your survey or who

11  responded to your inquiries about 5-milligram DES

12  could certainly say yes to this and have never

13  dispensed a prescription that dealt with accidental

14  pregnancy; isn't that logically possible?

15      A.  It's possible; not probable.

16      Q.  And it's not probable because your

17  experience at the Sparr Drugstore in your view is

18  the same as the experience everybody has had

19  forever; is that right?

20      A.  Yes.

21      Q.  Now, what, if any, indications were there

22  for the 25-milligram DES; do you know?

23      A.  That was used in problem pregnancies.

24      Q.  Are there any other indications that you (12/7/04)            **Page 173**

174

1  know of?

2      A.  No.

3      Q.  Have you made any investigation to find

4  out whether or not there were any other indications?

5      A.  No.

6      Q.  Do you agree with me that question 8 on

7  your survey does not tell you if any of the DES that

8  was in the stores for the pharmacists who were

9  responding was used for the treatment of accidental

10  pregnancy?

11      A.  It says, "Was the pregnancy size

12  diethylstilbestrol stocked and dispensed at the

13  store in the 1960s," where it's specific about

14  pregnancy.

15      Q.  You're specific about the sizes of

16  5-milligram and 25-milligram?

17      A.  Correct, for pregnancy.

18      Q.  But do you agree with me that that does

19  not rule out those pharmacies that may have had one

20  or other of those dosages --

21      A.  There may be a few prescriptions that

22  filtered through for other purposes.

23      Q.  Do you consider yourself to be an expert,

24  Mr. Sparr --              **Sparr, Harold (12/7/04)**              **Page 174**

213

1    Q.  So how does that 110, Mr. Sparr, relate to

2  the 91 in the box above it and the 146 in the box

3  above that?

4    A.  You'd have to ask Doctor Vanderschmidt.

5    Q.  And as far as, it doesn't make any

6  difference as far as your opinion goes; is that

7  right?

8    A.  No.

9    Q.  Before I ask the next question, let me go

10  back to question No. 9 on your survey, "if a

11  customer's," customer's possessive, "prescription

12  read DES stilbestrol or diethylstilbestrol in

13  pregnancy sizes 5-milligram or 25-milligram, but no

14  brand name was indicated, what brand would have been

15  primarily dispensed"; do you see that?

16    A.  Yes.

17    Q.  So do I understand that you were ruling

18  out any case where any prescription specified a

19  brand?

20    A.  They may have carried Squibb or Upjohn,

21  those are the other two responses that we got.  And

22  unless they specified Squibb or Upjohn, they would

23  have gotten Lilly.

24    Q.  Unless they specified, they would have **(12/7/04)**                **Page 213**

214

1  gotten whatever they had in the store; isn't that

2  right?

3      A.  They would have all three in the store.

4      Q.  But you aim your survey to preclude any

5  sales of DES that had to do with a specified

6  prescription naming a brand name; is that right?

7      A.  Repeat that.

8      Q.  You aimed your survey to preclude, not

9  include, any prescription for DES that specified a

10  brand name; isn't that right?

11      A.  No, they were allowed to give any brand

12  they wanted to.

13      Q.  Take a look at question No. 9, Mr. Sparr.

14      A.  Yes.

15      Q.  You asked there only for information about

16  unspecified prescriptions; isn't that right?

17      A.  Yes.

18      Q.  So your survey, then, would not catch

19  information that dealt with specified prescriptions;

20  isn't that right?

21      A.  That's correct.

22      Q.  So if they answer the question correctly,

23  they wouldn't give you any information about

24  dispensing DES on a prescription that's specified a/7/04)          **Page 214**

215

1  brand name; isn't that right?

2      A.  That's right.

3      Q.  Now, do you have any idea over the whole

4  spectrum of Massachusetts over the spectrum of years

5  between 1955 and 1971 how many of the prescriptions

6  were specified, that is, naming a manufacturer, as

7  opposed to unspecified?

8      A.  Very small amount.

9      Q.  The unspecified was very small?

10     A.  Yes.

11         MR. LEVINE:  Do you mean specified?

12     A.  No, the specified was very small, excuse

13  me.

14     Q.  And, Mr. Sparr, I have to ask you, how do

15  you know that; what is the basis for your view?

16         MR. LEVINE:  From his experience.

17     A.  From my experience working in the store.

18     Q.  Okay.  So your experience seeing

19  prescriptions --

20     A.  And speaking to other people.

21     Q.  So your experience at the Sparr Drugstore

22  was that very few prescriptions were specified; is

23  that right?

24     A.  That's correct.    **Sparr, Harold (12/7/04)**              **Page 215**

221

1    Q.  Yes, Bruce Baker, on page 10.

2    A.  Page 10?

3    Q.  Yes.

4    A.  Okay.

5    Q.  So did that signal to you that Mr. Baker

6  was perhaps uncertain of his, the breadth of his

7  memory?

8    A.  No.

9    Q.  So you took that as an absolutely it's

10  Lilly, and the fact that he said all those things

11  about so long ago and nothing else or you don't

12  recall as insignificant?

13    A.  Right.

14    Q.  And Mr. Bolero right below that, I believe

15  he's one of the ones who identified Lilly?

16    A.  Yes.

17    Q.  And he says, "It's as best as I can

18  remember"?

19    A.  Yes.

20    Q.  Did that make you wonder whether he had

21  good information or whether he --

22    A.  No.

23    Q.  You just counted it as solid; correct?

24    A.  Correct.          **Sparr, Harold (12/7/04)**          **Page 221**

222

1    Q.  On that same page, just above that on the

2  same page, Sheila Goldman?

3    A.  Yes.

4    Q.  She was a co-op student in 1965, what did

5  that mean to you?

6    A.  That she was at Northeastern, and she was

7  a co-op student working in the drugstore.

8    Q.  And do you think that her information

9  about the dispensing practices at the pharmacy is as

10  good as anybody else's information?

11    A.  Yes.

12    Q.  So that just counts total for you; is that

13  right, counts 100 percent?

14    A.  Yes.

15    Q.  On the next page, page 11, just go through

16  a couple of these, Mr. Federly, he's about 15 or 12

17  names up from the bottom, he says, "In the 7 years I

18  had the pharmacy I don't believe I dispensed more

19  than three to four prescriptions."

20    A.  Um-hmm.

21    Q.  Did that make you wonder if his experience

22  about dispensing DES matched your expectations of

23  what expectation that the Massachusetts experience

24  matched yours?                **Sparr, Harold (12/7/04)**          **Page 222**

223

1    A.  He may not have been in an area where

2  there is an obstetrician's office.

3    Q.  And for all we know, he may not have

4  carried these brands of DES, these dosages of DES;

5  isn't that right?

6    A.  Did he say he did?

7    Q.  I don't know.  You're right, there was a

8  question about that, and I don't want to fight about

9  it, I'm too tired.  The next page, page 13,

10  Mr. Bagley, said he believes that we stocked only

11  Lilly's, but I could be mistaken; does that make you

12  wonder whether you should do some effort to find out

13  if there was some way to corroborate Mr. Bagley's

14  memory?

15    A.  No.

16    Q.  Well, if he thought his memory might be

17  mistaken --

18        MR. LEVINE:  I think you're arguing

19  with the witness.

20        MR. DILLON:  I'm not arguing.

21        MR. LEVINE:  And the criteria and the

22  evaluations was done by a statistician, not him.

23    Q.  Let's go to the evaluation done by the

24  statistician, shall we, and this will be the last **d (12/7/04)**          **Page 223**