**EXHIBIT 5**

# HAROLD B. SPARR, R.PH., D.PH., M.S.
### 210 NAHANTON STREET, UNIT 121
### NEWTON, MA 02459
### TELEPHONE: (617)969-5322

October 12, 2004

Aaron M. Levine, Esq.
Aaron M. Levine & Associates
1320 19th Street, N.W., 5th Floor
Washington, DC 20036

Dear Mr. Levine:

In accordance with your request of May 4, 2004, I have embarked upon a study, over the last four months, to determine the extent of the share of the pregnancy size ($5_{mg}$ & $25_{mg}$) DES Market (Stilbestrol - - Diethylstilbestrol) dispensed in the drug stores, in the Commonwealth of Massachusetts, for the 16 year period centered in 1965, i.e., 1955 to 1971. The six research areas which provide the basis of my opinion are:

1. My personal experience as a retail practicing pharmacist dispensing DES and teacher of pharmacy in Massachusetts over the last forty-nine years, including my experience as president of the Massachusetts Board of Registration in Pharmacy and my presidency of the Massachusetts College of Pharmacy Alumni Association.

2. Personal conversations, research and investigations, wherein I have contacted hundreds of Massachusetts pharmacists who were practicing retail pharmacy during the period of time under investigation.

3. A review of approximately 200 sworn, randomly collected Statements obtained by your office and by me over the last few years, of the recollection of over 200 retail Massachusetts pharmacists who were practicing in the period under review, including the deposition testimony and sworn statements of a wholesale pharmacist and discussions with wholesalers, as well as the dozens of actual prescriptions for DES we were able to find.

4. A literature search of the pertinent pharmacy and retail pharmaceutical literature covering the period under examination; and



Aaron M. Levine, Esq.
Page Two
October 12, 2004

5. A study employing standard survey and accepted academic bio-statistical analysis conforming to proper questionnaire, reporting and analysis practices, with the assistance of professional survey personnel.

6. A review of the Massachusetts retail drug store practices and DES marketing environment over the period 1954 to 1971, to determine year to year consistency, in order to determine if the practices were stable during the period under review, statewide, including:

   a. Economic factors;
   b. Social and cultural factors;
   c. Competitive factors;
   d. Technological change;
   e. Government and legal factors;
   f. Communication within the retail pharmacy industry;
   g. Disease incidences;
   h. Distribution of goods and services;
   i. Demographic factors;
   j. Physician prescribing habits;
   k. Wholesaler and manufacturer services, distribution, support and literature;
   l. Pharmacist education;
   m. Packaging and delivery of pharmaceuticals;
   n. Year to year innovation;
   o. Medical indications;
   p. Marketing and sales practice and demand;
   q. Deletion and addition to drug popularity;
   r. Product life cycle and shelf life;
   s. Prescriber motivation and prescribing habits;
   t. New drug promotion – old drug withdrawal;
   u. Sources of information to the retail pharmacist;
   v. Pharmaceutical product development and popularization;
   w. F.D.A. involvement;
   x. Market characteristics;
   y. Generics v. brand names; and
   z. Stability of the marketplace;

In conducting the survey, I took into consideration the market, product availability, diversification and specialization. I looked at the topics from the standpoint of the manufacturer, the wholesaler and the retailer. I considered competition in the retail pharmaceutical industry,

Aaron M. Levine, Esq.
Page Three
October 12, 2004

price determination, advertising, detailing and other forms of promotion, as well as staffing, acquisition of businesses, brand image, detailing, promotion, regulations, publications, professional standards, attitudes, nature of drug store and retail pharmacy practices, such as independence, traditional goods, sales and discounts, consumer attitudes, competition, promotion and pharmacy ethical and professional responsibilities during the '50s and '60s. I also investigated and researched prescription habits, record keeping, product variation, wholesaler to retailer supply systems, trademark and generic names, hospital verses retail operations, stocking and dispensing practices and sales and sales record keeping.

Virtually the only body of information I did not have access to was the Lilly Digest, which was a compilation published annually by Eli Lilly during that period, which covered such topics as average volume, prescription charges, costs of goods sold, expenses, new prescriptions, refills and advertising at the retail level. I understand this research is included in the Lilly Digest, which the Company has been requested to open but has not seen fit to share with us.

My qualifications for this survey are:

I began my career in retail pharmacy in 1944, as a clerk and stock boy in my father's retail pharmacy, Sparr's Drug Store, Inc., which was across the street from the Boston Lying-In Hospital and adjacent to the Harvard Medical School and the Harvard School of Public Health. As you know, DES was popular in Massachusetts, as the Smith's and other promoters lived there through the Lilly detailmen, Jason Goldsmith and Harry Fine and Louis Bromberg.

From the age of 10 until I was 17, I was a stock boy, pharmacist's assistant and would unpack orders and stock the shelves from the drug wholesalers. In 1951 at the age of 17, I became a pharmacy student at Massachusetts College of Pharmacy and Health Sciences but continued to work in the store 20 or 30 hours a week as I had for the prior seven years. While in pharmacy school, I continued to work at the store part-time as an apprentice pharmacist from the years 1951 to 1955 and thereafter, engaged in the field of pharmacy continuously and exclusively until the present, except for two years of military service as a pharmacist. I hold a Bachelor of Science Degree in Pharmacy from the Massachusetts College of Pharmacy and I am registered in Massachusetts, New York and California. I hold a Masters in Health Care Management from Pacific Western University.

My employment in the field of pharmacy has given me the opportunity to observe the retail stocking of drugs primarily because of the store's proximity to the Boston Lying-In Hospital (where DES prescribing obstetricians were located), and therefore am conversant with the manner and method of prescription of DES in the 1950s and 1960s by those obstetricians in the Boston area who popularized this drug. Boston Lying-In Hospital was the main Obstetrics

Aaron M. Levine, Esq.
Page Four
October 12, 2004

hospital in Boston in the 1950s and 1960s as it was the Harvard teaching hospital where Smith and Smith popularized Stilbestrol for the use in preventing accidents of pregnancy.

During the 1950s and 1960s, I maintained close relationships with Lilly detailmen, and Gilman & McKesson wholesalers and actually and frequently ordered, stocked and dispensed DES. As a practicing pharmacist and active participant in pharmacy affairs, I was conversant with other pharmacists in the Boston area. At this time I had the opportunity to fill prescriptions for Stilbestrol and am familiar with the physician prescribing habits, pharmacy standard of care, usual and routine pharmaceutical brands dispensing and stocking.

**Personal familiarity with DES stocking and Dispensing:**

I am familiar with Diethylstilbestrol, also known as DES and Stilbestrol, as a hormone used in pregnancy. I filled on the average of three or four prescriptions a week for DES starting in the late 1950s, I have seen it on the shelves in many other pharmacies since 1951. I knew it was indicated for prevention of miscarriage, among other uses, and I knew it came in different strengths from .1 mg to 25 mg and in white uncoated tables as well as red-coated pills. Diethylstilbestrol was the only popular oral hormone medication given in the 1950s and 1960s to pregnant women. In the Boston area it was the drug of choice and the standard treatment for pregnant women and the only popular oral medication regularly used for this purpose. I am familiar with the Lilly publication "De Re Medica" that was sent to the physicians of America, which advocates DES as the best medication for avoiding miscarriage. I know that physicians in Massachusetts received this Lilly publication as well as P.D.R. and the other publications.

**The consistency of DES marketing 1955 to 1971:**

I have reviewed the commercial DES literature including PDR, Red Book, Blue Book, manufacturer brochures, and U.S. Pharmacopoeia from the 1950s and 1960s. I have also reviewed Lilly publications in general from the 1950s and 1960s, such as field reference manuals, product labeling, inserts, product brochures, Title and Till and other Lilly publications regarding competitive pharmaceutical manufacturers. I have reviewed a host of literature as set forth in Exhibit 6 and consulted additional texts set forth therein. I was familiar with this material in the 1950s, 1960s and 1970s. From these readings as well as my observations of the practice of pharmacy, I observed the changes occurring in the marketing, ordering, stocking and dispensing of retail pharmaceuticals over the last half century, with special focus on DES. These practices have remained relatively stable during the last 1950s and 1960s. In addition to those text and journals attached as Exhibit 6 and the Lilly publications attached as Exhibits 12, 13, 14 and 16, I have reviewed other documentation concerns with DES marketshare including:

Aaron M. Levine, Esq.
Page Six
October 12, 2004

1)  The Survey is trustworthy and based on a well grounded sampling, considering the passage of time from the event we are considering.

2)  Hearsay and memory risks were satisfactorily minimized.

3)  The numbers of adequate responders was properly surveyed to obtain a representative sample.

4)  The Questionnaire contained clear, precise and non-leading questions which were answered appropriately consistent with the sources of information.

5)  The responders had no knowledge of the litigation nor could they have been influenced or sympathetic to any individual or company.

6)  The mailings, returns and collating were protected, as well as the security and impartiality of the survey.

7)  Statistical analysis was in accordance with accepted and standard epidemiological procedures.

8)  Neither you nor anyone else engaged in such litigation nor any of the claimants have played any role in the design or conduct of this survey nor my conclusions.

**Conclusions:**

Based on my review of the literature, my experience, my discussions with other pharmacists and all the research and the investigation set forth above, it is my opinion to a reasonable degree of pharmaceutical and statistical certainty that Dr. Vanderschmidt's conclusion that Lilly's share of the DES market, in the pregnancy sizes, was 90% is conservative. From my standpoint, I would conclude that the following proportions are a more precise exact and realistic share of the market, as follows:

1.  Lilly – 94%;
2.  Squibb – 2%;
3.  Assuming that the New York and California matrices are correct, Parke Davis, Brewer, Upjohn, Merck, Premo, and the other brands listed on these matrices, comprise the remaining 4% of the market.

Attached as Exhibit 19, is a listing of assorted synthetic estrogens or DES-like drugs on the market in the fifties and sixties. I understand there are some contentions made that DES

Aaron M. Levine, Esq.
Page Seven
October 12, 2004

(Diethylstilbestrol) was not the only or not the most popular synthetic estrogen in use for prevention of the accidents of pregnancy.

In all the research above, the hundreds of pharmacists and doctors with whom this topic has been discussed was never any mention to any of the products listed on exhibit 19, other than DES (Diethylstilbestrol) in the Commonwealth of Massachusetts. I am familiar with DES but experienced that Stilbestrol was the only synthetic estrogen product prescribed or dispensed.

Additionally, I am informed that a contention has been made that there may have been non-Lilly brands of DES which were white and cross-scored. I have reviewed the P.D.R., Red and Blue Books and volumes of photographs of DES products. From my experience, personal familiarity with these products, a review of the literature, I can state with absolute certainty that the only popular DES product which appeared round, white and cross-scored, about the size of an aspirin without any other imprint or logo, as in Exhibit 11, was the Lilly DES $25_{mg}$ product.

I declare, under the penalty of perjury, that the foregoing statement is true and correct, based upon my personal knowledge of the facts set forth.

_10/17/04_
Date

_Harold B. Sparr_
Harold B. Sparr, R.PH., M.S.

WITNESS:

_[signature]_